K832EasC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

EASY SPIRIT, LLC,

                Plaintiff,              New York, N.Y.

            v.                          19 Civ. 3299 (WHP)

SKECHERS U.S.A., INC., et al.,

                Defendants.

------------------------------x         Teleconference

                                        August 3, 2020
                                        11:00 a.m.
Before:

            HON. WILLIAM H. PAULEY III,

                                        District Judge


                        APPEARANCES

PEROFF SAUNDERS, P.C.
     Attorneys for Plaintiff
BY:  DARREN W. SAUNDERS
     MARK I. PEROFF
     JASON H. KASNER


ALSTON & BIRD, LLP
     Attorneys for Defendants
BY:  ROBERT LEE
     ANDREW J. LIGOTTI
     EMILY CHAMBERS WELCH
```

K832EasC

1            THE COURT:  This is a premotion conference.
2            Would counsel for the plaintiff give their appearance?
3            MR. SAUNDERS:  Yes.  Good morning, your Honor.  Darren
4    Saunders for the plaintiffs.  With me on the line is Mark
5    Peroff and Jason Kasner.
6            THE COURT:  All right.  Good morning to all of you.
7            Would counsel for the defendant give their appearance?
8            MR. LEE:  Yes, your Honor.  This is Robert Lee, with
9    Alston & Bird, on behalf the defendant Skechers, and with me
10   are my colleagues Emily Welch and Andrew Ligotti.
11           THE COURT:  All right.  Good morning to you, as well.
12           Now, for the purposes of this conference, please
13   identify yourself each time you speak for my benefit and that
14   of the court reporter.
15           So, Mr. Lee, this is Skechers' proposed motion.  Do
16   you want to be heard?
17           MR. LEE:  Yes, your Honor, we would like to be heard,
18   if I could, sir.
19           THE COURT:  You may proceed.
20           MR. LEE:  Great.  Thank you, sir.
21           As we set forth in our letter, your Honor, we believe
22   that the timing is appropriate, and so there therefore we
23   request leave to file a motion for summary judgment.  We
24   believe that there is nothing --
25           THE COURT:  If I could just interrupt on that point,

K832EasC

1  obviously the plaintiff took some issue with that in their
2  initial letter, and it appears that Mr. Greenberg's deposition
3  may loom large in this action.  Why shouldn't the defendants
4  wait at least until that deposition has been conducted before
5  filing its motion?
6          MR. LEE:  Well, sir, certainly, I think that may be
7  appropriate, your Honor.  His deposition is scheduled for next
8  week.  His deposition is the only open issue remaining from
9  fact discovery.  The parties have exchanged their expert
10 report.  As the court may be aware, there is a pretrial order
11 deadline next month, with a pretrial conference deadline in
12 October, and so we simply wanted to give the court as much
13 notice of our desire to move for summary judgment such that the
14 court could consider our request, have this pre-conference
15 call, and then set a schedule down that gave, hopefully, the
16 court the appropriate time to consider the issue to the raised.
17         So certainly, while we honestly disagree with how
18 relevant his deposition may be, we certainly have no problem
19 whatsoever filing our motion after his deposition so that
20 Easy Spirit could consider any issues that they glean from his
21 deposition and any opposition on whatever briefing schedule
22 your Honor sets to give them adequate time.  We didn't want to
23 wait until after his deposition to raise this request simply
24 because just the inherent delays in the letters and setting the
25 conference, your Honor, and then pushing into September.  We

1   didn't want to otherwise condense any consideration period that
2   the court may be willing to give, and so we thought the timing
3   now was appropriate.  But certainly we could factor in their
4   issues with Mr. Greenberg's deposition to any timing on the
5   briefing schedule.
6              THE COURT:  All right.  You can continue.
7              MR. LEE:  Thank you, your Honor.
8              Again, we think that the factual record will
9   demonstrate that summary adjudication in favor of Skechers is
10  appropriate, your Honor.
11             Given that this is just our request to file a motion,
12  I will hit the high points, your Honor.  I won't go through
13  everything because, of course, that could take a while.
14             But turning, first, your Honor, to their trade dress
15  claims, as your Honor of course is aware, the *Wal-Mart v.*
16  *Samara* case out of the Supreme Court recognized that consumers
17  do not normally look at a product design for it to serve as a
18  source identifier, and so therefore recognized that a plaintiff
19  must prove acquired distinctiveness in any trade dress, your
20  Honor, and that therefore the trade dress has secondary
21  meaning.
22             Here, we believe that the record will show that
23  Easy Spirit does not have any protectable trade dress rights,
24  your Honor, and has not acquired secondary meaning in its
25  alleged trade dress.  Its own witnesses have testified that

there is nothing unique about the various components.  You have honestly, your Honor, a slip-on upper shoe with a midsole and outsole, and there is lots of shoes with slip-on uppers, and Easy Spirit's own witnesses testified that there is nothing unique about the components of the midsole and the outsole.

You have numerous third parties, including Skechers, that have been selling shoes like this for decades, your Honor.  Skechers itself has been selling shoes virtually identical to its accused shoe from the late '90s into the early 2000s, well before Easy Spirit first came on the market.

You have Easy Spirit itself has been aware of numerous third parties selling shoes that it believes has its trade dress elements that it has never taken action against.  So it is not surprising, when Skechers commissioned an expert to conduct a survey on secondary meaning, that Dr. Stec found that there is no evidence whatsoever that Easy Spirit enjoys secondary meaning in its trade dress.  Easy Spirit does not have an expert on this issue and has not offered a rebuttal to Dr. Stec and his report on this issue.

Again, looking at sort of the high-point issues, your Honor, there is no confusion in the record whatsoever as to any confusion between these designs.  And, again, this is an issue that is really simply not, in the design, distinctive or unique to anyone.

Now, in its letter, Easy Spirit sort of wants to

K832EasC

point to this issue of intent being sort of the tail that wags the dog; and, as the court is well aware, the issue of intent is intent to infringe or intent to confuse, not simply intent to copy. Now here, your Honor, we are not even admitting -- we believe the record will show that we did not intend to copy and did not copy their design. We certainly did not intend to infringe.

Looking at some of the points they raise on this issue, they point to one of Sketchers' lead designers on this issue who looked at an Easy Spirit shoe to use it as a guide for the measurements of one component, the midsole, the relative widths and heights of that midsole component. That's not a factor -- that's not an element of their trade dress, your Honor.

But, more importantly, the exhibit --

THE COURT: Let me ask you this: Could that specific examination of the plaintiff's shoe be evidence of bad faith?

MR. LEE: No, your Honor, we don't believe so, because the record shows and even the exhibits they cite the letter show that the designer had already come up with his design. The design was set in design documents, the design of the upper, design of the midsole, design of the outsole. The design had been already set, your Honor. And the shoe we produced mirrored that design.

He simply, when he was asking the factory in China to

1  make him a sample, they start with a blueprint, of course, and
2  he didn't have handy any way to measure how big that foam mid
3  piece he wanted, how tall and how wide.  He happened to have
4  available to him one of their slip-on shoes, so he said, hey,
5  take this shoe, measure that foam midsole, how wide and how
6  high it is, and that's what I want you to plug into this
7  blueprint.
8          So the design, your Honor, again, had been set.  His
9  design documents were in the record well before that.  And he
10 testified where he got that design from, and it was off his
11 historical experience designing nearly identical shoes for
12 decades.  So the design had been set even before this sample
13 was sent to China, and the sample did not affect, your Honor,
14 or influence at all the design itself.
15         Now, in their letter, they also talk about some of the
16 different color patterns and uppers, your Honor, and their
17 complaint really goes to the fact that both parties sell shoes
18 of similar colors, both parties have animal patterns, even
19 thought they might be different animal prints, both parties
20 have tropical patterns.  Each company has sold dozens of
21 different styles, your Honor, different colors and patterns and
22 the like, and they are complaining about that, your Honor, but
23 what they are complaining about are really just common
24 elements -- colors, patterns -- in any shoes.
25         Notably, your Honor, though, questions of color and

the patterns themselves are not part of their trade dress.
They have never asserted it to be a component of their trade
dress.  They never pointed to color or pattern to be
protectable.  And, in fact, your Honor, they have done the
exact opposite.  We asked them -- after they started asking one
of our witnesses about color patterns, when we served our Rule
30(b)(6) deposition notice, we asked them to put up a witness
to talk about any proprietary rights they may own in colors or
patterns, and they said they objected to that request on the
grounds of relevance, saying they didn't have a witness and
there was no one at Easy Spirit that knew anything about that.
So they can't now claim rights in colors and patterns to try to
avoid summary judgment.

And, again, looking at the facts, your Honor, they
have deposed the designer at Skechers who picks the color
patterns and picks the fabric patterns, and she testified she
had no experience with and no knowledge of Easy Spirit or its
shoes when it developed the pattern -- when she developed the
colors and patterns that she did, and the record shows that,
your Honor.

Now, looking again to the trademark, your Honor, we
have the same issue.  There is no evidence whatsoever of
confusion in the record.  In this day and age with social media
and Yelp reviews and the like and people putting all of their
opinions all online, if someone was confused, I think the

K832EasC

parties would know it, your Honor, and there is no evidence whatsoever of confusion. Again, we had a survey expert who did a survey who found no likelihood of confusion, your Honor, and they do not have a survey and have not offered a rebuttal to Dr. Stec.

Now, I am not going to go through all of the *Polaroid* factors, your Honor.

THE COURT: I don't think that's necessary.

MR. LEE: Yes, sir.

You know, here you have a mark that's -- there are different words, your Honor, sights, sounds, while they have a related meaning, your Honor, they are different. And so we believe there is no surprise as to why there is no confusion over the use of the parties' respective marks. You have the Skechers Commute Time or Skechers brand -- its house mark all over everything, your Honor. You have, you know, this idea that somehow consumers are going to look to Skechers when Skechers puts "Skechers" on its shoes and "Skechers" on its box and somehow find confusion, again, your Honor, it is just, we believe, not credible and the record bears that out.

Again, they focus on this issue of intent, your Honor, but, again, if you actually look at the record, there is no evidence of any bad-faith intent to copy. They point to Ms. Hobbs' deposition, and somehow some allegation that she changed her testimony on this issue which creates some disputed

fact. That is simply not true, your Honor. Ms. Hobbs was the Skechers employee that came up with the name "Commute." She testified about the process that she employs when she comes up with new names. Mr. Sanders deposed Ms. Hobbs extensively about this. The process involves making sure that Skechers itself has not used that name in the past five years and then plugging the name into various trademark-related databases to see if there is registrations out there that would be problematic.

He asked her if she employed that -- if she had any examples of employing that process, and who did she -- who would she speak to, did she speak to legal? She gave an example of one mark or one name where she had done this, employed this process, which included reaching out to legal. He asked her if she could remember any other instances, and she said, no, not at this time.

He didn't ask her if she had done it for the Commute mark. He simply asked: Do you recall doing this for any other names? And she said: I can't recall at this time. Well, she did what any witness does, your Honor, she reviewed her deposition, when she was looking to sign her errata, and remembered that she did it for the Commute name. So she changed the errata. We produced that errata back in March. We have also produced documents, your Honor, that corroborate contemporaneously at that time the fact that she had done --

Case 1:19-cv-03299-WHP   Document 48   Filed 08/20/20   Page 11 of 20     11
K832EasC

that she had employed this process for the Commute name.  And they never deposed Ms. Hobbs about this issue.  They raised it during discovery a couple of times, and we said you can depose Ms. Hobbs, and they never did.

So, again, putting aside the fact it doesn't -- it is not evidence of bad faith anything, there is just simply not an issue here, your Honor, on Ms. Hobbs' testimony that would prevent us, we believe, from pursuing summary judgment.

And again --

THE COURT:  All right.

MR. LEE:  -- Mr. Greenberg's deposition is still open, your Honor.  We certainly don't know what they are going to ask him.  To the extent they ask him questions about his knowledge and intent, your Honor, again, his intent to infringe or intent to confuse, not simply intent to copy, and intent, even then, is just one factor of the *Polaroid* factors, your Honor, and intent alone is not dispositive of a likelihood of confusion.  And their cases they cite in their letter on intent simply recognize that, in those cases, intent was one of four or five factors that that particular court considered in denying the request for summary judgment.

THE COURT:  All right.

MR. LEE:  With that --

THE COURT:  All right.

MR. LEE:  -- I will conclude your, Honor, unless you

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

1    have any questions.

2             THE COURT:  No.  Thank you, Mr. Lee.

3             Mr. Saunders, do you want to be heard?

4             MR. SAUNDERS:  Yes, your Honor.  Thank you.

5             First I will try and take counsel's comments in order,

6    your Honor, so we will start with the trade dress.

7             We do believe and the case law and Second Circuit law

8    is very clear that intent can be a pivotal factor in the

9    Polaroid analysis.  If you are targeting one's trade dress,

10   one's trademark, and you come as close as possible and you

11   copy, what other reason would you be doing it for except to

12   capitalize on good will and blur the distinction between the

13   parties' intellectual property rights.

14            And I hear something interesting. Counsel said, well,

15   there is nothing particularly unusual or distinctive about the

16   outsole-midsole design of the Easy Spirit Traveltime shoe.  And

17   if that were the case, and you take Skechers, which is a

18   company that has sold so many different styles of shoes, why

19   would they need to copy?  Why would they need to copy the exact

20   dimensions, not even approximate, but the exact dimensions of

21   the midsole/outsole?  Why?

22            And your Honor asked a good question.  Is this

23   evidence of bad faith?  And we suggest strongly that of course

24   it is.  Why would Skechers otherwise have any incentive or need

25   to copy the precise dimensions?  And they sent only one shoe to

1    the factory, your Honor.  They didn't pick a bunch of
2    competitive shoes and say, we like these from these companies.
3    There are, of course, other third-party companies that make
4    comfort shoes.  They only picked the Easy Spirit Traveltime,
5    and they sent that shoe with very express, explicit directions
6    to the factory:  Make it exact.
7             And, on top of that, as we outlined in our letter,
8    when the prototype came back, your Honor, there are other
9    documents created by this designer at Skechers in which -- and
10   he testified to this as well -- he carefully checked every
11   dimension of the prototype, and they are, again, reflected in
12   a document, to absolutely ensure that the dimensions were
13   exactly the same as the Traveltime shoe.
14            Now, further, when we go to the upper -- so that takes
15   care of the lower part of the shoe, your Honor, the midsole,
16   and the outsole.
17            Then when you go to the upper, we requested documents,
18   of course, from Skechers that concern the design of the uppers
19   that they utilized and that they copied to complete the shoe.
20   And we kept hearing, oh, this is an old design from ten years
21   ago, 14 years ago, however many years ago, but they produced no
22   documents to back that up.  We don't have a single document
23   that says, oh, here's how the Skechers upper was designed.
24            And, once again, if you look at the two shoes, we can
25   go right back to the complaint, if you look at the uppers, they

are virtually indistinguishable.  Of course you can point to some minor differences, but the courts have held there is a *Victorinox* case in the, I believe, Second Circuit -- I know it is Southern District -- where you make minor modifications to your trade dress and then you say, oh, this is different and the corner is rounder and this has two dots and this has four.  But that's not what consumers recognize and perceive.  They don't look to such fine detail.  They look at the overall commercial impression of the trade dress.

And, finally, with respect to trade dress and intent, Skechers produced documents of -- showing many, many, many different styles of slip-on clog-type shoes, the shoes that are involved here, that they have sold over the years going back quite some time.  So, again, it begs the question, your Honor, well, if you are able to sell all of these other styles of the same type of shoe for the same purpose, then why would you need to copy, right down to the finest detail, the Traveltime shoe?  So that's the trade dress.  We believe there is intent and certainly protectable trade dress rights in this extensively sold number one brand.  We -- I don't want to repeat everything in the letter, but the Traveltime has been the number one selling line of shoe for Easy Spirit since it was introduced in 2004-2005.

Now going to the trademark, your Honor, again, when you go to the issue of intent, it is certainly paramount.  It

K832EasC

1    is not the only issue.  We have outlined other bases for why I
2    believe the Polaroid analysis absolutely favors a finding of a
3    likelihood of confusion.  And certainly, of all the names that
4    were available -- so they take the copied shoe and then, of all
5    the names available to you, there is an infinite number of
6    names available, why do you pick the first one that had the
7    same connotation?  Clearly, as we have said in the complaint
8    and elsewhere, the word "commute" means to travel, travel back
9    and forth.
10             Professor McCarthy has an extensive list of trademarks
11   in his treatise.  I believe we cited a section in our letter.
12   he has a list of marks that are not the same.  Just as here,
13   they are not the same, but the courts found them confusingly
14   similar anyway because they conveyed the same impression to the
15   buyer.  And that is what we have here.  And again, it is just
16   the combination, your Honor.
17             Another issue I want to address was counsel's comments
18   about claiming proprietary rights in colors and patterns, and I
19   just want to clarify something, because he is absolutely right,
20   we do not, we do not claim proprietary rights in and of
21   themselves to a particular color.  Of course not.  You can't.
22   Or even to a particular flamingo design or palm tree design.
23   But what counsel is missing -- and this is important -- is that
24   that is further evidence of intent, and there is case law on
25   this.  McCarthy speaks to it as well.  When you have an example

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

of trademark infringement and, in addition, you copy even nonprotectable elements of the competitor's packaging or trade dress, that goes to intent, your Honor.  That weighs in favor of the plaintiff in terms of further evidence of intent to copy and to come as close as possible and to misappropriate good will and to cause confusion, so I do want to clarify that point.

And, finally, we heard about Ms. Hobbs and her first not seeking legal input and then later changing her testimony. And to be clear, I went through -- first of all, let me back up.  Ms. Hobbs is not a lawyer.  She is a product manager type person who oversees the day-to-day production of the Commute Time shoe, and she testified very clearly that she alone selects the names, that she goes through a trademark database -- I believe the PTO database -- and she herself checks to see if it's registered and checks to see -- and if it is registered, checks to see if it is for the same or similar product.  She gave an example of a baby stroller, that that wouldn't be a problem, and she alone makes that determination. We went through this procedure very carefully, and her testimony was very clear.

And then I did ask her, I think this question is very clear, your Honor, "And other than that, do you involve any other departments such as legal?"  and she gave one example, like I said -- like we said in our letter, and then I asked

K832EasC

1  her, "Besides that, can you think of any other names that you
2  have run by legal before adopting them as a style name?"  And
3  even though this entire case and the reason why she is sitting
4  there for a full day is to address the Commute and Commute Time
5  marks, her answer was, "No, not at this time," she could not
6  recall any other examples, and that's what we were talking
7  about, "Commute."
8           And then I asked her, "Do you need to get anyone
9  else's approval before you go ahead and actually implement the
10 name?"  And her response, "I can usually just go ahead and
11 implement that name."
12          So she was deposed thoroughly on this.  And,
13 certainly, if she had even intimated that she did go to legal,
14 which clearly she didn't, then there would be no reason for her
15 to submit an errata sheet.  She changed her testimony 180
16 percent.
17          Now, we don't know why, we don't know what happened.
18 We don't know if she suddenly discovered that on her own or
19 maybe if she had some help discovering that.  We don't know.
20 But we also know that, after that Commute Time name was
21 selected, that wasn't good enough for Skechers.  And
22 apparently we will find out next week, your Honor, but from
23 everything that we know right now, the CEO of this huge company
24 instructed, no, I want it to be Commute Time, not Commute.
25          And then you take all of this and you put it together

K832EasC

logically and then you say -- and you step back, and Skechers said, oh, we didn't have any intent to confuse, but we just wanted to come as close, as close, as close as possible. Well, that's where we are now.

I don't think I need to cover the timing, your Honor. I think we have addressed that perhaps the timing is a bit premature. But we are certainly amenable to proceed however the court thinks is best and recommends and orders.

And other than that, if your Honor has any questions, I think I have covered everything or almost everything.

THE COURT: All right. Well, look, I am inclined to think, after reviewing the letters and hearing your arguments this morning, that the motion for summary judgment should be teed up. I think the timing issue can easily be addressed, given that the only remaining discovery is the deposition of Mr. Greenberg, which is scheduled for next week.

So I am prepared to fix a motion schedule for the defendants' motion.

Mr. Lee, when would you like to file your motion following the completion of Mr. Greenberg's deposition?

MR. LEE: Thank you, your Honor.

Yes, his deposition is set towards the end of next week, so I believe we can be able to file the following week, your Honor, that is the week of the 16th, any time thereafter. That would accommodate, again, Mr. Greenberg's -- the

|   |   |
|---|---|
| 1 | scheduling of Mr. Greenberg's and, therefore, that just being |
| 2 | all done.  So any time I believe starting the week of -- I |
| 3 | guess the Monday is the 17th, your Honor, it can be prepared |
| 4 | that week or thereafter. |
| 5 |         THE COURT:  So why don't you file your motion on |
| 6 | August 20. |
| 7 |         MR. LEE:  Yes, your Honor, August 20. |
| 8 |         THE COURT:  And, Mr. Saunders, how much time would you |
| 9 | like to oppose the motion? |
| 10 |         MR. SAUNDERS:  We would respectfully ask for four |
| 11 | weeks, your Honor. |
| 12 |         THE COURT:  All right, September 17. |
| 13 |         And a week for reply, Mr. Lee -- |
| 14 |         MR. LEE:  Yes, sir.  We could doing that in a week. |
| 15 |         THE COURT:  -- the 24th? |
| 16 |         All right.  And I think I will take a look at those |
| 17 | papers and I will set this down for oral argument.  I'm going |
| 18 | to set it down for October 13 at 11:00, and that will be by |
| 19 | telephone.  Is that time and day convenient for counsel? |
| 20 |         MR. LEE:  This is Mr. Lee.  It is for Skechers, your |
| 21 | Honor. |
| 22 |         MR. SAUNDERS:  Yes, same here.  This is Darren |
| 23 | Saunders.  Same here for Easy Spirit. |
| 24 |         THE COURT:  All right.  I will enter a scheduling |
| 25 | order to that effect. |

1              Have a good afternoon and stay safe, everyone.
2              MR. SAUNDERS:  Thank you, your Honor, and the same to
3    you.  Thank you.
4              MR. LEE:  Thank you, your Honor.
5              THE COURT:  Thank you.
6                                 oOo