## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

EASY SPIRIT, LLC,

                          Plaintiff,

v.                                              Case No. 1:19-cv-03299-WHP

SKECHERS U.S.A., INC. and
SKECHERS U.S.A., INC. II,                       PUBLIC VERSION - REDACTED

                          Defendants.

## DEFENDANTS SKECHERS U.S.A., INC. AND SKECHERS U.S.A., INC. II'S REPLY TO PLAINTIFF EASY SPIRIT, LLC'S COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 56.1, Defendants Skechers U.S.A., Inc. and Skechers U.S.A., Inc. II (collectively "Skechers" or "Defendants"), by and through their undersigned counsel, respectfully submit this Reply to Plaintiff Easy Spirit, LLC's ("Plaintiff" or "Easy Spirit") Counterstatement of Material Facts.

### SKECHERS' REPLY TO EASY SPIRIT'S STATEMENT OF ADDITIONAL FACTS

291.    Easy Spirit designs and sells women's comfort footwear. (Ex. 2, DeZao Decl. ¶ 3.)

**SKECHERS' RESPONSE:** Undisputed.


292.    Founded in 1987, Easy Spirit has developed a reputation in the footwear industry and among consumers as a seller of ultra-comfortable quality footwear for life's everyday activities, including work, leisure and staying active. (Ex. 2, DeZao Decl. ¶ 3.)

**SKECHERS' RESPONSE:** Disputed. Easy Spirit's Complaint states the shoe brand originated in 1985 (D.I. 1 (Complaint) at ¶ 8). Skechers objects to the remaining contentions. Easy Spirit has not produced anything other than a declaration from its VP of Product Development and Design, Mark DeZao, to support the contention that the company has such a reputation. Without any other admissible evidence, this claim is speculative. Fed. R. Evid. 602. Mr. DeZao is testifying to Easy Spirit's reputation in the community without explaining or identifying the basis for his testimony. *Id.*

293.    In or around 2004, Easy Spirit introduced the TRAVELTIME shoe. (Ex. 2, DeZao Decl. ¶ 4.)

**SKECHERS' RESPONSE:** Undisputed.

294.    By 2006, it became the #1 selling shoe of 2006 according to department store data provided by the NPD Group, Inc. (Ex. 2, DeZao Decl. ¶ 11.)

**SKECHERS' RESPONSE:** Disputed and objected to on authentication and hearsay grounds. This alleged third-party information cannot be introduced now via testimony by Mr. DeZao without any authentication from the NPD group or foundation as to how the determination of "#1" was made. Fed. R. Evid. 602; Fed. R. Evid. 901(a). Further, this is impermissible hearsay. Easy Spirit is attempting to have Mr. DeZao testify about the contents of third-party data in order to prove the truth of the third-party statement, that the Traveltime Shoe was the "#1 selling shoe of 2006". Fed. R. Evid. 801(a), 802.

295.    Since 2006, the TRAVELTIME shoe has been Easy Spirit's best-selling product and consistent number one shoe style every year since its launch. (Ex. 2, DeZao Decl. ¶ 12.)

**SKECHERS' RESPONSE:** Disputed and objected to for lack of foundation. Additionally, this statement is inconsistent. If the Traveltime Shoe was launched in or around 2004, as alleged above (*supra* at ¶ 293), then it does not follow that the Traveltime has been Easy Spirit's best-selling product and number one shoe style every year since its launch since 2006.

296.    In August 2017, Footwear News, the leading industry publication, described the TRAVELTIME shoe as "iconic" and a "style that continues to resonate with consumers across the board." (Saunders Decl. ¶ 53, Ex. 29 at p. 3.)

**SKECHERS' RESPONSE:** Disputed and objected to on hearsay grounds and for failure to timely produce. Easy Spirit did not timely produce the cited FootwearNews.com article or any documentation or exhibit supporting this claim during discovery, and this third-party information cannot be introduced now via Mr. Saunders' declaration. Fed. R. Evid. 901(a); Fed. R. Civ. Pro. 56(c)(1)(A); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F.Supp.3d 467, 474 n.1 (S.D.N.Y. 2020) (striking certain documents from consideration during summary judgment for failure to produce said documents during discovery). Doing so denies Skechers the right to question the authenticity of this statement and to question Easy Spirit witnesses about it during discovery. Further, this is impermissible hearsay. Easy Spirit is attempting to introduce this third-party article as proof that the Traveltime Shoe has been described as "iconic" and as "a 'style that continues to resonate with consumers across the board.'" Fed. R. Evid. 801(a), 802. Skechers further disputes the claim that Footwear News is "the" leading industry publication, as

unsupported by citation, as no evidence has been produced to that effect beyond attorney statement.

297.    In 2019, The Oprah Magazine, featured the TRAVELTIME shoe in two of its articles. (Saunders Decl. ¶ 54, Ex. 30 at ESNY_033565, ESNY_033570; Saunders Decl. ¶ 55, Ex. 31 at ESNY_033583.)

**SKECHERS' RESPONSE:** Disputed and objected to on relevance grounds and for failure to timely produce cited evidence. These allegations are irrelevant and outside the scope of this case. Easy Spirit is relying upon media coverage published after Skechers' alleged infringement began. Fed. R. Evid. 401; *Sports Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (unsolicited media coverage must predate infringement to establish secondary meaning); *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, No. 16-CV-885 (JPO), 2020 WL 1673687, at *8 (S.D.N.Y. Apr. 6, 2020) (no evidence of secondary meaning as "none of these articles are from the relevant time period — before the [alleged infringer] came onto the market in 2008"). Further, these documents were not timely produced during discovery, and cannot be introduced now via Mr. Saunders' declaration. Fed. R. Evid. 901; Fed. R. Civ. Pro. 56(c)(1)(A); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F.Supp.3d 467, 474 n.1 (S.D.N.Y. 2020) (striking certain documents from consideration during summary judgment for failure to produce said documents during discovery). Doing so denies Skechers the right to question the authenticity of the documents and to question Easy Spirit witnesses about them during discovery. Additionally, disputed that these documents are "articles." It appears that this media coverage

was solicited by Easy Spirit. The documents expressly read, "From Oprah Magazine for Easy Spirit" at the top (D.I. 80-57, 80-58).

298.    The WalkJogRun site referred to the TRAVELTIME shoe as "**legendary**." (Saunders Decl. ¶ 56, Ex. 32 at p. 8.)

**SKECHERS' RESPONSE:** Disputed and objected to on relevance grounds and for failure to timely produce the cited evidence. These allegations are irrelevant and outside the scope of this case. Easy Spirit is relying upon media coverage published after Skechers' alleged infringement began. Fed. R. Evid. 401; *Sports Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (unsolicited media coverage must predate infringement to establish secondary meaning); *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, No. 16-CV-885 (JPO), 2020 WL 1673687, at *8 (S.D.N.Y. Apr. 6, 2020) (no evidence of secondary meaning as "none of these articles are from the relevant time period — before the [alleged infringer] came onto the market in 2008"). Further, these documents were not timely produced during discovery, and cannot be introduced now via Mr. Saunders' declaration. Fed. R. Evid. 901; Fed. R. Civ. Pro. 56(c)(1)(A); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F.Supp.3d 467, 474 n.1 (S.D.N.Y. 2020) (striking certain documents from consideration during summary judgment for failure to produce said documents during discovery). Doing so denies Skechers the right to question the authenticity of the documents and to question Easy Spirit witnesses about them during discovery.

299.    In July 2020, Meredith Corporation's Health Magazine praised the TRAVELTIME shoe's "**unconventional design**" and "**unexpected style with 7,0000 perfect reviews**" on Amazon. (Saunders Decl. ¶ 57Ex. 33 at p.1.)

**SKECHERS' RESPONSE:** Disputed and objected to on relevance grounds and for failure to timely produce cited evidence. These allegations are irrelevant and outside the scope of this case. Easy Spirit is relying upon media coverage published after Skechers' alleged infringement began. Fed. R. Evid. 401; *Sports Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (unsolicited media coverage must predate infringement to establish secondary meaning); *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, No. 16-CV-885 (JPO), 2020 WL 1673687, at *8 (S.D.N.Y. Apr. 6, 2020) (no evidence of secondary meaning as "none of these articles are from the relevant time period — before the [alleged infringer] came onto the market in 2008"). Further, these documents were not timely produced during discovery, cannot be introduced now via Mr. Saunders' declaration. Fed. R. Evid. 901; Fed. R. Civ. Pro. 56(c)(1)(A); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F.Supp.3d 467, 474 n.1 (S.D.N.Y. 2020) (striking certain documents from consideration during summary judgment for failure to produce said documents during discovery). Doing so denies Skechers the right to question the authenticity of the documents and to question Easy Spirit witnesses about them during discovery. Further, disputed that the article constitutes "praise" for the Traveltime shoe's design. Easy Spirit misrepresents how the phrases "unconventional design" and "unexpected style with 7,000 perfect reviews" are used in the Health.com article. The headline of the article is, "Shoppers Say You Won't Regret Adding This Unexpected Style With 7,000 Perfect Reviews to Your Wardrobe," and the article describes the Easy Spirit shoe as, "a pair of slip-on sneakers on Amazon with 7,000 perfect reviews that we hadn't heard about yet." The article also states, "The crossbreed of a breathable tennis shoe and a clog, the unconventional design meshes support and convenience for the perfect summer style."

300.    In June 2020, Travel + Leisure, a leading travel magazine, also recognized the TRAVELTIME shoe as the "**best backless option**" for slip-on sneakers and the shoe's significant fan base. (Saunders Decl. ¶ 58, Ex. 34 at pp. 2, 7.)

**SKECHERS' RESPONSE:** Disputed and objected to on relevance grounds and for failure to timely produce during discovery. It is undisputed that the cited Travel + Leisure article lists "Easy Spirit Traveltime Mule Sneaker" as the "Best Backless Option" in a list of the best slip-on sneakers for women. (Saunders Decl. ¶ 58, Ex. 34). The statement that Travel + Leisure is "a leading travel magazine" is disputed as unsupported by citation, as no evidence has been produced to that effect beyond attorney statement. These allegations are irrelevant and outside the scope of this case. Easy Spirit is relying upon media coverage published after Skechers' alleged infringement began. Fed. R. Evid. 401, *Sports Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (unsolicited media coverage must predate infringement to establish secondary meaning); *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, No. 16-CV-885 (JPO), 2020 WL 1673687, at *8 (S.D.N.Y. Apr. 6, 2020) (no evidence of secondary meaning as "none of these articles are from the relevant time period — before the [alleged infringer] came onto the market in 2008"). Further, these documents were not timely produced during discovery, cannot be introduced now via Mr. Saunders' declaration. Fed. R. Evid. 901; Fed. R. Civ. Pro. 56(c)(1)(A); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F.Supp.3d 467, 474 n.1 (S.D.N.Y. 2020) (striking certain documents from consideration during summary judgment for failure to produce said documents during discovery). Doing so denies Skechers the right to question the authenticity of the documents and to question Easy Spirit witnesses about them during discovery.

301.     In or around 2017, prior to designing the COMMUTE shoe, Skechers was aware of the Easy Spirit brand in the footwear industry. (Saunders Decl. ¶ 33, Ex. 9, Hobbs Dep. Tr. at 99:9-13; Saunders Decl. ¶ 2, Ex. 3, Greenberg Dep. Tr. at 15:17-19.)

**SKECHERS' RESPONSE:** Undisputed that Ms. Hobbs and Mr. Greenberg were aware of the brand Easy Spirit in or around 2017.

302.     In or around 2017, prior to designing the COMMUTE shoe, Skechers was aware of the Easy Spirit brand in the footwear industry. (Ex. 9, Hobbs Dep. Tr. at 99:9-13; Ex. 3, Greenberg Dep. Tr. at 15:17-19.)

**SKECHERS' RESPONSE:** Undisputed that Ms. Hobbs and Mr. Greenberg were aware of the brand Easy Spirit in or around 2017. This allegation is duplicative of the one above. (*Supra* ¶ 301). Fed. R. Evid. 403.

303.     In or around 2017, Skechers purchased an Easy Spirit TRAVELTIME shoe and sent it to its factory with instructions to construct the Skechers midsole and outsole with the "same exact" width and height dimensions of the TRAVELTIME shoe midsole and outsole. (Saunders Decl. ¶ 10, Ex. 6, Deposition Transcript of Savva Teteriatnikov ("Teteriatnikov Dep. Tr.") at 112:17-113:17; 117:24-118:25; 127:22-128:22; 136:22-138:6; 139:19-144:14; Saunders Decl. ¶ 11, Ex. 6A (Teteriatnikov Dep. Ex. 5) at SK0090078-80; Saunders Decl. ¶ 12, Ex. 6B (Teteriatnikov Dep. Ex. 6) at SKNY0090017-19; Saunders Decl. ¶ 13, Ex. 6C (Teteriatnikov Dep. Ex. 7) at SKNY0090076-77; Saunders Decl. ¶ 14, Ex. 6D (Teteriatnikov Dep. Ex. 8) at SKNY0063258-61.)

**SKECHERS' RESPONSE:** Undisputed that Mr. Teteriatnikov sent an Easy Spirit Traveltime shoe to China (D.I. 80-12, 59-3[1] (Teteriatnikov Depo. Tr.) at 144:6-14). Disputed as to the remaining contentions. Nowhere in the record does it state – nor does anyone testify – that Skechers purchased an Easy Spirit Traveltime shoe. Mr Teteriatnikov testified that he had a Traveltime shoe "laying around" in his office and that he did not purchase it and did not know where it came from (*id.* at 112:23-113:17). Mr. Teteriatnikov testified that, rather than provide measurements in his communications with Skechers' manufacturing partners in China – and because the team in China could take measurements that he could not as easily take – he sent along the Traveltime shoe so it could be measured on site for outsole width and midsole height measurements (*id.* at 115:12-15; 171-173). Mr. Teteriatnikov had already finalized his initial outsole designs for the sole that became the Skechers Commute prior to sending the Easy Spirit Traveltime shoe to China. (D.I. 56 (Teteriatnikov Dec.) at ¶ 13).

304.    After receiving a prototype of the midsole and outsole constructed by the factory referenced in Counter-SF ¶ 303, above, Skechers' designer of the COMMUTE shoe compared the prototype with an actual Easy Spirit TRAVELTIME shoe to confirm that the width and height dimensions of the midsole and outsole were exactly the same. (Ex. 6, Teteriatnikov Dep. Tr. at 202:7-204:25; 205:14-206:1; Saunders Decl. ¶ 15, Ex. 6E (Teteriatnikov Dep. Ex. 22) at SKNY0089975-81.)

---

[1] The parties submitted separate sets of excerpts of many depositions as exhibits to their respective briefs. Where necessary, Skechers cites to excerpts from both exhibits, as indicated.

**SKECHERS' RESPONSE:** Undisputed that Mr. Teteriatnikov compared the 3D print of an outsole and midsole he designed to a Traveltime shoe.

305.    In response to Easy Spirit's requests for documents in this action, Skechers did not produce any documents that concerned the design of the upper for the COMMUTE shoe.

**SKECHERS' RESPONSE:** Disputed. Skechers has produced several documents concerning the design of the Commute/Commute Time upper. (*See, e.g.* D.I. 59-21 (Welch Dec. Ex. T); D.I. 63-12 (Welch Dec. Ex. DK)).



Image retrieved from D.I. 59-21, Exhibit T to the Welch Dec., lines in the original.

306.    The width and height dimensions of the COMMUTE TIME shoe midsole and outsole are the same as the TRAVELTIME shoe midsole and outsole. (Ex. 6, Teteriatnikov Dep. Tr. at 202:7-204:25; 205:14-206:1; Ex. 6E (Teteriatnikov Dep. Ex. 22) at SKNY0089975-81)

**SKECHERS' RESPONSE:** Disputed. Mr. Tetriatnikov confirmed that the China team created a prototype shoe for the shoe he was designing that eventually became the Commute Time shoe that had the same measurements for certain outsole width and midsole height dimensions, specifically the same midsole height as the midsole on the Traveltime and the same outsole width as the outsole of the Traveltime (*see* Response to ¶ 303). Easy Spirit cites no evidence that other dimensions were the same. Easy Spirit further cites to no evidence showing that the finalized Skechers COMMUTE TIME and Easy Spirit Traveltime shoe have the exact same dimensions on any features, including midsole height and outsole width.

307.    Skechers received information from a Bealls buyer about the best-selling prints and materials for uppers of TRAVELTIME shoes that were sold at Bealls. (Saunders Decl. ¶ 20, Ex. 8B (Baruch Dep. Ex.14) at SKNY0014686); Saunders Decl. ¶ 19, Ex. 8A (Baruch Dep. Ex.12) at SKNY0001323, SKNY0001323-1327).)

**SKECHERS' RESPONSE:** Disputed in part. Undisputed that on December 12, 2017, Heidi Carpentier, a Senior Buyer of Athletic and Canvas Footwear at Bealls, reached out to Ms. Baruch via e-mail, sent an Easy Spirit advertisement, and provided information regarding Bealls' most successful patterns and materials (Baruch Reply Decl. at ¶¶ 6-10).

Disputed to the extent the information provided by Ms. Carpentier was described as information regarding the best-selling prints and materials for uppers of TRAVELTIME shoes. Easy Spirit admits that Bealls gives it explicit, controlling print direction, and then maintains a

right of exclusive sale in those exact same prints. Mr. DeZao testified that Bealls designs its own prints and provides those prints to Easy Spirit to use on its footwear. Mr. DeZao stated he is unaware of any formal agreement between Bealls and Easy Spirit that covers use of the Bealls' prints and that he is unaware whether Bealls provides the same prints it sends to Easy Spirit to anyone else for use on shoes. When discussing whether Bealls could send the exact same prints to others to use, Mr. DeZao testified, "I mean, it's their print so they have the rights, they own the rights to the print, what they do with it is up to them" (Welch Dec. Exhibit DN, (DeZao Depo. Tr.) at 134:13-138:7).

308.   Skechers used information it received from a Bealls buyer about prints and materials on TRAVELTIME shoe uppers to design uppers for COMMUTE or COMMUTE TIME shoes. (Ex. 8B (Baruch Dep. Ex.14) at SKNY0014686; Ex. 8A (Baruch Dep. Ex.12) at SKNY0001323, SKNY0001323-1327).)

**SKECHERS' RESPONSE:** Disputed. Skechers used the information it received from Ms. Carpentier – regarding Bealls' most successful patterns and materials and certain Skechers and Easy Spirit shoe patterns that were popular and selling well at the time – to create a draft mock-up of a poster advertising Skechers' Commute Time. That mock-up was never utilized, released into the marketplace, or otherwise disseminated to the public (Baruch Reply Decl. at ¶¶ 6-10). Easy Spirit further cites no evidence showing that any information obtained from Ms. Carpentier was used in selecting prints for Skechers COMMUTE TIME shoes. Further, Ms. Spear testified that she did not consult this or any Easy Spirit Traveltime shoes before designing Skechers Commute Time shoe uppers  which were offered for sale (D.I. 80 ¶ 44; D.I. 59-5 (Spear Depo. Tr) at 48:12-18; 203:21-204:10). When Kari Anne Spear was instructed to make prints for Bealls

in spring 2018, that instruction did not reference Traveltime shoes, and instead stated "Please also develop a few more prints, they do well with anchors, pineapples, seashells, etc. Think coastal resort.  Do not pop heel counter lining on the commute. They prefer tonal heel lining colors. Check out Bealls home area, i.e. Bed sheets, etc. for what is selling for them." (Welch Declaration Exhibit DL, Spear Depo. Exhibit 15).

Easy Spirit admits that Bealls gives it explicit, controlling print direction, and then maintains a right of exclusive sale in those exact same prints. Mr. DeZao testified that Bealls designs its own prints and provides those prints to Easy Spirit to use on its footwear. Mr. DeZao stated he is unaware of any formal agreement between Bealls and Easy Spirit that covers use of the Bealls' prints and that he is unaware whether Bealls provides the same prints it sends to Easy Spirit to anyone else for use on shoes. When discussing whether Bealls could send the exact same prints to others to use, Mr. DeZao testified, "I mean, it's their print so they have the rights, they own the rights to the print, what they do with it is up to them" (Welch Dec. Exhibit DN (DeZao Depo. Tr.) at 134:13-138:7).

Further, Mr. DeZao testified that he looks at shoes manufactured by other companies for upper pattern or material trends and inspiration for Easy Spirit (*id.* at 126:23-127:3). Mr. DeZao also testified that Easy Spirit has conversations with the catalog company, Mason, resulting in insights on shoes offered by competitors Naturalizer and Skechers. Specifically, Mason insights have provided Easy Spirit with information about competitors including trends in dressiness of competitors' shoes to identify "opportunities" for Easy Spirit shoes in the marketplace. Easy Spirit uses this information, as well as customer requests, to fulfill opportunities in the market, identify trends, and learn what styles are selling on customers' floors (*id.* at 127:10-134:9).

309.    The Skechers shoe with a palm tree print, shown below (the "Skechers Palm Tree Shoe"), was designed after it viewed the TRAVELTIME shoe, a representative example also below. (Saunders Decl. ¶ 25, Ex. 8G (Baruch Dep. Ex. 22); Saunders Decl. ¶ 26, Ex. 8H (Baruch Dep. Ex. 23); Ex. 8B (Baruch Dep. Ex.14) at SKNY0014686; Saunders Decl. ¶ 18, Ex. 8, Baruch Dep. Tr. at 165:17-167:2.)

| Easy Spirt | Skechers |
|---|---|



**SKECHERS' RESPONSE:** Disputed. First, this statement is unsupported by citation, as the deposition transcript section cited above is not relevant to this contention. Further, Easy Spirit has not cited anything above to support the contention that this shoe was designed after "it" (counsel assumes "it" refers to Skechers) viewed the Traveltime shoe. The Easy Spirit palm tree print shown above was not depicted in the Easy Spirit pinwheel advertisement sent to Skechers (D.I. 80-37 (Ex.10) at SKNY0008555). Further, Ms. Spear testified that she did not consult this or any Easy Spirit Traveltime shoes before designing Skechers Commute Time shoe uppers which were offered for sale (D.I. 80 ¶ 44; D.I. 59-5 (Spear Depo. Tr) at 48:12-18; 203:21-204:10). Ms. Baruch also testified that she had never seen the Easy Spirit Traveltime shoe with

an umbrella and palm tree print prior to her deposition, and that she did not know whether or not

Ms. Spear had. (D.I. 80-20 (Response Exhibit 8, Baruch Dep. Tr.) at 173:11-174:3).

310.    The Ms. Baruch approved the Skechers Palm Tree Shoe for sale. (Ex. 8, Baruch

Dep. Tr. at 172:19-173:10.)

**SKECHERS' RESPONSE:** Undisputed that Ms. Baruch approved the Skechers Commute

Time, shown in Exhibit 22 to Ms. Baruch's deposition, for sale.

311.    The Skechers shoe with a metallic or glitter material, shown below, was designed

after it viewed the TRAVELTIME shoe, representative examples also shown below. (Ex. 8A

(Baruch Dep. Ex.12) at SKNY0001323, SKNY0001323-1327; Ex. 8, Baruch Dep. Tr. at 165:17-

167:2.)



| Easy Spirt | Skechers |
| --- | --- |

**SKECHERS' RESPONSE:** Disputed. First, this statement is unsupported by citation as the

deposition transcript section cited above is not relevant to this contention. Further, Easy Spirit

15

did not ask Ms. Baruch when the relevant Skechers COMMUTE TIME upper was designed and did not ask her about the Traveltime shoe as it relates to this design. Easy Spirit has not cited anything above to support the contention that this shoe was designed after "it" (counsel assumes "it" refers to Skechers) viewed the Traveltime shoe. Easy Spirit did not ask Ms. Spear if she had reviewed the above Easy Spirit shoes specifically; however, Ms. Spear testified that she did not review any Traveltime shoes prior to selecting prints or materials for Skechers COMMUTE TIME shoes that were offered for sale (D.I. 59-5 (Spear Depo. Tr) at 48:12-19).

312.    The Skechers shoe with a leopard print, shown below (the "Skechers Leopard Shoe"), was designed after it viewed the TRAVELTIME shoe, a representative example also below. (Saunders Decl. ¶ 29, Ex. 8K (Baruch Dep. 26); Saunders Decl. ¶ 30, Ex. 8L (Baruch Dep. 27); Ex. 8, Baruch Dep. Tr. at 165:17-167:2.)

| Easy Spirt | Skechers |
| --- | --- |



**SKECHERS' RESPONSE:** Disputed. The Easy Spirit cheetah print shown above was not depicted in the Easy Spirit pinwheel advertisement sent to Skechers (D.I. 80-37 (Ex.10) at SKNY0008555). Further, Ms. Spear testified that she did not consult any Easy Spirit Traveltime

shoes before designing any Skechers Commute Time shoe uppers which were offered for sale

(D.I. 80 at ¶ 44; D.I. 59-5, (Spear Depo Tr.) at 48:12-18; 201:1-201:21; 203:21-204:10). Ms.

Baruch also testified that she had never seen the Easy Spirit Traveltime shoe with a

leopard/cheetah print prior to her deposition, and that she did not know whether or not Ms. Spear

had (D.I. 80-20, (Reply Exhibit 8, Baruch Dep. Tr.) at 178:21-179:16, 179:25-180:5).

313.    The Ms. Baruch approved the Skechers Leopard Shoe for sale. (Ex. 8, Baruch Dep.

Tr. at 178:8-20.)

**SKECHERS' RESPONSE:** Undisputed that Ms. Baruch approved the Skechers Commute

Time, shown in Exhibit 26 to Ms. Baruch's deposition, for sale.

314.    The Skechers shoe with a flamingos print, shown below, was designed after it

viewed the TRAVELTIME shoe, a representative example also below. (Ex. 8A (Baruch Dep.

Ex.12) at SKNY0001323, SKNY0001323-1327; Ex. 8, Baruch Dep. Tr. at 165:17-167:2.)

| Easy Spirt | Skechers |
|:---:|:---:|
|  |  |

**SKECHERS' RESPONSE:** Disputed. First, this statement is unsupported by citation as the

deposition transcript section cited above is not relevant to this contention. Easy Spirit did not ask

Ms. Baruch when the relevant Skechers COMMUTE TIME upper was designed and did not ask

her about the Traveltime shoe as it relates to this design. Easy Spirit has not cited anything above

to support the contention that this shoe was designed after "it" (counsel assumes "it" refers to Skechers) viewed the Traveltime shoe. Easy Spirit did not ask Ms. Spear if she had reviewed the above Easy Spirit shoes specifically, however, Ms. Spear testified that she did not review any Traveltime shoes prior to selecting prints or materials for Skechers COMMUTE TIME shoes that were offered for sale (D.I. 59-5 (Spear Depo. Tr) at 48:12-19).

315.    The Skechers shoe with a mesh material, shown below (the "Skechers Mesh Shoe"), was designed after it viewed a TRAVELTIME shoe with mesh material, a representative example also below. (Saunders Decl. ¶ 27, Ex. 8I (Baruch Dep Ex. 24); Saunders Decl. ¶ 28, Ex. 8J (Baruch Dep Ex. 25); Ex. 8, Baruch Dep. Tr. at 165:17-167:2.)

| Easy Spirt | Skechers |
|---|---|


**SKECHERS' RESPONSE:** Disputed. Easy Spirit has not cited anything above to support the contention that this shoe was designed after "it" (counsel assumes "it" refers to Skechers) viewed the Traveltime shoe. The Easy Spirit shoe with mesh material shown above was not depicted in the Easy Spirit pinwheel advertisement sent to Skechers (D.I. 80-37 (Ex.10) at SKNY0008555). Further, Ms. Spear testified that she did not consult this or any Easy Spirit Traveltime shoes before designing Skechers Commute Time shoe uppers that were offered for sale (D.I. 80 at ¶ 44; D.I. 59-5 (Spear Depo Tr.) at 48:12-18; 203:21-204:10). Ms. Baruch also testified that she had never seen the Easy Spirit Traveltime shoe with a cut-out, gold, champagne material prior to her

deposition, and that she did not know whether or not Ms. Spear had (D.I. 80-20, Response Exhibit 8, Baruch Dep. Tr.) at 176:22-178:2).

316.    The Ms. Baruch approved the Skechers Mesh Shoe for sale. (Ex. 8, Baruch Dep. Tr. at 176:9-177:16.)

**SKECHERS' RESPONSE:** Undisputed that Ms. Baruch approved the Skechers Commute Time, shown in Exhibit 32 to Ms. Baruch's deposition, for sale.

317.    The Skechers shoe with a pineapple print, shown below (the "Skechers Pineapple Shoe"), was designed after it viewed the TRAVELTIME shoe, a representative example also below. (Ex. 8B (Baruch Dep. Ex.14) at SKNY0014686; Saunders Decl. ¶ 27, Ex. 8D (Baruch Dep. Ex.19); Saunders Decl. ¶ 16, Ex. 6F (Teteriatnikov Dep. Ex. 33); Ex. 8, Baruch Dep. Tr. at 165:17-167:2.)



| **Easy Spirt** | **Skechers** |
|---|---|

**SKECHERS' RESPONSE:** Disputed. Easy Spirit has not cited anything above to support the contention that this shoe was designed after "it" (counsel assumes "it" refers to Skechers) viewed

the Traveltime shoe. The Easy Spirit shoe with pineapple print above was not depicted in the

Easy Spirit pinwheel advertisement sent to Skechers (D.I. 80-37 (Ex.10) at SKNY0008555).

Further, Ms. Spear testified that she did not consult this or any Easy Spirit Traveltime shoes

before designing Skechers Commute Time shoe uppers which were offered for sale (D.I. 80 at ¶

44; D.I. 59-5 (Spear Depo Tr.) at 48:12-18; 203:21-204:10). Ms. Baruch also testified that she

had never seen the Easy Spirit Traveltime shoe with a pineapple print prior to her deposition, and

that she did not know whether or not Ms. Spear had (D.I. 80-20, (Response Exhibit 8, Baruch

Dep. Tr.) at 169:1-170:8).


318.    The Ms. Baruch approved the Skechers Pineapple Shoe for sale. (Ex. 8, Baruch

Dep. Tr. at 167:3-168:20.)

**SKECHERS' RESPONSE:** Undisputed that Ms. Baruch approved the pineapple print Skechers

Commute Time, shown in Exhibit 33 to Ms. Baruch's deposition, for sale.


319.    The Skechers shoe with an anchors print, shown below (the "Skechers Anchor

Shoe"), was designed after it viewed the TRAVELTIME shoe, a representative example also

below. (Ex. 8E (Saunders Decl. ¶ 23, Baruch Dep. Ex. 20); Saunders Decl. ¶ 24, Ex. 8E (Baruch

Dep. Ex. 20); Ex. 8, Baruch Dep. Tr. at 165:17-167:2.)

| Easy Spirit | Skechers |
|---|---|
|  | |

**SKECHERS' RESPONSE:** Disputed. Easy Spirit has not cited anything above to support the contention that this shoe was designed after "it" (counsel assumes "it" refers to Skechers) viewed the Traveltime shoe. The Easy Spirit shoe with anchor print above was not depicted in the Easy Spirit pinwheel advertisement sent to Skechers (D.I. 80-37 (Ex.10) at SKNY0008555). Further, Ms. Spear testified that she did not consult this or any Easy Spirit Traveltime shoes before designing Skechers Commute Time shoe uppers (D.I. 80 at ¶ 44; D.I. 59-5 (Spear Depo Tr.) at 48:12-18; 203:21-204:10). Ms. Baruch also testified that she had never seen the Easy Spirit Traveltime shoe with an anchor print prior to her deposition, and that she did not know whether or not Ms. Spear had (D.I. 80-20 (Response Exhibit 8, Baruch Dep. Tr.) at 171:17-172:13).

320.    The Ms. Baruch approved the Skechers Anchors Shoe for sale. (Ex. 8, Baruch Dep. Tr. at 170:16-171:15.)

**SKECHERS' RESPONSE:** Disputed in part. Undisputed that Ms. Baruch approved the nautical print Skechers Commute Time, shown in Exhibit 20 to Ms. Baruch's deposition, for sale. Disputed that the shoe is properly described as the "Skechers Anchors Shoe."

321.    The Skechers shoe with a suede-like material and faux fur trim, shown below (the "Skechers Fur Shoe"), was designed after it viewed the TRAVELTIME shoe, a representative example also below. (Saunders Decl. ¶ 31, Ex. 8M (Baruch Dep. Ex. 30); Saunders Decl. ¶ 32, Ex. 8N (Baruch Dep. Ex. 31); Ex. 8, Baruch Dep. Tr. at 165:17-167:2.)



| Easy Spirit | Skechers |
|:---:|:---:|

**SKECHERS' RESPONSE:** Disputed. Easy Spirit has not cited anything above to support the contention that this shoe was designed after "it" (counsel assumes "it" refers to Skechers) viewed the Traveltime shoe. The Easy Spirit shoe with a suede-like material and faux fur trim above was not depicted in the Easy Spirit pinwheel advertisement sent to Skechers (D.I. 80-37 (Ex.10) at SKNY0008555). Further, Ms. Spear testified that she did not consult this or any Easy Spirit Traveltime shoes before designing Skechers Commute Time shoe uppers (D.I. 80 at ¶ 44; D.I.

59-5 (Spear Depo Tr.) at 48:12-18; 202:1-21; 203:21-204:10). Ms. Baruch also testified that she had never seen the Easy Spirit Traveltime shoe with fur tan material prior to her deposition, and that she did not know whether or not Ms. Spear had (D.I. 80-20 (Response Exhibit 8, Baruch Dep. Tr.) at 184:22-186:8).

322.     The Ms. Baruch approved the Skechers Fur Shoe for sale. (Ex. 8, Baruch Dep. Tr. at 184:2-17).

**SKECHERS' RESPONSE:** Disputed in part. Undisputed that Ms. Baruch approved the cozy Skechers Commute Time lined with chenille and suede, shown in Exhibit 30 to Ms. Baruch's deposition, for sale. Dispute that the shoe is properly described as a "Skechers Fur Shoe."

323.     The Skechers poster, shown below, was designed after it viewed the Easy Spirit Traveltime poster, also shown below. (Saunders Decl. ¶ 34, Ex.10 at SKNY0008555; Saunders Decl. ¶ 35, Ex. 11 at SKNY0000015.)

| Easy Spirt | Skechers |
|---|---|



**SKECHERS' RESPONSE:** Disputed in part. Undisputed that, after Ms. Carpentier sent Ms.

Baruch an Easy Spirit advertisement and indicated that she "would like to do something like this

to introduce the product and features," Ms. Baruch requested the Skechers' graphics team create

a Skechers advertisement along the lines of Ms. Carpentier's request. Also undisputed that the

team then created the draft mock-up of a graphic for Skechers Commute Time, shown above.

Disputed that the graphic is a "poster" as Skechers never utilized the draft mock-up

advertisement, released it into the marketplace, or otherwise disseminated it to the public

(Baruch Decl. at ¶¶ 6-9).

324.    In June 2019, Skechers started shipping newer COMMUTE TIME shoe styles in a shoe box with the below lid (the "Commute Time Box"). (Skechers MSJ Declaration of Jessica Baruch ("Baruch Dec.") at Baruch ¶ 13; Skechers MSJ, Ex. I (SKNY0058893.))



**SKECHERS' RESPONSE:** Undisputed that a few, newer Skechers Commute Time styles are offered in the Skechers Commute Time box shown above. This box was not shipped until June 25, 2019 (D.I. 80 at ¶ 7).


325.    Each side of the lid of the Commute Time Box states "Commute Time." (Skechers MSJ Declaration of Jessica Baruch ("Baruch Dec.") at Baruch ¶ 13; Skechers MSJ, Ex. I).

**SKECHERS' RESPONSE:** Undisputed that the words "Skechers Commute Time" appear on each side of the lid of Skechers' newer Skechers Commute Time box, in which a few, newer Skechers Commute Time styles are offered.

326.    The words "Commute Time" are written in a font on the Commute Time Box that is approximately twice the size of the font of the house brand. (Skechers MSJ Declaration of Jessica Baruch ("Baruch Dec.") at Baruch ¶ 13; Skechers MSJ, Ex. I.)

**SKECHERS' RESPONSE:** Disputed. "Commute Time" does not appear anywhere on the newer Skechers Commute Time box without the house brand SKECHERS, and the font size does not appear larger for any of the words in "Skechers Commute Time" on the newer Skechers Commute Time box, in which a few, newer Skechers Commute Time styles are offered.

327.    The words "Commute Time" appear at least four times on the Commute Time Box. (Skechers MSJ Declaration of Jessica Baruch ("Baruch Dec.") at Baruch ¶ 13; Skechers MSJ, Ex. I.)

**SKECHERS' RESPONSE:** Undisputed that the words "Skechers Commute Time" appear at least four times on Skechers' newer Skechers Commute Time box, in which a few, newer Skechers Commute Time styles are offered.

328.    Skechers changed the name of the Skechers Commute shoe to the Skechers Commute Time shoe after the Skechers Commute shoe had already been shipped to customers. (Saunders Decl. ¶ 3, Ex. 3A (Greenberg Ex. 1, Hobbs Dep. Ex. 46) at SKNY0045203.)

**SKECHERS' RESPONSE:** Undisputed.

329.    The change of the name of the Skechers Commute shoe to the Skechers Commute Time shoe was directed by Skechers' CEO, Robert Greenberg. (Ex. 3A (Greenberg Ex. 1, Hobbs Dep. Ex. 46; Ex. 3C (Greenberg Dep. Ex. 3); Ex. 3, Greenberg Dep. Tr. at 25:14-26:22.)

**SKECHERS' RESPONSE:** Disputed. Nothing Easy Spirit cites supports the contention that Mr. Greenberg "directed" the name change. One exhibit Easy Spirit cited for this contention is a 2019 Annual Report that does not include shipping information or even mention the Commute/Commute Time shoe (D.I. 80-5 (Greenberg Ex. 1)). The second exhibit cited is an email that Mr. Greenberg did not send and is not copied on, which states that "Robert" was wondering whether the name could be changed to "Commuters by Skechers" and that he wanted the name changed to "Commute Time" (D.I. 80-7). Additionally, in his deposition testimony, including the testimony Easy Spirit cited for this contention, Mr. Greenberg repeatedly stated that he did not recall whether he had any involvement in selecting the name "Commute Time." (D.I. 80-4 (Greenberg Depo. Tr.) at 25:14-27:12).

330.    New packaging for the Skechers Commute Time shoe was directed by Skechers' CEO, Robert Greenberg. (Ex. 3C(Greenberg Dep. Ex. 3 at SKNY0131153-4.)

**SKECHERS' RESPONSE:** Disputed in part. In the cited exhibit (D.I. 80-7 (Greenberg Ex. 3)), Emma Stevens' email stated, "Can you please confirm RG wants to make this change? Once you confirm we will work on changing the outsole name and developing a 'Commute Time' box." (*id.* at SKNY0131153). The email also states that in September of 2018, Mr. Greenberg wanted to proceed with creating a new box for the "Commute Time" program but does not state that Mr. Greenberg "directed" "new packaging" for the Commute Time (*id.*). Undisputed that box bearing the Commute Time logo was implemented on April 1, 2019, and those new boxes reflecting the name change first shipped on June 25, 2019.

331.     Skechers emails with the subject "Memo from Robert" were directed to be sent by Skechers' CEO, Robert Greenberg. (Ex. 3, Greenberg Dep. Tr. at 37:22-39:5)

**SKECHERS' RESPONSE:** Disputed. Easy Spirit has not cited anything to support this contention, and the contention is contradicted by Mr. Greenberg's testimony. The cited portion of Mr. Greenberg's testimony does not reference any emails or the subject line "Memo from Robert." During a later part of Mr. Greenberg's testimony, he stated that he is not sure whether emails sent by Karen Kreinman with the subject line "memo from Robert" contained content from him and that Karen Kreinman would write "memo from Robert" even if information was from someone other than Mr. Greenberg (D.I. 80-4 (Greenberg Depo. Tr.) at 40:21-42:3).


332.     When confronted with the email in which he called the COMMUTE TIME shoes the "travel-time looking product," he suggested that someone else may have wrote it without his involvement despite the subject, "Memo from Robert." (Ex. 3, Greenberg Dep. at 41:19-24.) When asked why his assistant would send the "Memo from Robert" if it were not actually from him, he responded, "I – I really don't know." (Ex. 3 (Greenberg Dep. at 45:21-24).)

**SKECHERS' RESPONSE:** Disputed. Mr. Greenberg testified that he did not recall the email in question, that he could not verify the source of the information contained in the email, and that the memo "could have been anything." He also testified that Karen Kreinman would write "memo from Robert" even if the information contained came from someone other than Mr. Greenberg (D.I. 80-4 (Greenberg Depo. Tr.) at 41:10-42:2; 42:22-43:3; 43:18-45:24).


333.     Mr. Greenberg directed an email with the subject line, "Memo from Robert," to be sent that says, "Take me in the Modern Comfort room, I want to talk to you about some of the

travel-time looking product." (Saunders Decl. ¶ 7, Ex. 3E (Greenberg Dep., Ex. 5) at SKNY0099848.)

**SKECHERS' RESPONSE:** Disputed. Nothing Easy Spirit has cited supports these contentions. In Mr. Greenberg's testimony, he states that he does not recall instructing anyone to write this email and does not recall this email (D.I. 80-4 (Greenberg Depo. Tr.) at 46:2-49:10).

334.    When Mr. Greenberg was questioned about Exhibit 5 of his deposition, Mr. Greenberg testified that the "travel-time looking product" refers to the Commute Time shoe. (Ex. 3, Greenberg Dep. Tr. at 49:11-50:13.)

**SKECHERS' RESPONSE:** Disputed. In the cited portion of Mr. Greenberg's testimony, he states that the phrase "Traveltime-looking product" in Exhibit 5 of his deposition "would refer" to open back footwear, which includes the Commute Time shoe (D.I. 80-4 (Greenberg Depo. Tr.) at 49:11-50:13; D.I. 80-9).

335.    Mr. Greenberg directed an email with the subject line, "Memo from Robert," to be sent that says, "A nice idea for the "Travel Time" CVs that you're doing is that you do it also in a lace-up version also. We sold lace-up Energys way back, slip-ons and people loved them because you could adjust the fit. And there's your way to jump all over them and get 'em." (Ex. 3D (Greenberg Dep. Ex. 4) at SKNY0099878.)

**SKECHERS' RESPONSE:** Disputed. Easy Spirit does not cite anything to support the contention that Mr. Greenberg "directed" this email to be sent. In Mr. Greenberg's deposition testimony about this exhibit, he states he is not positive that the memo is from him and that

Karen Kreinman would write "memo from Robert" even if information was from someone other than Mr. Greenberg (D.I. 80-4 (Greenberg Depo. Tr.) at 39:6-42:3).

336.    When Mr. Greenberg was questioned about Exhibit 4 of his deposition, Mr. Greenberg testified that "them" is "somebody we sell shoes to" and did not know what "get 'em" meant. (Ex. 3, Greenberg Dep. Tr. at 44:13-21; 45:1-9.)

**SKECHERS' RESPONSE:** Disputed. Mr. Greenberg testified that he does not recall writing or dictating the email in question and he "assumes" that the "them" referred to in the email is an account, or it could be "everybody we sell to," but he is not certain what it means (D.I. 80-4 (Greenberg Depo. Tr.) at 44:1-45:3).

337.    Mr. Greenberg directed an email with the subject line, "Memo from Robert," to be sent that says, "The #49359 is a huge hit, why don't you create an open back version of that. I'm sure it would give Travel Time a run for its money." (Saunders Decl. ¶ 17, Ex. 7 at SKNY0004194)

**SKECHERS' RESPONSE:** Disputed. Easy Spirit is speculating that Mr. Greenberg "directed" this email, while citing nothing to support that contention (see above response to paragraph 335). Undisputed that the email referred to style number #49359, the Skechers Reggae Fest, depicted below, as a "huge hit."



338.     Mr. Greenberg was deposed on August 19, 2020, whereby Mr. Greenberg testified that he did not know of any reason why he could not give complete and accurate testimony and there was no medical condition or medication that would affect his memory. (Ex. 3, Greenberg Dep. at 6:17-24).)

**SKECHERS' RESPONSE:** Undisputed.

339.     Melissa Hobbs is not an attorney, does not have any training in trademark law and does not even know the legal test for trademark infringement. (Ex. 9; Hobbs Dep. Tr. at 226:3-227:1.)

**SKECHERS' RESPONSE:** Undisputed.

340.     Melissa Hobbs, the Senior Product Manager who oversees the COMMUTE TIME product day-to-day, testified during her deposition that she alone checks new names for shoes in

32

her division by using a website and that she does not submit proposed new names to the legal department for clearance. (Ex. 9, Hobbs Dep. Tr. at 14:3-9, 42:13-16, 42:5-24, 44:13-16.)

**SKECHERS' RESPONSE:** Disputed. Nothing Easy Spirit has cited supports these contentions. Ms. Hobbs did not state that she oversees the Commute product day-to-day, nor did she testify that she alone checks new names. Ms. Hobbs testified that she – or somebody else, such as her sample coordinator – checks Skechers' system internally and then checks a trademark website before proposed names are approved. Further, she stated that other people in the company sometimes have involvement in approving proposed names for use, such as other product managers (D.I. 80-36 (Hobbs Depo. Tr.) at 39:11-42:7). In the testimony cited by Easy Spirit above, Ms. Hobbs testified she is the main contact person for Skechers' fit and costing departments, as well as for designs and merchandisers and she oversees products. Additionally, in the cited testimony, Ms. Hobbs stated that, although she does not usually run new names by legal, she sometimes involves "other departments, such as legal" and gets other people's input on whether a proposed name is appropriate to use for a style name (*id.* at 41:13-42:7).

341.    Melissa Hobbs changed her testimony in Counter-SF 339 after her deposition that she asked the legal department to approve the name option COMMUTE, COMMUTERS, AND COMMUTE TIME. (Ex. 9, Hobbs Dep. Errata at 232:6-9.)

**SKECHERS' RESPONSE:** Disputed. Counter-SF ¶ 339 states, "Melissa Hobbs is not an attorney, does not have any training in trademark law and does not even know the legal test for trademark infringement." Ms. Hobbs did not change this testimony after her deposition, and Counter-SF ¶ 339 does not relate to approving name options for shoes. Additionally, Ms. Hobbs' Errata is not listed in the Appendix of Exhibits submitted along with Easy Spirit's

Counterstatement of Material Facts.  Undisputed that while Ms. Hobbs originally stated that, at the time of her deposition, she could not think of any other names she had to run by legal before adopting as a style name, Ms. Hobbs submitted a timely errata stating that "Nick Salita, my sample coordinator and I asked legal to approve the name options COMMUTE, COMMUTERS, and COMMUTE TIME. I cannot recall any other instances at this time." (D.I. 59-2 at PDF page 19; D.I. 80 at ¶ 51).

342.     Mr. Greenberg testified during his deposition that new names for shoes are approved by Skecher's legal department. (Ex. 3, Greenberg Dep. Tr. at 36:14-16.)

**SKECHERS' RESPONSE:** Disputed. Mr. Greenberg testified that he does not know where names come from, and that "all names in the company" are approved by legal, and that he assumes that the legal department helps select names (D.I. 80-4 (Greenberg Depo. Tr.) at 36:14-37:11).

343.     Melissa Hobbs testified during her deposition that Mr. Greenberg becomes involved in the process of approving names for important shoes. (Ex. 9, Hobbs Dep. Tr. at 102:20-103:16.)

**SKECHERS' RESPONSE:** Disputed. In the cited testimony, Ms. Hobbs testified that Mr. Greenberg was typically not involved in setting up style names, that he "sometimes just wants to okay certain names" and that he wanted to okay the name for the Seager outsole – the 49481 – because it was going to be a big outsole for Skechers (D.I. 80-36 (Hobbs Depo. Tr.) at 102:20-103:16).

344.    The COMMUTE TIME shoe was included in a list of "key initiatives" for the Modern Comfort line, which is a company designation for a specific shoe that it wants to sell and believes will sell well.  (Ex. 8, Baruch Dep. Tr. at 160:7-165:25; Saunders Decl. ¶ 21, Ex. 8C at SKNY0014714, SKNY0014723-25, SKNY0014731-33, SKNY0014755, SKNY0014758.)

**SKECHERS' RESPONSE:** Disputed in part. Undisputed that several Skechers Commute Time style shoes were included in an email attachment titled "Modern Comfort- Fall 19 Matrix" and that Ms. Baruch described the styles listed in the attachment as "key initiatives" for Active, Modern Comfort and Modern Comfort Boots. Also undisputed that, in general, the shoes selected as key initiatives are styles the sales team believes will sell, though they are not always successful in doing so (D.I. 80-20 (Baruch Depo. Tr.) at 160:7-165:25).  Disputed that "key initiatives" is a company designation.


345.    Mr. Greenberg testified during his deposition that he is not aware of the name selection process for shoes at Skechers. (Ex. 3, Greenberg Dep. Tr. at 36:17-24; Greenberg Dep. Tr. at 37:16-19).

**SKECHERS' RESPONSE:** Disputed. Mr. Greenberg testified that he does not know where names come from, and that "all names in the company" are approved by legal, and that he assumes that the legal department helps select names (D.I. 80-4 (Greenberg Depo. Tr.) at 36:14-37:11).  Mr. Greenberg never made the statement that he is "not aware of the name selection process for shoes at Skechers."


346.    Mr. Greenberg has been leading Skechers as its CEO since 1992. (Greenberg Dep. Tr. at 7:24-5)

**SKECHERS' RESPONSE:** Undisputed that Mr. Greenberg joined Skechers U.S.A., Inc. in 1992 as chairman.

347.    During his deposition, Mr. Greenberg could not recall any basic facts regarding the design and naming of the COMMUTE TIME shoe or any facts concerning documents which implicate him in directing the name change from COMMUTE to COMMUTE TIME. (Greenberg Dep. Tr. at 36:17-24; 37:16-19.)

**SKECHERS' RESPONSE:** Disputed. In the cited deposition transcript Easy Spirit relies upon for this contention, Easy Spirit questioned Mr. Greenberg about Skechers' legal department's involvement in selecting product names and how the naming process works, to which Mr. Greenberg responded that he does not know where product names originate (D.I. 80-4 (Greenberg Dep. Tr.) at 36:17-24; 37:16-19). Additionally, Easy Spirit is impermissibly attempting to admit as a fact that there are documents that "implicate" Mr. Greenberg in "directing the name change" without relying on any citation to support that allegation. Fed. R. Civ. Pro. 56(c)(1)(A). Undisputed that Mr. Greenberg does not have personal recollection of details regarding the design and development of a single shoe among thousands for which he did not bear primary responsibility (*see, e.g.* Welch Exhibit DM, (Greenberg Depo. Tr. Excerpts) at 8:13-10:7).

348.    During his deposition, Mr. Greenberg was unable to recall if he has ever authorized the filing of a lawsuit on behalf of the company. (Ex. 3, Greenberg Dep. Tr. at 63:1- 3.)

**SKECHERS' RESPONSE:** Disputed in part and objected to on relevance grounds. Undisputed that Mr. Greenberg testified he did not recall whether he, as chairman, authorized filing a lawsuit

on behalf of the company. He also stated that Skechers' legal department can authorize filing lawsuits without his knowledge, that he is not aware of Skechers' pending lawsuit against Easy Spirit in California, and that he would ask the legal department if he wanted to find out about lawsuits filed by Skechers. (D.I. 80-4 (Greenberg Depo. Tr.) at 59:14-63:19.).

349.    During his deposition, Mr. Greenberg was unable to confirm who at Skechers authorizes the filing of suits on behalf of the company. (Greenberg Dep. Tr. at 62:9-16.)

**SKECHERS' RESPONSE:** Undisputed that Mr. Greenberg testified he "would assume" the legal department authorizes the filing of litigation on behalf of the company; however, immediately after making that statement, Mr. Greenberg confirmed that the legal department can authorize the filing of a lawsuit by Skechers (Welch Dec. Exhibit DM, Greenberg Depo. Tr. at 62:14-20). Objected to on relevance grounds. Skechers' general litigation practices and those with authority to initiate causes of action have no relevance to Easy Spirit's current claims against Skechers as the defending party.  Fed. R. Evid. 401.

350.    Jessica Baruch has ultimate authority at Skechers to approve and introduce new shoes with new names. (Baruch Dep. Tr. at 26:12-23.)

**SKECHERS' RESPONSE:** Disputed. Ms. Baruch testified that, other than technical issues, she alone has the ultimate approval authority for a new product for Modern Comfort and that she has the ultimate say in whether a new shoe in the Modern Comfort line will continue to be sold for future seasons (D.I. 80-20 (Baruch Depo. Tr.) at 26:12-23). She did not testify about shoe names in the testimony cited by Easy Spirit to support this contention.

351.    Lori Mamiya works in advertising and acts as Mr. Greenberg's assistant. (Ex. 9, Hobbs Dep. Tr. at 194:2-19.)

**SKECHERS' RESPONSE:** Disputed. First, this statement is unsupported by citation, as Easy Spirit's citations do not support these contentions. Easy Spirit cites nothing that states that Lori Mamiya works in advertising. The cited deposition transcript quotes Ms. Hobbs stating that Lori Mamiya "helps Robert out" and is "like Robert's assistant, like an assistant" and that Ms. Hobbs is not sure what Lori Mamiya's title is. In fact, earlier in its Counterstatement, Easy Spirit cites to testimony in Mr. Greenberg's deposition transcript in which Mr. Greenberg states that Karen Kreinman is his assistant (*supra* at ¶ 331; D.I. 80-4 (Greenberg Dep. Tr.) at 37:22-39:5).


352.    Skechers testified it was "inspired" by some of the TRAVELTIME shoe uppers when designing the Commute Time shoes. (Ex. 8, Baruch Dep. Tr. at 165:17-167:2.)

**SKECHERS' RESPONSE:** Disputed. Ms. Baruch testified, "I don't believe it was our intention to mimic [Traveltime] uppers. I think we were inspired by some of their uppers maybe on certain items, certain styles." (D.I. 80-20 (Baruch Depo. Tr.) at 166:5-176:2.) Ms. Baruch never testified that anyone was "inspired" by Traveltime uppers when designing the Commute Time shoes; she was responding to Mr. Saunders' question of whether Skechers Modern Comfort created uppers for the Commute Time shoe that mimicked the uppers of the Easy Spirit Traveltime shoe. Creating uppers for a shoe and designing a shoe are two different things, and Easy Spirit is confusing them in this contention. Further, Ms. Baruch testified that Skechers was ***maybe*** inspired by certain Traveltime shoes, but repeatedly testified that she had no viewed specific Traveltime shoes prior to authorizing the allegedly similar SKECHERS COMMUTE TIME shoes for sale (D.I. 80-20 (Baruch Dep. Tr.) at 169:1-170:8, 171:17-172:13; 176:22-178:2;

184:22-186:8) Ms. Baruch further testified that she was unaware at her deposition whether colorist Kari Anne Spear might have seen those Easy Spirit shoes (*id.*). At her deposition, Ms. Spear resolved that question. She had not seen the identified shoes and did not review any Easy Spirit Traveltime shoes prior to designing Skechers COMMUTE TIME shoe uppers that were offered for sale (D.I. 80 ¶ 44; D.I. 59-5 (Spear Depo. Tr) at 48:12-18; 203:21-204:10). Skechers further objects to this statement on relevance grounds. Easy Spirit does not claim any shoe upper elements beyond the open-back style as part of its alleged trade dress (D.I 1 (Complaint) at ¶ 21). Fed. R. Evid. 401.

353.    Jessica Baruch, Karianne Spear and Savva Teteriatnikov testified during their depositions that they prepared for their depositions by meeting with counsel and reviewing documents for several hours. (Ex. 8, Baruch Dep. Tr. at 68:2-15 (6-7 hours); Saunders Decl. ¶ 39, Ex. 39, Spear Dep. Tr. at 183:12-184:18 (5 hours); Saunders Decl. ¶ 10, Ex. 6,Teteriatnikov Dep. Tr. at 119:7-24).)

**SKECHERS' RESPONSE:** Disputed. No witness stated that he or she reviewed documents for several hours. Easy Spirit asked Ms. Baruch, Ms. Spear, and Mr. Teteriatnikov whether they reviewed "any" documents during their prep with counsel. Ms. Baruch testified that her prep meeting with counsel lasted "maybe six hours, seven hours" and she confirmed that she reviewed documents during the prep meeting (D.I. 80-20 (Baruch Depo. Tr.) at 68:2-15). Ms. Spear testified that she met with counsel for "approximately five hours maybe" and stated, "we reviewed some e-mails" (D.I. 80-66 (Spear Depo Tr.) at 183:12-184:18). Mr. Teteriatnikov

testified that he met with counsel for a "good portion of the day" and that confirmed that he reviewed documents with counsel (D.I. 80-12 (Teteriatnikov Depo. Tr.) at 119:7-24).

354.   Mr. Greenberg testified during his deposition that he had no preparation with counsel on any substantive issue or documents. (Ex. 3, Greenberg Dep. 23:9-24:1)

**SKECHERS' RESPONSE:** Undisputed that Mr. Greenberg did not meet with counsel in advance of being deposed in his personal capacity, other than an explanation of technical issues associated with his remote deposition.

355.   In an email, Skechers discussed fulfilling orders for the Blair Catalog and stated, "This is a big program for [the Blair Catalog] and if it works could potentially replaced [*sic*] their million + Travel Time business." (Saunders Decl. ¶ 45, Ex. 21 at SKNY0000866.)

**SKECHERS' RESPONSE:** Disputed. The quote is, "This is a big program for [Blair Catalog] and if it works could potentially replaced [sic] their million <u>dollar</u> + Travel Time business" (D.I. 80-48 at SKNY0000866).

356.   Skechers did not waive the attorney-client privilege during discovery and has not produced any legal opinions. (Saunders Decl. ¶ 64, Ex. 40.)

**SKECHERS' RESPONSE:** Undisputed.

357.   Easy Spirit TRAVELTIME shoes have been and/or are sold in department stores, through footwear catalog companies and online, including Macy's department stores, Bealls

department stores, Nordstrom Rack stores, Boscov's department stores, and many independent shoe stores. (DeZao Decl. 8; Saunders Decl. ¶¶ 37, 39, 41, 43; Exs. 13, 15, 17. 19.)

**SKECHERS' RESPONSE:** Undisputed.

358.    Skechers TRAVELTIME shoes have been and/or are sold in department stores, through footwear catalog companies and online, including Macy's department stores, Bealls department stores, Nordstrom Rack stores, Boscov's department stores, and many independent shoe stores. (Saunders Decl. ¶¶ 38, 40, 42, 44; Exs. 14, 16, 18, 20.)

**SKECHERS' RESPONSE:** Disputed. Skechers has never sold TRAVELTIME shoes. Assuming Plaintiff intended to write Skechers COMMUTE TIME shoes, Easy Spirit has not cited any evidence to support the claim that the Skechers COMMUTE TIME shoes have been and/or are sold in many independent shoe stores.

359.    The TRAVELTIME shoe has received unsolicited media attention. (DeZao Decl. 13; Exs. 29-32.)

**SKECHERS' RESPONSE:** Disputed. It is not clear from the documents provided that the Traveltime shoe has received unsolicited media attention, and the untimely nature of Plaintiff's production of these articles, after the close of fact discovery, precludes Skechers from investigating this claim, for which Plaintiff bears the burden of proof. *Bobcar Media*, 2020 WL 1673687, at *8 (it is plaintiff's burden to show that media coverage is unsolicited). Some of Easy Spirit's citations for this contention are clearly not unsolicited. For example, the media coverage

in D.I. 80-57 and 80-58 (Exs. 30 and 31) was solicited by Easy Spirit. The articles expressly

read, "From Oprah Magazine for Easy Spirit" at the top.


360.    In August 2017, Footwear News, the leading industry publication, described the

TRAVELTIME shoe as "iconic" and a "style that continues to resonate with consumers across the

board." (Saunders Decl. ¶ 53, Ex. 29 at p. 3.)

**SKECHERS' RESPONSE:** Disputed and objected to on authentication and hearsay grounds.

Additionally, this allegation is duplicative of one above (*supra* ¶ 296). Fed. R. Evid. 403. Easy

Spirit did not timely produce the cited FootwearNews.com article or any documentation or

exhibit supporting this claim during discovery, and this third-party information cannot be

introduced now via Mr. Saunders' declaration. Fed. R. Evid. 901; Fed. R. Civ. Pro. 56(c)(1)(A);

*AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F.Supp.3d 467, 474 n.1 (S.D.N.Y. 2020) (striking

certain documents from consideration during summary judgment for failure to produce said

documents during discovery). Doing so denies Skechers the right to question the authenticity of

this statement and to question Easy Spirit witnesses about it during discovery. Further, this is

impermissible hearsay. Easy Spirit is attempting to introduce this third-party article as proof that

the Traveltime Shoe has been described as "iconic" and as "a 'style that continues to resonate

with consumers across the board.'" Fed. R. Evid. 801(a), 802. Skechers further disputes the

claim that Footwear News is "the" leading industry publication, as no evidence has been produced to that effect beyond attorney statement.

361.    In 2019, the coveted O, The Oprah Magazine, featured the TRAVELTIME shoe in two of its articles. (Saunders Decl. ¶ 54, Ex. 31 at ESNY_033565, ESNY_033570; Saunders Decl. ¶ 55, Ex. 32 at ESNY_033583.)

**SKECHERS' RESPONSE:** Disputed and objected to on relevance grounds and for failure to timely produce. Additionally, this allegation is duplicative of one above (*supra* ¶ 297). Fed. R. Evid. 403. These allegations are irrelevant and outside the scope of this case. Fed. R. Evid. 401. Easy Spirit is relying upon media coverage published after Skechers' alleged infringement began. Fed. R. Evid. 401; *Sports Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (unsolicited media coverage must predate infringement to establish secondary meaning); *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, No. 16-CV-885 (JPO), 2020 WL 1673687, at *8 (S.D.N.Y. Apr. 6, 2020) (no evidence of secondary meaning as "none of these articles are from the relevant time period — before the [alleged infringer] came onto the market in 2008"). Further, these documents were not timely produced during discovery, cannot be introduced now via Mr. Saunders' declaration. Fed. R. Evid. 901; Fed. R. Civ. Pro. 56(c)(1)(A); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F.Supp.3d 467, 474 n.1 (S.D.N.Y. 2020) (striking certain documents from consideration during summary judgment for failure to produce said documents during discovery). Doing so denies Skechers the right to question the authenticity of the documents and to question Easy Spirit witnesses about them during discovery. Additionally, this media coverage was solicited by Easy Spirit. The articles expressly read, "From Oprah Magazine for Easy Spirit" at the top (D.I. 80-30, 80-31). Finally, Easy Spirit cites

to Ex. 32 (D.I. 80-59) for this contention; however, Ex. 32 is a WalkJogRun.net article, not an

article from O The Oprah Magazine.


362.    The WalkJogRun site referred to the TRAVELTIME shoe as "legendary."

(Saunders Decl. ¶ 56, Ex. 33 at p. 8.)

**SKECHERS' RESPONSE:** Disputed and objected to on relevance grounds. Additionally, this

allegation is duplicative of one above (*supra* ¶ 298). Fed. R. Evid. 403. These allegations are

irrelevant and outside the scope of this case. Fed. R. Evid. 401. Easy Spirit is relying upon media

coverage published after Skechers' alleged infringement began, attempting to introduce this

third-party article as proof that the Traveltime Shoe is "legendary." Easy Spirit is relying upon

media coverage published after Skechers' alleged infringement began. Fed. R. Evid. 401; *Sports*

*Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (unsolicited

media coverage must predate infringement to establish secondary meaning); *Bobcar Media, LLC*

*v. Aardvark Event Logistics, Inc.*, No. 16-CV-885 (JPO), 2020 WL 1673687, at *8 (S.D.N.Y.

Apr. 6, 2020) (no evidence of secondary meaning as "none of these articles are from the relevant

time period — before the [alleged infringer] came onto the market in 2008"). Further, these

documents were not timely produced during discovery, cannot be introduced now via Mr.

Saunders' declaration. Fed. R. Evid. 901; Fed. R. Civ. Pro. 56(c)(1)(A); *AM Gen. LLC v.*

*Activision Blizzard, Inc.*, 450 F.Supp.3d 467, 474 n.1 (S.D.N.Y. 2020) (striking certain

documents from consideration during summary judgment for failure to produce said documents

during discovery). Doing so denies Skechers the right to question the authenticity of the

documents and to question Easy Spirit witnesses about them during discovery. Finally, Easy

Spirit cites to Ex. 33 (D.I. 80-60) for this contention; however, Ex. 33 is a Health.com article, not an article from WalkJogRun.

363.   In July 2020, Meredith Corporation's Health Magazine described the TRAVELTIME shoe as an "unconventional design" and "unexpected style with 7,0000 perfect reviews" on Amazon. (Saunders Decl. ¶ 57, Ex. 34 at p.1.)

**SKECHERS' RESPONSE:** Disputed and objected to on relevance and hearsay grounds. Additionally, this allegation is duplicative of one above (*supra* ¶ 299). Fed. R. Evid. 403. These allegations are irrelevant and outside the scope of this case. Fed. R. Evid. 401. Easy Spirit is relying upon media coverage published after Skechers' alleged infringement began. Fed. R. Evid. 401; *Sports Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (unsolicited media coverage must predate infringement to establish secondary meaning); *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, No. 16-CV-885 (JPO), 2020 WL 1673687, at *8 (S.D.N.Y. Apr. 6, 2020) (no evidence of secondary meaning as "none of these articles are from the relevant time period — before the [alleged infringer] came onto the market in 2008"). Further, these documents were not timely produced during discovery, cannot be introduced now via Mr. Saunders' declaration. Fed. R. Evid. 901; Fed. R. Civ. Pro. 56(c)(1)(A); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F.Supp.3d 467, 474 n.1 (S.D.N.Y. 2020) (striking certain documents from consideration during summary judgment for failure to produce said documents during discovery). Doing so denies Skechers the right to question the authenticity of the documents and to question Easy Spirit witnesses about them during discovery. Further, Easy Spirit misrepresents how the phrases "unconventional design" and "unexpected style with 7,000 perfect reviews" are used in the Health.com article (D.I. 80-60). The headline of the article is,

"Shoppers Say You Won't Regret Adding This Unexpected Style With 7,000 Perfect Reviews to Your Wardrobe," and the article describes the Easy Spirit shoe as, "a pair of slip-on sneakers on Amazon with 7,000 perfect reviews that we hadn't heard about yet." The article also states, "The crossbreed of a breathable tennis shoe and a clog, the unconventional design meshes support and convenience for the perfect summer style." It is unclear how these statements are relevant to Easy Spirit's claims in this case. Finally, Easy Spirit cites to Ex. 34 (D.I. 80-61) for this contention; however, Ex. 34 is a TravelandLeisure.com article, not an article from Meredith Corporation's Health Magazine.

364.   In June 2020, Travel + Leisure, a leading travel magazine, described the TRAVELTIME shoe as the "best backless option" for slip-on sneakers and recognized the shoe's significant fan base. (Saunders Decl. ¶ 58 Saunders Decl. ¶ 58, Ex. 35 at pp. 2, 7.)

**SKECHERS' RESPONSE:** Disputed in part on relevance grounds and for failure to timely produce cited evidence. Undisputed that the Travel + Leisure article lists "Easy Spirit Traveltime Mule Sneaker" as the "Best Backless Option" in a list of the best slip-on sneakers for women (D.I. 80-61 (Ex. 34)). Additionally, this allegation is duplicative of one above (*supra* ¶ 300). Fed. R. Evid. 403. These allegations are irrelevant and outside the scope of this case. Fed. R. Evid. 401 Easy Spirit is relying upon media coverage published after Skechers' alleged infringement began. Fed. R. Evid. 401; *Sports Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (unsolicited media coverage must predate infringement to establish secondary meaning); *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, No. 16-CV-885 (JPO), 2020 WL 1673687, at *8 (S.D.N.Y. Apr. 6, 2020) (no evidence of secondary meaning as "none of these articles are from the relevant time period — before the [alleged infringer] came

onto the market in 2008"). Further, these documents were not timely produced during discovery, cannot be introduced now via Mr. Saunders' declaration. Fed. R. Evid. 901; Fed. R. Civ. Pro. 56(c)(1)(A); *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F.Supp.3d 467, 474 n.1 (S.D.N.Y. 2020) (striking certain documents from consideration during summary judgment for failure to produce said documents during discovery). Doing so denies Skechers the right to question the authenticity of the documents and to question Easy Spirit witnesses about them during discovery. Additionally, Skechers objects that this contention includes attorney testimony that Travel + Leisure is "a leading travel magazine" as unsupported by citation beyond attorney testimony. Finally, Easy Spirit cites to Ex. 35 (D.I. 80-62) for this contention; however, Ex. 35 is "Catalogs Showing TravelTime," not an article from Travel + Leisure.

365.    Over the past 15 years, Easy Spirit and its predecessors have designed and sold numerous different upper designs with various color combinations, fabrics, materials and print designs, all of which maintain the same unique overall appearance of the TRAVELTIME shoe. (DeZao Decl. ¶ 4.)

**SKECHERS' RESPONSE:** Disputed in part. Undisputed that Easy Spirit has sold Traveltime shoes over the past 15 years and that those shoes have been offered with different colors, fabrics, materials, and print designs on the uppers. Disputed that different upper designs were sold as TRAVELTIME shoes. Disputed that the Traveltime shoe has a "unique overall appearance"; numerous third-party shoes contain all of the claimed Traveltime trade dress elements (D.I. 80 at ¶¶ 166-168, 170, 172, 177, 182, 187, 189, 223). Further, Easy Spirit sells shoes under different names and considers them part of the "Traveltime family," as well as shoes with non-Traveltime names that contain all of the claimed Traveltime trade dress elements. For example, in his

deposition, Mr. Besanceney described an Easy Spirit produced shoe as a Traveltime look-alike or Traveltime family member even though the shoe was not on the Traveltime sole construction. (D.I. 59-11 (Welch Dec. Ex. J (Besanceney Depo. Tr.)) at 205:19-206:17.)

366.    The TRAVELTIME shoe, TRAVELTIME mark and TRAVELTIME trade dress have been promoted in the United States by Easy Spirit and its predecessors in interest from launch through the present day. (DeZao Decl. ¶¶ 11, 14-16; Exhibits 1-5 to Complaint )

**SKECHERS' RESPONSE:** Disputed. None of the exhibits cited for this contention include advertisements or promotions prior to 2006, even though Easy Spirit has stated numerous times that the Traveltime shoe was launched in or around 2004. Additionally, Easy Spirit has not produced any evidence showing that the TRAVELTIME trademark or Traveltime trade dress were promoted. Several of the advertisements cited for this contention and produced by Easy Spirit do not depict either the TRAVELTIME word mark or the claimed TRAVELTIME trade dress elements, instead promoting, for example, the EASY SPIRIT mark (*see* D.I. 80 at ¶ 289.)

367.    Easy Spirit and its predecessors promoted the TRAVELTIME mark and TRAVELTIME trade dress TRAVELTIME mark and TRAVELTIME trade dress through in-store promotional items, advertising in major publications including the New York Times and Redbook, and on e-commerce/social media sites. (DeZao Decl. ¶ 13.)

**SKECHERS' RESPONSE:** Disputed and objected to under the Best Evidence Rule. Fed. R. Evid. 1002-03. Easy Spirit has not provided basic information and documents (either originals or copies) to support this claim, such as samples of the advertisements as printed, images of the

advertising or in-store promotional items, or dates during which the advertisements and promotions ran. *Id.*

368.   As early as at least 2006, Easy Spirit launched extensive mailer and in-store initiatives for Macy's department stores that included the TRAVELTIME shoe. (DeZao Decl. ¶ 14.)

**SKECHERS' RESPONSE:** Disputed. Additionally, this allegation is duplicative of the one above (*supra* ¶ 367). Fed. R. Evid. 403. Easy Spirit's 30(b)(6) witness on advertising issues Shanya Perera testified that she was unable to provide any information about distribution or scope of advertisements and promotions handled by Easy Spirit's predecessors in interest (D.I. 62-19 (Perera Depo. Tr.) at 136:3-8), and she did not correct that testimony via errata. Easy Spirit therefore cannot describe any promotions as "extensive." Further, Easy Spirit has not cited to any evidence showing these alleged Macy's mailers or in-store initiatives, nor the extent of their distribution beyond Mr. DeZao's subjective descriptor.

369.   The TRAVELTIME shoes are also advertised in and sold by major shoe catalog companies, including Masseys and Maryland Square. (DeZao Decl. ¶ 15; Saunders Decl. ¶ 59, Ex. 35.)

**SKECHERS' RESPONSE:** Disputed in part. Undisputed that Easy Spirit has sold the Traveltime shoe via catalog companies, including the catalog companies Masseys and Maryland Square. Disputed that such catalog entries constitute advertisements.

370.   Easy Spirit promotes the TRAVELTIME shoe on its website, including promotional videos and advertising that features the TRAVELTIME shoe (DeZao Decl. ¶ 16; Exhibit 2 of Complaint.)

**SKECHERS' RESPONSE:** Disputed in part and objected on relevance grounds. Undisputed that Easy Spirit currently promotes the TRAVELTIME shoe on its website and includes the Traveltime shoe among its products. Disputed and that the website includes videos featuring the Traveltime shoe. Easy Spirit cites no evidence of such videos. Further, as discussed above in paragraphs 371-373, this alleged video campaign began in the Spring of 2018, after the launch of the Skechers Commute Time shoe (D.I. 80 ¶ 4), and is therefore irrelevant. Fed. R. Evid. 401; *Sports Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (evidence after the launch of defendant's product is irrelevant, as that is the date by which plaintiff's "trade dress must have attained secondary meaning").

371.   To further promote the TRAVELTIME shoe, Easy Spirit created videos that included the TRAVELTIME shoe as a part of a national marketing campaign for the Easy Spirit brand. (DeZao Decl. ¶ 16.)

**SKECHERS' RESPONSE:** Disputed and objected to as irrelevant. Skechers objects to Easy Spirit's discussion of this national marketing campaign as irrelevant, as the evidence provided above in paragraphs 371-373 indicates that this campaign began in the Spring of 2018, after the launch of the Skechers Commute Time shoe (D.I. 80 ¶ 4). Fed. R. Evid. 401; *Sports Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (evidence after the launch of defendant's product is irrelevant, as that is the date by which plaintiff's "trade dress must have attained secondary meaning"). Additionally, the advertising expenditures produced by Easy

Spirit in this case show expenditures at the Easy Spirit Brand level, not expenses devoted to the Traveltime, making this campaign again, irrelevant. Fed. R. Evid. 401; *Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 412 (E.D.N.Y. 2011) (no secondary meaning in part because provided "advertising expenditures do not clearly reflect use of the Grout Shield mark,"); *MZ Wallace Inc. v. Fuller*, Case No. 18-cv-2265, 2018 WL 6715489, at *10 (S.D.N.Y. Dec. 20, 2018) (no evidence of secondary meaning in millions spend without evidence of "what portion of its advertising expenditures" were spent on promoting products with claimed trade dress); *Gerffert Co. v. Dean*, 41 F. Supp. 3d 201, 205, 216 (E.D.N.Y. 2014) (millions without indicating what went towards the products with claimed trade dress did not show secondary meaning); *Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, No. 12 Civ. 3599, 2013 WL 866867, at *3 (S.D.N.Y. Mar. 8, 2013) (millions in advertising expenditures fail to show secondary meaning when those advertisements do not stress or mention the trade dress). To date, Easy Spirit has failed to identify which portion of those expenses are used for promoting the Traveltime shoe. Disputed that this marketing campaign features the Traveltime Shoe. Easy Spirit has failed to specifically identify any advertisements or marketing materials from this campaign featuring the Traveltime shoe.

372.    Easy Spirit purchased national television commercials for four-week runs in the Fall and Spring of 2018 that showcased the TRAVELTIME shoe, including commercials that ran during a sponsored segment of ABC network's *The View* and on CBS and the Hallmark Channel. (DeZao Decl. ¶ 16.)

**SKECHERS' RESPONSE:** Disputed and objected to as irrelevant and unauthenticated. Skechers objects to Easy Spirit's discussion of these commercial runs as irrelevant, as the

contention above indicates that these commercials began in Spring 2018, after the launch of the

Skechers Commute Time shoe (D.I. 80 ¶ 4). R. Evid. 401; *Sports Traveler v. Advance Mag.*

*Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (evidence after the launch of defendant's

product is irrelevant, as that is the date by which plaintiff's "trade dress must have attained

secondary meaning"). Further disputed that these commercials are related to the Traveltime shoe

because Easy Spirit has not cited to any evidence about these commercial runs, aside from Mr.

DeZao's declaration. Additionally, Easy Spirit has not produced any evidence showing the

purchase details or expenditures for these commercial runs. This evidence is irrelevant as Easy

Spirit's identified advertising expenditures are at the Easy Spirit brand level, and Easy Spirit has

failed to identify which portion of those expenses are used to promote the Traveltime shoe, much

less the claimed Traveltime trade dress. Fed. R. Evid. 401; *Grout Shield Distribs., LLC v. Elio E.*

*Salvo, Inc.*, 824 F. Supp. 2d 389, 412 (E.D.N.Y. 2011) (no secondary meaning in part because

provided "advertising expenditures do not clearly reflect use of the Grout Shield mark,"); *MZ*

*Wallace Inc. v. Fuller*, Case No. 18-cv-2265, 2018 WL 6715489, at *10 (S.D.N.Y. Dec. 20,

2018) (no evidence of secondary meaning in millions spend without evidence of "what portion of

its advertising expenditures" were spent on promoting products with claimed trade dress);

*Gerffert Co. v. Dean*, 41 F. Supp. 3d 201, 205, 216 (E.D.N.Y. 2014) (millions without indicating

what went towards the products with claimed trade dress did not show secondary meaning);

*Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, No. 12 Civ. 3599, 2013

WL 866867, at *3 (S.D.N.Y. Mar. 8, 2013) (millions in advertising expenditures fail to show

secondary meaning when those advertisements do not stress or mention the trade dress).

373.    For its Spring 2019 Campaign, Easy Spirit featured the TRAVELTIME shoe through videos shown on its website and social media sites. The videos were also used for paid social media advertising. (DeZao Decl. ¶ 16.)

**SKECHERS' RESPONSE:** Disputed and objected to as irrelevant and unauthenticated. Skechers objects to Easy Spirit's discussion of these commercial runs as irrelevant, as the contention above indicates that these videos were created in Spring 2019, after the launch of the Skechers Commute Time shoe (D.I. 80 ¶ 4). Fed. R. Evid. 401; *Sports Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (evidence after the launch of defendant's product is irrelevant, as that is the date by which plaintiff's "trade dress must have attained secondary meaning"). Further disputed that these commercials are related to the Traveltime shoe because Easy Spirit has not cited to any evidence about these videos, aside from Mr. DeZao's declaration. Fed. R. Evid. 401; Fed. R. Evid. 901. Further, Easy Spirit's identified advertising expenditures do not include information about this paid social media advertising or what portion of Easy Spirit's advertising expenses were used for the videos or to promote the Traveltime shoe. Fed. R. Evid. 901; Fed. R. Evid. 401; *Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 412 (E.D.N.Y. 2011) (no secondary meaning in part because provided "advertising expenditures do not clearly reflect use of the Grout Shield mark,"); *MZ Wallace Inc. v. Fuller*, Case No. 18-cv-2265, 2018 WL 6715489, at *10 (S.D.N.Y. Dec. 20, 2018) (no evidence of secondary meaning in millions spend without evidence of "what portion of its advertising expenditures" were spent on promoting products with claimed trade dress); *Gerffert Co. v. Dean*, 41 F. Supp. 3d 201, 205, 216 (E.D.N.Y. 2014) (millions without indicating what went towards the products with claimed trade dress did not show secondary meaning); *Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc.*, No. 12 Civ. 3599, 2013 WL

866867, at *3 (S.D.N.Y. Mar. 8, 2013) (millions in advertising expenditures fail to show

secondary meaning when those advertisements do not stress or mention the trade dress).

374.    Between 2017 and 2019, Easy Spirit spent approximately ███████ on marketing

and advertising for the brand. (Saunders Decl. ¶ 60, Ex. 36 at ESNY_036285.))

**SKECHERS' RESPONSE:** Undisputed however objected to as irrelevant. Undisputed that

Easy Spirit's produced document, Bates labeled ESNY_036285, lists expenditures for "media &

product placements," "production," "wholesale," "partnerships," "events/gifting suites," "PR,"

"social content & WEI," and "branding agency" totaling ████████ from 2017-2019. However,

Skechers objects to this information as irrelevant, as the claimed expenditures largely occurred

after the launch of the Skechers Commute Time shoe (D.I. 80 ¶ 4). Fed. R. Evid. 401; *Sports*

*Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (evidence after

the launch of defendant's product is irrelevant, as that is the date by which plaintiff's "trade dress

must have attained secondary meaning"). Further, Easy Spirit's identified advertising

expenditures are at the overall Easy Spirit brand level, and Plaintiff has failed to identify which

portion of those expenses were used for promoting the Traveltime shoe, much less the claimed

Traveltime trade dress, making this information irrelevant. Fed. R. Evid. 401; Fed. R. Evid. 901;

*Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 412 (E.D.N.Y. 2011) (no

secondary meaning in part because provided "advertising expenditures do not clearly reflect use

of the Grout Shield mark,"); *MZ Wallace Inc. v. Fuller*, Case No. 18-cv-2265, 2018 WL

6715489, at *10 (S.D.N.Y. Dec. 20, 2018) (no evidence of secondary meaning in millions spend

without evidence of "what portion of its advertising expenditures" were spent on promoting

products with claimed trade dress); *Gerffert Co. v. Dean*, 41 F. Supp. 3d 201, 205, 216

(E.D.N.Y. 2014) (millions without indicating what went towards the products with claimed trade

dress did not show secondary meaning); *Urban Grp. Exercise Consultants, Ltd. v. Dick's*

*Sporting Goods, Inc.*, No. 12 Civ. 3599, 2013 WL 866867, at *3 (S.D.N.Y. Mar. 8, 2013)

(millions in advertising expenditures fail to show secondary meaning when those advertisements

do not stress or mention the trade dress).


375.    In Spring 2018, Easy Spirit underwent a relaunch of the brand that caused a

noticeable change in sales. (Saunders Decl. ¶ 61, Ex. 37, Deposition Transcript of Shanya Perera

("Perera Dep. Tr.") at 149:16-150.25).

**SKECHERS' RESPONSE:** Disputed. Ms. Perera stated that she noticed a change in the sales

after the relaunch, and that, from the marketing efforts that she was doing for the EasySpirit.com

website, the change was noticeable. She did not state that the relaunch itself or alone caused the

change in sales (D.I. 80-64 (Perera Depo. Tr.) at 150:14-25). Undisputed that Easy Spirit's sales

noticeably improved after the launch of the Skechers Commute Time in early 2018.


376.    Easy Spirit's brand relaunch in 2018 alone cost approximately ██████

(Saunders Decl. ¶ 62, Ex. 38 at p. 2 (ESNY_033061).)

**SKECHERS' RESPONSE:** Disputed in part and objected to on relevance grounds. The cited

document states that Easy Spirit's "2018 Spring Media Campaign" spend total was ██████

but the document does not mention the Traveltime. Fed. R. Evid. 401. Easy Spirit's identified

advertising expenditures are at the overall Easy Spirit brand level, and Easy Spirit has failed to

identify which portion of those expenses are used for promoting the Traveltime shoe. Further,

this relaunch happened in 2018, after the Skechers Commute Time was first sold. *Id.*; *Sports*

*Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (evidence after the launch of defendant's product is irrelevant, as that is the date by which plaintiff's "trade dress must have attained secondary meaning").

377.   Easy Spirit's brand relaunch campaign in 2018 included subway and airport advertisements that exclusively featured the TRAVELTIME shoe. (Ex. 37, Perera Dep. Tr. 182:5-188:5; Ex. 38 p. 9 (ESNY_033068).)

**SKECHERS' RESPONSE:** Disputed and objected to as irrelevant. The subway and other out-of-home advertisements highlighted by Easy Spirit as evidence of recent advertisements of the Traveltime shoe ran in 2018, after the Skechers Commute Time was first sold. Fed. R. Evid. 401; *Sports Traveler v. Advance Mag. Publishers*, 25 F. Supp. 2d 154, 164 (S.D.N.Y. 1998) (evidence after the launch of defendant's product is irrelevant, as that is the date by which plaintiff's "trade dress must have attained secondary meaning").  Additionally, these examples clearly illustrate that the advertising is not focused on the trade dress or on building source identification but is instead focused on features like the comfort of the shoe and the variety of upper patterns available. Ms. Perera testified that the images that she was viewing of subway and airport advertisements all featured the Traveltime shoe. She did not testify that all such advertisements always featured the Traveltime shoe (D.I. 80-64 (Perera Depo. Tr.) at 187:12-188:8).

378.   Although Easy Spirit does not usually register as a trademark its sub-brands or names for its shoe lines, due to the value and importance of the TRAVELTIME brand, TRAVELTIME was registered on the Principal Registry of the U.S. Patent and Trademark Office in 2014. (DeZao Decl. ¶ 5.)

**SKECHERS' RESPONSE:** Undisputed that the mark TRAVELTIME was registered on the USPTO's Principal Registry in 2014 (Reg. Nos. 4,505162 and 4,505,161). Disputed as to the remainder of the contention. Easy Spirit has registered and applied for trademarks for several shoe names, many of which may be classified as "sub-brands" in the company. Easy Spirit has applied to register the marks STUDIO SPIRIT (App. No. 88/322,351; filed as an intent-to-use application), 3.0 EASY SPIRIT & Design (App. No. 88/677, 521; filed as an intent-to-use application), DREAMFLEX (App. No. 86/964,500; filed as an intent-to-use application; now abandoned), E+ & Design (App. No. 86/366,873; filed as an intent-to-use application; now abandoned), TRUE SPIRIT (App. No. 86/964,523; filed as an intent-to-use application; now abandoned), 360MEMORY (App. No. 86/303,877; filed as an intent-to-use application; now abandoned), E & Design (App. No. 86/128,260; filed as an intent-to-use application; now abandoned), and KEEP ON MOVING (App. No. 87/722,811; now abandoned), and has registered the marks MOVE FOR PINK (Reg. No. 6,069,594), MAKERS OF EASY (Reg. No. 5,513,768), E 360 & Design (Reg. No. 4,525,761), E360 (Reg. No. 4,215,363), EXPLORE24 (Reg. No. 4,515,822), EXPLORE 24 & Design (Reg. No. 4,516,144), EASY WEATHER (Reg. No. 3,091,586), TRUSPIRIT (Reg. No. 3,914,642; now cancelled), E & Design (Reg. No. 2,407,374), EASY SPIRIT ANTI-GRAVITY (Reg. No. 2,276,352), SPA EASY SPIRIT & Design (Reg. No. 2,061,568), and EASY SPIRIT SLIPPERS (Reg. No. 2,269,779), all for footwear in Class 25.

379.    Easy Spirit's U.S. trademark for TRAVELTIME (Registration No. 4,505,161) has become incontestable under the Lanham Act and remains valid and enforceable. (*See* Exhibit 6 to Complaint; Saunders Decl. ¶ 65, Ex. 41.)

**SKECHERS' RESPONSE:** Undisputed.

Respectfully submitted, this 8th day of October, 2020.

/s/ Robert L. Lee
Robert L. Lee (*Pro Hac Vice*)
Emily Chambers Welch (*Pro Hac Vice*)
Michelle W. Wilco (*Pro Hac Vice*)
ALSTON & BIRD LLP
1201 West Peachtree St. NW
Atlanta, GA 30309-3424
Tel: (404) 881-7000
Email:  bob.lee@alston.com
emily.welch@alston.com
michelle.wilco@alston.com

Andrew J. Ligotti
ALSTON & BIRD LLP
90 Park Avenue
New York, New York 10016
Tel: (212) 210-1286
Email:  andy.ligotti@alston.com

*Attorneys for Defendants Skechers U.S.A., Inc. and*
*Skechers U.S.A., Inc. II*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on October 8, 2020, a copy of the foregoing document was filed via this Court's electronic filing system and thereby served upon all counsel of record.

Date: October 8, 2020                              */s/ Robert L. Lee*
                                                             Robert L. Lee