kaj2EasA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   EASY SPIRIT, LLC,

4                    Plaintiff,              New York, N.Y.

5              v.                            19 Civ. 3299 (WHP)

6   SKECHERS U.S.A., INC., *et al.*,

7                    Defendants.

8   ------------------------------x         Teleconference

9                                           Argument

10                                          October 19, 2020
                                            11:00 a.m.
11
    Before:
12
                         HON. WILLIAM H. PAULEY III,
13
                                            District Judge
14

15
                              APPEARANCES
16

17  PEROFF SAUNDERS, P.C.
         Attorneys for Plaintiff
18  BY:  DARREN W. SAUNDERS
         CASSANDRA TAM
19       JASON H. KASNER

20
    ALSTON & BIRD, LLP
21       Attorneys for Defendants
    BY:  ROBERT LEE
22       ANDREW J. LIGOTTI
         EMILY CHAMBERS WELCH
23       MONICA LAREDO-RUIZ
         MICHELLE WILCO
24

25


                  SOUTHERN DISTRICT REPORTERS, P.C.

                         (212) 805-0300

kaj2EasA

1        THE COURT:  This is oral argument on the defendant

2    Skechers' motion for summary judgment.

3        Would counsel for the plaintiff Easy Spirit give their

4    appearance.

5        MR. SAUNDERS:  Yes.  Good morning, your Honor.  Darren

6    Saunders for Easy Spirit.  With me here are my associates Jason

7    Kasner and Cassandra Tam.

8        THE COURT:  All right.  Good morning to you,

9    Mr. Saunders.

10        Would counsel for defendant Skechers, give their

11    appearance.

12        MR. LEE:  Yes, your Honor.  Good morning.  This is Bob

13    Lee with Alston & Bird.  I will be handling the argument.  With

14    me on the line are Ms. Emily Welch and Mr. Andy Ligotti, who I

15    think you have met before, and then we also have two of our

16    younger associates, Ms. Monica Ruiz and Ms. Michelle Wilco,

17    listening in as well.

18        THE COURT:  All right.  Good morning to you.

19        Just as a general ground rule, I would ask each of you

20    to identify yourselves before addressing the Court for my

21    benefit and that of the court reporter.

22        So with that, Mr. Lee, do you wish to be heard on

23    behalf of Skechers?

24        MR. LEE:  Yes, I do, your Honor.  Thank you.

25        We believe, Skechers believes that the factual record

kaj2EasA

1    demonstrates that summary judgment in Skechers' favor is

2    appropriate.

3           As you may, of course, see from the pleadings and in

4    the summary judgment papers, Easy Spirit broadly alleges two

5    categories of claims -- trade dress-related claims and

6    trademark-related claims.  It alleges that Skechers has

7    infringed its trade dress rights by Skechers' sale of its

8    Commute Time shoe, that it has diluted Easy Spirit's trade

9    dress rights, and that it alleges that Skechers has infringed

10   its Traveltime trademark by its use of the marks Commute and

11   Skechers Commute Time and that it, again, has diluted those

12   trademarks rights.  However, as we demonstrated in our opening

13   and reply papers, there is no genuine issue of material fact

14   preventing summary judgment in Skechers' favor on all of these

15   claims.

16          Now, at a high level I will sort of hit the arguments

17   and then I will go into more detail, your Honor.

18          In response to our motion for summary judgment, Easy

19   Spirit failed to put forth any issue creating a material fact

20   that they are disputing that its trade dress rights are

21   comprised of generic elements that are not entitled to

22   protection, that those elements are also functional, therefore

23   not entitled to protection, in that it failed to put forth any

24   substantive evidence demonstrating that its trade dress is

25   entitled to secondary meaning or any acquired distinctiveness.

kaj2EasA

1          The rule of evidence it marshaled supports that Easy

2    Spirit, at best, engaged in what we would call brand-level

3    advertising, promoting the Easy Spirit brand as a whole, at the

4    top level, if you will, your Honor, but didn't do any

5    advertising to tie consumers' protections to its trade dress or

6    highlighting any elements or the trade dress or design of the

7    Traveltime itself.

8          It did not even address the confusion factors for

9    trade dress infringement, where Skechers clearly articulated

10   that it does not infringe these trade dress rights.

11         On the trademark side, it did offer some arguments,

12   your Honor, but cannot meaningfully dispute that the marks

13   Skechers Commute and Skechers Commute Time are dissimilar to

14   the Easy Spirit Traveltime, that there is no actual confusion

15   evidence whatsoever in the record.  In fact, Skechers has a

16   survey expert who has opined that confusion is not likely.

17         Instead, primarily in its opposition, Easy Spirit

18   focused on its efforts -- focused its efforts on issues of what

19   it calls witness credibility and inconsistencies in certain

20   deposition testimony and factual record; but, in reality, those

21   arguments are all unsupported and unfounded, and they are

22   simply designed to distract from a meaningful consideration of

23   the merits of Easy Spirit's claims.

24         THE COURT:  But, Mr. Lee, isn't it true that Skechers

25   changed the name of its shoe to Commute Time after it had

kaj2EasA

1    already been selling the shoe under the name Commute for

2    months?

3              MR. LEE:  Yes, sir, it did.

4              THE COURT:  And what is Skechers' explanation for

5    that?

6              MR. LEE:  Certainly, your Honor.

7         The documents show that Mr. Greenberg made a comment

8    that he didn't like the Commute name, and he instructed his

9    team to investigate using the marks Commuters by Skechers or

10   Skechers Commute Time.  So he put that to the team to run

11   through legal, run through a clearance process, run through

12   legal, which it did, and Skechers made the name change.  They

13   simply didn't like --

14             THE COURT:  But isn't it odd for a manufacturer to

15   launch a shoe with a given name and sell it and then change the

16   name?

17             MR. LEE:  Respectfully, your Honor, I don't believe

18   so, especially for a shoe like this, your Honor, that has no

19   promotion, it has no marketing behind it.  It really, for

20   Skechers, involved just changing a UPC label.  And, in fact,

21   what it did, however, was only change the label on certain

22   boxes.  It did not go back and retrofit anything.  So its

23   inventory of shoes that were already being sold under the

24   Skechers Commute were still sold as a Skechers Commute.  So, in

25   fact, what you had on the market for -- even until today, your

kaj2EasA

1  Honor, is shoes being sold that have, if you will, both names

2  on the box.

3          But, again, it's not a brand that Skechers advertises

4  or promotes.  It doesn't promote Skechers Commute or Skechers

5  Commute Time individually from simply promoting the shoe as a

6  Skechers shoe.  So for Skechers it wasn't a meaningful change

7  or a change in a business practice that necessitated any real

8  effort on Skechers' behalf.

9          THE COURT:  But hasn't Skechers sold over 400,000

10  pairs of Commute Time shoes since their introduction in 2018?

11          MR. LEE:  Total, both shoes, that you could classify

12  as a Skechers Commute or a Skechers Commute Time, your Honor.

13  That is from inception roughly to date or at least through the

14  most current numbers we have.  Again, the overwhelming majority

15  of those shoes would have been sold as a Skechers Commute, as

16  opposed to a Skechers Commute Time.  But, again, really the

17  only place you ever see the name is on some boxes, where we

18  have some styles in a Skechers Commute Time box or on a UPC

19  label.

20          THE COURT:  With respect to the dilution analysis, why

21  isn't that indicative of considerable renown?

22          MR. LEE:  You mean why is the 400,000 pairs not, your

23  Honor.

24          THE COURT:  Yes.

25          MR. LEE:  Well, your Honor, that's not really an

kaj2EasA

1   element that I think either party really has addressed, but

2   what I would say --

3           THE COURT:  Well, I'm asking.  The parties didn't

4   address a lot of things.  Why isn't that indicative of renown?

5   These shoes sell for, what, somewhere between, what, 30, 40,

6   $50 a pair?

7           MR. LEE:  Yes, sir.

8           Well, it's probably because, your Honor, I would say

9   Skechers sells millions of pairs a year.  If you look over the

10  last few years, these shoes amount to less than two-tenths of

11  one percent of Skechers' sales.  Skechers is a big shoe

12  company, your Honor.  They sell a lot of shoes.  so, given how

13  minuscule this offering is within the realm of Skechers' sales,

14  this is just a minor shoe for Skechers.  And so, therefore, at

15  least from Skechers' perspective, the mark and dress had little

16  to no renown.

17          THE COURT:  All right.  Why don't you continue?

18          MR. LEE:  Yes, your Honor.

19          First, I will start with the trade dress arguments,

20  your Honor.

21          In order for Easy Spirit to proceed with a trade dress

22  claim, there are certain things it has to do.  It has to

23  identify the elements of its trade dress and explain ways that

24  those elements are distinctive and demonstrate that those

25  elements are not generic or overbroad.  It must also

kaj2EasA

1   demonstrate that those elements and its trade dress is not

2   functional.  It must prove that it has acquired distinctiveness

3   or secondary meaning in its trade dress, and then it must prove

4   a likelihood of confusion.

5        Easy Spirit, honestly, your Honor, its failed on its

6   trade dress claims in every regard.  In our opposition brief we

7   detail why these elements are generic.  We cite it to their own

8   witness's 30(b)(6) testimony, who identified primarily these

9   elements as all being typical and common in the industry.  Easy

10  Spirit offered no response to that, your Honor.

11       Looking at the functionality, your Honor, again, we

12  detailed with evidence why each of these elements were

13  functional.  You are looking at an easy slip-on/slip-off upper,

14  for example, a rubber toe bumper for slip resistance, the

15  claimed arch between the midsole and heel, your Honor, given

16  the shape of the foot.  Again, all of these elements, your

17  Honor, we argue were functional and, again, Easy Spirit failed

18  to even address that issue whatsoever in its opposition.

19       And looking at secondary meaning again, your Honor, as

20  you are well aware, Courts in the Second Circuit and the

21  Supreme Court have all recognized that product design rarely

22  serves itself as a source identifying function, which

23  necessitates thus the secondary meaning consideration.  And

24  when you are looking at secondary meaning, a party seeking to

25  prove secondary meaning has a very high burden, and proof of

kaj2EasA

1    secondary meaning entails vigorous evidentiary requirements.

2             Now, Courts in the Sixth Circuit have -- excuse me,

3    Second Circuit have identified six different factors.  I won't

4    list them all, but they are in our papers.  And by and large,

5    Easy Spirit has offered no arguments and very little evidence

6    that it has tried to marshal to demonstrate secondary meaning.

7             I will lump the advertising, sales success, and media

8    coverage factors together real quick.

9             Easy Spirit has produced some limited information over

10   the last two years about some of its advertising and its sales

11   practices.  Its witnesses weren't able to substantiate or

12   corroborate anything prior to 2017.  As you may have seen in

13   some of the papers or we have discussed in the past, there was

14   an acquisition by this plaintiff of the Easy Spirit brand at

15   the end of 2017, and the witnesses basically said, We can't

16   corroborate or substantiate anything prior to that time.

17            What little they did point to post 2017 is irrelevant,

18   your Honor, because you establish secondary meaning at the time

19   of the first act of alleged infringement which was, in this

20   instance --

21            THE COURT:  So let me ask you this, though.  Even

22   assuming that Easy Spirit can only show that it sold

23   approximately 390,000 pairs of Traveltime shoes between 2017

24   and early 2018, why isn't that enough to show secondary

25   meaning?

kaj2EasA

1          MR. LEE:  Certainly, your Honor.

2          Courts in this district have repeatedly found that

3    sales success standing alone is not sufficient to establish

4    secondary meaning, especially in a claim of something like this

5    for product configuration.  Because you don't know that the

6    sales -- what the sales are tied to.  Is the sales tied to the

7    fact that they promote it as an Easy Spirit shoe, your Honor,

8    or is it tied to the fact that they promote it as a Traveltime

9    shoe but not the trade dress elements themselves, or is it

10   attributed to the fact that the price point is attractive?  So

11   Courts routinely say sales success alone is not sufficient -- a

12   sufficient consideration or to be determinative of secondary

13   meaning.

14          Here, your Honor, there is also no evidence of, quote,

15   sales success.  I mean, you have got a shoe without a track

16   record of documented sales such that you can determine that

17   these sales are continuing to be successful as opposed to be

18   declining from what may have been a sales high at some point in

19   the past.

20          And when you look at those sales in the face of the

21   advertising they have even pointed to, your Honor, the

22   advertising they have pointed to demonstrates they don't

23   promote this shoe by its trade dress.  They promote this shoe

24   either as an Easy Spirit shoe, just as an Easy Spirit shoe, or

25   with the Traveltime trademark.

kaj2EasA

1          What little they have pointed to, your Honor, and that

2     we have pointed to that we got out of the record shows that

3     they do not promote this shoe by its design or its trade dress

4     elements so, therefore, necessarily create the association of

5     the trade dress to a source in the mind of the consuming

6     public.  So, again, that's why sales alone, your Honor, are not

7     indicative.

8          We have offered also a survey, your Honor.  You know,

9     one of the factors for secondary consideration -- excuse me,

10    secondary meaning are consumer studies; and, in fact, the

11    Courts in this district have recognized that consumer studies

12    are often the most direct and persuasive evidence to secondary

13    meaning.  Here there are none from the plaintiff.  In fact,

14    what you have is a survey we conducted by our expert, Dr. Jeff

15    Stec, who is very experienced in this area, who found no

16    likely -- excuse me, no secondary meaning.  Dr. Stec's opinions

17    are unrebutted, your Honor.  They didn't offer an expert

18    report.  They didn't hire anyone to respond to his report.

19    They didn't even depose him, your Honor.  So, again, you

20    know --

21          THE COURT:  But isn't his study, given that it only

22    focuses on Internet purchasers, of a limited probative value?

23          MR. LEE:  Well, your Honor, there are two studies,

24    your Honor.  One is a secondary meaning survey, your Honor,

25    which is done just how these surveys are done.  All of these

kaj2EasA

surveys now are done over the Internet.  What I think you are

referring to, your Honor, is second likelihood of confusion

survey, which plaintiff has criticized from a trademark

infringement -- as part of the trademark infringement analysis

as being limited somehow or only being of limited value because

it focused on online sales.

        Again, I can address that in more detail either now or

when I get to that in my remarks, but there is no similar

consideration, if you will, for the trade dress survey.  He did

a formal, routinely recognized survey.  It's all done over the

Internet, your Honor, because that's how these surveys are

conducted, especially these days, and he found no secondary

meaning.

        THE COURT:  What about on the likelihood of confusion,

that aspect of the survey?

        MR. LEE:  Yes, your Honor.  He offered a survey and

opined there is no likelihood of confusion with regard to the

trademarks, your Honor.  He did not do a trade dress

infringement survey.  But on the trademarks he said -- again,

he looked at the survey universe of consumers likely to

experience both parties' trademarks.

        In this instance, your Honor, the evidence shows that

Skechers, when it uses its Commute Time trademark, primarily

uses it online.  If you look at how you are buying online,

consumers are buying a Skechers Commute Time, they are buying

kaj2EasA

1    it online from Skechers, from Zappos, from Wal-Mart, or

2    wherever.

3          The evidence demonstrates that Skechers does not

4    advertise or promote its trademark in any fashion, and it

5    doesn't put the trademark on store shelves *per se* as part of

6    the customer purchasing experience.  The only other place you

7    see the Skechers trademark is on the box which, generally

8    speaking, you only see after you purchase the product.

9          So the evidence of record for Easy Spirit is similar.

10   You know, they promote and sell this product online, so that's

11   where consumers are seeing this.  There is no evidence in the

12   record of point of sale advertisements.  There is no evidence

13   of record of how Easy Spirit presents its point of sale, or

14   otherwise how they use their mark.  Because, again, they

15   promote their shoe primarily as an Easy Spirit shoe or the

16   Traveltime in online advertising and other places.

17         So Dr. Stec was faced with, okay, I'm trying to

18   replicate the market.  How does the market view these parties'

19   marks?  And primarily, when you are looking and seeing both of

20   these marks, these parties see it online as the Skechers

21   Commute Time or the Easy Spirit Traveltime.  So that's the

22   market he replicated.

23         Now, even if, again, that is only partially the market

24   for these parties goods -- which I would admit it is, because

25   both of these parties' shoes are sold in brick and mortar

kaj2EasA

stores -- he is left with replicating how the marks themselves

are presented to consumers and primarily they are presented

online.  So if you are going to see potential confusion between

the marks, that's where it is more likely to be found, so

that's the survey that he ran.  He found no confusion.

          Now, your Honor, turning back to sort of the trade

dress issues, if it's okay with you, your Honor?

          THE COURT:  Go ahead.

          MR. LEE:  Thank you.

          Again, the only factor really that there is any

evidence that -- it's not really even evidence, your Honor,

that I would say that would support Easy Spirit' argument is,

if you are looking at the exclusivity of its use, I guess

Skechers doesn't dispute that Easy Spirit has used its trade

dress for some period of time; but, as you see from the record,

there is an overwhelmingly abundant volume of evidence that its

use has not been exclusive.

          Skechers put into the record, your Honor, dozens of

shoe pairs, both from Skechers' prior shoes, from the '90s and

early 2000s, where it was selling nearly identical shoe styles

to its Skechers Commute.  It put in dozens of pairs of shoes

from third parties, where Skechers, again, documented -- was

able to obtain evidence through subpoenas and the like that

these third parties sold millions of pairs of these shoes.

Skechers itself sold millions of pairs of these shoes.  Easy

kaj2EasA

1    Spirit's own witnesses admitted that all of these shoes -- 25

2    different pairs of Skechers shoes, for example -- all possess

3    all of these claimed trade dress elements.  So certainly Easy

4    Spirit has never enjoyed any exclusive use of its trade dress.

5           Now, looking at the confusion factors, your Honor,

6    again, as your Honor is well aware, certain factors weigh more

7    heavily than others, things like strength of the trade dress or

8    similarity or proximity or issues of confusion.  Here, really,

9    the only factor that favors Easy Spirit is the competitive

10   proximity factor.  We will admit, your Honor, these shoes are

11   competitive.  However, overwhelmingly, the other factors favor

12   Skechers in the substantive finding of no likelihood of

13   confusion.

14          Again, based upon all of this third-party evidence

15   that we put forth and the fact that Easy Spirit cannot

16   establish secondary meaning in its trade dress, its trade dress

17   is weak at best.  We detailed in our brief why the parties'

18   trade dresses were not similar.  We went through that element

19   by element.  Again, Easy Spirit did not respond to that.

20          We demonstrated that the quality of our products is

21   high and buyer sophistication is high.  You know, these are

22   sophisticated buyers.  Both parties' documents in evidence

23   recognize that.  There is no evidence of absolute confusion, as

24   I talked about, your Honor, for the trade dress -- on the trade

25   dress infringement side.  If there was, I believe both parties

kaj2EasA

1    would have heard about it by now, your Honor.

2           Really the only factor they focus on, your Honor, is

3    some discussion of what they say would be Skechers' bad faith

4    in adopting its trade dress.  The problem, your Honor, the

5    record just doesn't support that.  I know they don't like it,

6    but the record simply does not support the fact that Skechers

7    engaged in good faith in the development and design of its

8    shoe.

9           THE COURT:  Excuse me, Mr. Lee, but Skechers does not

10   dispute, does it, that its lead designer sent a Traveltime shoe

11   that happened to be, in his words, laying around his office, to

12   China for copying the measurements.  Why isn't evidence of bad

13   faith?

14          MR. LEE:  Two reasons, your Honor.

15          One, he had already designed the upper and the midsole

16   design of the shoe at the time that he did that.  So his design

17   was already set.  And so their complaint about what they claim

18   is their trade dress goes to a design that, again, he had

19   already established based upon his own efforts.

20          And, two, that sample was used only to determine how

21   high and how wide that piece of foam in the midsole is, your

22   Honor.  That was the only element that he said, hey, I want a

23   midsole that's got these measurements.  I don't have a way to

24   measure it accurately.  Can you measure it for me?  The parties

25   don't dispute that.  The parties don't dispute that that's all

kaj2EasA

1    that he did, your Honor.  And, again, the relative height and

2    width measurements of that midsole piece of foam is not an

3    element of their trade dress.

4           So certainly he sent the shoe to China, your Honor,

5    and at best that evidence supports a claim somehow that we

6    intended to compete or even intended to copy, your Honor, but

7    that's not the law.  The law says bad-faith intent to infringe.

8    And in this instance, your Honor, there is nothing wrong with

9    him using that shoe sample, using that shoe to create a sample

10   for those measurement, your Honor, when it didn't go into any

11   elements of their trade dress and which, again, it's a shoe

12   that we labeled all over it Skechers.  We put Skechers' name on

13   it in multiple places on that design -- on the outsole, on the

14   insole, on the tongue.  All of those things demonstrate that

15   there was no bad faith intent to infringe.  All you have is,

16   again, this one shoe use as a sample for some measurements,

17   your Honor, when the measurements themselves are unrecognizable

18   to a consumer in any shape or form.

19          THE COURT:  But is the Skechers house mark present on

20   every Commute Time shoe?

21          MR. LEE:  Yes, your Honor, in multiple places.

22          THE COURT:  What about the Commute Time Snow Escape

23   shoe?

24          MR. LEE:  The Commute Time Snow Escape shoe, your

25   Honor, I'm not sure.  If you give me a second --

kaj2EasA

1           THE COURT:  Counterstatement, paragraph 40.

2           MR. LEE:  Give me just a second, your Honor.

3           (Pause)

4           MR. LEE:  Your Honor, looking at this image -- I

5    honestly don't have the shoe in front of me -- I could not see

6    for this first shoe, whatever it is called, where it could be.

7    It could be on the side, your Honor.  That's my understanding.

8    Again, I don't have -- I'm looking at their document.  I'm not

9    looking at the image of the shoe or the shoe itself.

10          THE COURT:  All right.  Let's move on.

11          MR. LEE:  Certainly.  But I would say, your Honor,

12   this shoe, this one shoe you are talking about, this first

13   shoe, it doesn't meet -- it's not -- doesn't fall within the

14   scope of their alleged trade dress.  It doesn't have all of the

15   same elements, your Honor, and again --

16          THE COURT:  Look, I understand.  You were just making

17   the point that Skechers' trademark name is plastered all over

18   every shoe --

19          MR. LEE:  Yes, your Honor.

20          THE COURT:  -- and I don't think that's true.

21          MR. LEE:  Okay, your Honor.  Well, again, one of my

22   colleagues will look at that --

23          THE COURT:  It's time to move on, because I want to

24   hear from Easy Spirit.  What other key points do you want to

25   make?

kaj2EasA

1          MR. LEE:  Yes, your Honor.  Okay.  Well, I will move

2     on again to the trademark infringement, your Honor.

3          Again, the marks themselves, Skechers Commute Time,

4     Skechers Traveltime, are dissimilar in sight, sound, and

5     meaning, your Honor.  The law doesn't protect --

6          THE COURT:  Right, but aren't --

7          MR. LEE:  -- synonyms.

8          THE COURT:  -- they synonyms?

9          MR. LEE:  Well, they are synonyms, your Honor.  They

10    can be.  But -- and, certainly, that's the nature of trademark

11    law.  You know, parties, as you know, there are various

12    classifications of trademarks, whether they are generic,

13    descriptive, suggestive.  Parties employ synonyms all of the

14    time, your Honor, and we have pointed at some cases in our

15    brief that recognize that, again, parties are -- utilize

16    synonyms regularly and are not found to infringe.  So you are

17    looking --

18          THE COURT:  But after you started with the synonym and

19    the Commute shoe was already in commerce, you then took a big

20    step toward increasing that similarity, didn't you, by adding

21    the word "time" to your shoe?

22          MR. LEE:  So I wouldn't say -- I wouldn't agree that

23    it was a big step, your Honor.  Certainly it did increase the

24    similarity because "time" is in their mark and "time" is in our

25    mark.  But the formative elements of both parties' marks are

kaj2EasA

1  still very dissimilar, your Honor.

2            THE COURT:  All right.  What else?

3            MR. LEE:  Yes, sir.

4            Well, again, because of the movement and nature of

5  "travel," again, their mark is weak with lots of third-party

6  use in this similar arena.  Again, we submit that the parties'

7  marks are dissimilar and, again, you have to recall, again,

8  both parties used their respective marks with their respective

9  house mark.  So it is the Skechers Commute Time, it is the

10  Easy Spirit Traveltime.

11            Again, there is no evidence of confusion whatsoever in

12  the record.  And you have our survey, which I have already

13  talked about already, that is unrebutted.

14            Again, they are getting into issues, such as, the good

15  faith/bad faith.  I've talked about that a little bit.  You do

16  have the name change from Commute to Commute Time that

17  Mr. Greenberg testified he didn't like the Commute, so he first

18  wanted it changed to Commuters by Skechers and then Skechers

19  Commute Time.

20            But Ms. Hobbs detail the process that she employed.

21  She ran it through legal, your Honor, and they made the change.

22  And so, again, is there, at best, evidence of an intent to

23  compete?  At best, potentially, but certainly not evidence of

24  an intent to infringe, again, where the mark is used with its

25  Skechers house mark.  And, again, the Commute Time name doesn't

kaj2EasA

1    appear on the shoe at all.

2              Now, looking briefly at dilution, your Honor, again,

3    as you know, dilution, whether under state or federal law,

4    requires that a mark or a dress be either distinctive or

5    famous.  There are various factors that you consider to

6    establish whether that mark or dress is distinctive or famous.

7    Easy Spirit did not address any of those.  But for the same

8    reason that its dress and mark are not a strong brand or the

9    dress does not have secondary meaning, certainly they are not

10   distinctive or even remotely rising to the level of fame, your

11   Honor, that the federal law recognizes is reserved for marks

12   like Budweiser and Camel and Coca-Cola.

13             The resultant new evidence is to have how or why

14   either the trade dress -- Easy Spirit's trade dress or

15   trademarks have been diluted, either under a theory of blurring

16   or tarnishment, your Honor.  There is just simply no evidence

17   in any way, shape, or form that's been marshaled that there is

18   any sort of diluted aspect to Skechers' conduct that affects

19   Easy Spirit's mark or trade dress.  And so for the same reason

20   that the factors, the confusion factors weigh heavily in

21   Skechers' favor, consideration of them from an aspect of

22   dilution weighs heavily in Skechers' favor.

23             With that, your Honor, I will turn it to you for any

24   questions or to Mr. Saunders.

25             THE COURT:  Thank you, Mr. Lee.

kaj2EasA

1          Let me hear from Mr. Saunders.

2          MR. SAUNDERS:  Thank you, your Honor.

3          I would like to begin very briefly with three

4   fundamental legal propositions on summary judgment motions, the

5   first two from the U.S. Supreme Court.

6          The first being, "In determining whether there is a

7   genuine issue as to any material fact, the evidence of the

8   nonmovant is to be believed and all justifiable inferences are

9   to be drawn in its favor."  That's *Anderson v. Liberty Lobby*.

10  I know the Court is familiar with this.

11         The Second Circuit has also said that "even if one

12  inference seems like it may be the better one, the Court must

13  still draw all inferences in favor of the nonmoving party."

14  That's *Island Software v. Microsoft*, 413 F.3d 257.

15         The second point is that "credibility determinations,

16  the weighing of the evidence, and drawing inferences from facts

17  are of course jury functions, and it's not appropriate for

18  summary judgment."  That's also *Anderson v. Liberty Lobby*.

19         And the third proposition is that "the burden of

20  demonstrating the absence of any genuine dispute as to a

21  material fact rests with the moving party," and that's also

22  U.S. Supreme Court.

23         Here, Skechers has not met its burden of demonstrating

24  an absence of any genuine dispute as to a material fact and,

25  indeed, your Honor, there are truly *bona fide* disputes as to

kaj2EasA

1    numerous material facts which I will detailed regarding most of

2    the *Polaroid* factors and not, as Skechers claims, only as to

3    intent and bad faith.

4           Now, the Second Circuit has said, "To avoid summary

5    judgment, all that is required of the nonmoving party is a

6    showing of sufficient evidence supporting the claimed factual

7    dispute as to require a judge or a jury's resolution of the

8    parties' differing versions of the truth."  That's *Kessler v.*

9    *Westchester County*, 461 F.3d 199.

10          THE COURT:  Look, Mr. Saunders, let's get down to this

11   case, okay?  A huge volume of paper has been submitted on this

12   motion, and there are issues that I am confused by.  So, I

13   mean, I have let you speak but, quite frankly, references to

14   Supreme Court precedence on summary judgment, I am all too

15   familiar with them.

16          MR. SAUNDERS:  I understand, your Honor.

17          THE COURT:  So, first, with respect to your trade

18   dress claim, your complaint explicitly listed six elements, but

19   now in your summary judgment papers, you claim that the trade

20   dress includes the overall design of the shoe.

21          Can you explain that discrepancy?

22          MR. SAUNDERS:  Sure, your Honor.  It's not a

23   discrepancy at all.  It's really just a matter of semantics.

24   We are not trying to change anything.

25          We have identified -- first of all, Skechers claims

kaj2EasA

1    that the trade dress itself is not sufficiently distinct,

2    specific enough to warrant protection, but that's not true.

3    And, in fact, as you know, in paragraph 21, I believe, of the

4    complaint, we did detail six very specific elements, and it is

5    those elements in combination which create the overall

6    appearance of the shoe, your Honor.  What Skechers is trying to

7    do is take them one at a time, take them out and say, okay,

8    this shoe has an arch and this shoe has a swirl.  But you can't

9    do that.  It's -- the elements in combination make up the

10   overall appearance of the shoe, and there is nothing --

11           THE COURT:  But doesn't the -- excuse me.  Doesn't the

12   overall design of the shoe include the upper patterns and

13   materials for the shoe, things that you concede that you have

14   no protectable rights in?

15           MR. SAUNDERS:  Yes.  Certainly that could include

16   those patterns, but that's evidence, again, of copying and

17   intent.  Even if that one element is not claimed as part of the

18   trade dress, your Honor, that doesn't mean it's not relevant in

19   the analysis.  They copied everything to the finest detail.  So

20   some of it is trade dress and some of it just goes to intent,

21   and we think that that's very strong evidence of intent, which

22   I was going to get to a little bit later.

23           THE COURT:  Excuse me, but you are not claiming that

24   you have protectable rights in the upper patterns or materials

25   for the shoe, are you?

kaj2EasA

1          MR. SAUNDERS:  That's correct, your Honor.  That's

2     correct.  Easy Spirit is not claiming that.  But, as I said, it

3     doesn't mean it's not relevant to the analysis.  It goes to

4     intent.  Even if -- there is case law on this, by the way,

5     there is case law on this, there is a section in *McCarthy*.  I

6     think it is the *My-T-Fine* case -- I don't have it in front of

7     me -- that says, where the defendant has infringed a trademark

8     or trade dress right and also copies nonprotectable elements,

9     that's still evidence of intent to come as close as possible

10    and it's still relevant and admissible, your Honor.

11         THE COURT:  Could you explain to me the relationship

12    between Easy Spirit, Nine West, Marc Fisher, and Premier

13    Brands?

14         MR. SAUNDERS:  Well, some of those are just

15    predecessor entities.  Marc Fisher Footwear purchased the

16    Easy Spirit business from Nine West Corporation.  Nine West is

17    a prior owner of that business, a predecessor in interest, and

18    Marc Fisher now has a series -- produces a series of different

19    branded shoes, some under license and some under brands that it

20    owns, such as Easy Spirit.

21         THE COURT:  So are you telling me that Marc Fisher is

22    Easy Spirit LLC the plaintiff in this case?

23         MR. SAUNDERS:  No.  Easy Spirit LLC is a discrete

24    legal entity and that entity is the owner of the intellectual

25    property at issue here and is the entity that designs and sells

kaj2EasA

the Easy Spirit and Traveltime shoes.  So it's the proper

plaintiff, your Honor.

Marc Fisher is actually not a legal entity.  Marc

Fisher Footwear is basically just a business name, an umbrella

name that incorporates each of the separate and independent

LLCs who sell the branded footwear.  So each LLC sells one

particular brand of footwear.  So the only proper plaintiff is

the owner of the IP here, and that's Easy Spirit LLC.

THE COURT:  Where does Premier Brands fit in?

MR. SAUNDERS:  Premier brands . . .

Hold on.

(Pause)

MR. SAUNDERS:  At the moment is there a particular

reference you are looking at?

THE COURT:  No, Premier Brands is mentioned throughout

in your briefs, and I just can't figure out where they fit in.

You have got sales data from Premier Brands.  So how do they

fit into this puzzle?

MR. SAUNDERS:  I believe that Premier Brands is also a

predecessor entity, your Honor.  The only seller currently of

the Traveltime shoe is Easy Spirit LLC.

THE COURT:  But does Easy Spirit have any records that

accurately reflect the number of Traveltime shoes that have

been sold since their inception?

MR. SAUNDERS:  Not to the exact penny, your Honor.

kaj2EasA

Unfortunately, because of the own change of ownership of the
brand multiple times, the company was not able to obtain
detailed sales information from all of the predecessor
entities.  It did what it could.

          But certainly, on this record, that should not affect
its ability to presently protect its intellectual property
rights.  So if it sold 10 million or 11 million or 12 million,
we think that it doesn't really matter at that point, that
these are protectable rights and that the jury could
certainly -- a reasonable jury could find, based on this
evidence, that they are protectable rights.

          THE COURT:  Right, but in your complaint you allege
that they sold 11 million pairs of Traveltime shoes, yet the
evidence that's presented on this motion talks in terms of
hundreds of thousands of pairs.  That's a huge difference,
isn't it?

          MR. SAUNDERS:  It is.  The 11 million figure was based
off of information obtained from factories on number of
products ordered.  And since the companies did not have
excessive inventory of the shoes, Mr. DeZao had believed all of
them were sold.  And so that's where that number came from.
It's certainly a good-faith number.

          But the sales data itself is more limited to recent
years.  As we said in the complaint and in our papers, the shoe
was a big hit early on, right after its introduction, and had

kaj2EasA

massive sales.  In 2006 alone, it was the number-one selling

shoe, as we mentioned in our papers, in the entire country for

that category for women's fashion.  So it is true that the more

significant sales were earlier on in the shoe's lifetime,

lifespan, however, that success is what helped build that brand

quickly and make it as popular and well known and as

distinctive as it is.

THE COURT:  But sales records matter to the secondary

meaning analysis, right?  It's an important factor.

MR. SAUNDERS:  Yes, but as I --

THE COURT:  If there is no secondary meaning, there is

no protectable trade dress, and the sales records that have

been put in on this motion are confusing, to say the least.

MR. SAUNDERS:  Yes, we did the best we could with

that, your Honor.  But I would refer the Court to a Southern

District case with very similar facts, *Frito-Lay v. The Bachman

Company,* 704 F.Supp. 432, and that's cited on page 15 of our

opposition brief, and this was a motion this is a trade dress

case motion for summary judgment made by the defendant, and the

Court there, Judge Cedarbaum, held that the -- stated "the

undisputed facts that Frito-Lay, the plaintiff, has been using

the trade dress for at least 15 years," which happens to be the

same period of time here, "and that the trade dress has been

featured exclusively in advertising," which is true here, "and

that plaintiff's product experienced strong sales," which is

kaj2EasA

1   also true here, your Honor, "could also lead a trier of fact to

2   determine reasonably that the trade dress is a strong one

3   deserving of broad protection."  And so the same is -- it's the

4   same logic and reasoning here.

5        That evidence -- if we put forward, the evidence that

6   we have provided to the Court on this motion, the jury could

7   reasonably determine based on that evidence that the trade

8   dress has acquired secondary meaning and also has -- and is

9   therefore protectable.

10       And we are trying to find -- let's see, statement of

11  fact, coming back to the issue of units sold, your Honor,

12  referring you to Skechers' Statement of Fact No. 264, No. 264,

13  which is on page 75 of that document, that Easy Spirit has

14  provided a separate record from October 2011 through December

15  2017 showing alleged Traveltime sales of $3,912,479 or

16  4,800,226 units sold, so either of those numbers.  And that's

17  attached to the Welch declaration as Exhibit CJ, CJ.

18       So we did provide the Court with as much information

19  as we could, but we believe it's legally sufficient information

20  to establish secondary meaning, your Honor.

21       So I would say --

22       THE COURT:  Thank you.

23       MR. SAUNDERS:  I'm sorry?

24       THE COURT:  No, go ahead.

25       MR. SAUNDERS:  Okay.  So I would say, accepting those

kaj2EasA

1   facts as true, for the purposes of this motion, they raise a

2   legitimate dispute as to a material fact that a trier of fact,

3   the jury, could find in favor of Easy Spirit on.  Skechers is

4   saying completely failed to demonstrate any evidence and to put

5   forward evidence of secondary meaning, and here we believe we

6   have more than sufficient evidence.  But even if it -- at the

7   end of the day, if it's not sufficient, it certainly raises an

8   issue of fact that should preclude summary judgment, your

9   Honor.

10           Now, moving on to the shoes themselves in the context

11   of likelihood of confusion --

12           THE COURT:  Before you do that, you appended several

13   news articles to your summary judgment papers that Skechers

14   claimed were not produced during discovery.  Why should I

15   consider them?

16           MR. SAUNDERS:  Well, is there any prejudice?  You

17   know, if they are just, you know, a multitude of -- just to

18   corroborate other documents that were produced in the

19   litigation, unless there is some real prejudice by producing

20   additional examples as opposed to with holding an entire

21   category of documents and then dumping them at the last minute

22   or after discovery, which we did not do, I would say that the

23   Court certainly is free to consider them and give them whatever

24   weight it deems appropriate.

25           THE COURT:  Of the articles which you did produce,

kaj2EasA

1   weren't nearly all of them published after Skechers introduced

2   the Commute Time shoe?

3            MR. SAUNDERS:  Your Honor, some predate, some were

4   about the same time that they were actually designing the shoe.

5   I mean, there was one article, they called the shoe "iconic,"

6   in the leading trade publication in this industry, *Footwear*

7   *News*, and that was —

8            THE COURT:  Right, but how is one article sufficient

9   to show secondary meaning even if I decide to consider the

10  *Footwear News* piece?

11           MR. SAUNDERS:  There are two aspects to that.

12           The first is, we are not saying any single article

13  establishes secondary meaning.  You have to view the evidence

14  in its totality, and the evidence in its totality supports

15  enough distinctiveness and recognition such that there is

16  secondary meaning.

17           And the second answer to that is, you know, some

18  articles may not be as significant depending upon who published

19  them and who wrote them; but, again, *Footwear News* is

20  basically, your Honor, the Bible in this field.  It is the

21  leading trade publication that every single footwear

22  manufacturer subscribes to and reads.  And so if they are

23  saying something about a particular shoe, it should be given

24  more weight in the industry than, perhaps, others.

25           THE COURT:  In your view, is there any difference in

kaj2EasA

1    the likelihood of confusion analysis for your trademark and

2    trade dress claims?

3             MR. SAUNDERS:  No.  No, your Honor.  You still use the

4    *Polaroid* factors.

5             THE COURT:  Aren't many of the features of the

6    Traveltime shoe, like its toe bumper and clog shape,

7    functional?

8             MR. SAUNDERS:  You could point to individual elements

9    that have a function, but that's not the test under the

10   applicable law, your Honor.  The test for functionality -- and

11   this is now what we are talking about, utilitarian

12   functionality -- is not whether the product or feature has a

13   function.  That is not the test.  The test is whether it is a

14   necessary element for someone to use in a competitive product

15   and whether the feature affects the cost of manufacturing or

16   the ease of manufacturing.

17            So the mere facts -- and there is a ton of case law on

18   this.  The mere fact that the element has a function doesn't

19   make it functional under trademark law.  And, besides, you

20   can't look at the independent -- individual elements

21   themselves, because the trade dress is the combination of those

22   elements.

23            So the question is, is the entire -- all six elements,

24   your Honor, are they all functional under trademark law?  And

25   the answer is absolutely not because there are a zillion ways

kaj2EasA

to make that shoe with the same purpose, the same feel, the

same cost and not look like the Traveltime shoe.  So that,

there, *de jure*, is no functionality.

THE COURT:  How can you claim that Traveltime enjoyed

exclusivity in the market in light of your own witnesses'

repeated concessions that several shoes, some dating back to

the early 2000s, possessed all of the claimed travel dress

elements?

MR. SAUNDERS:  Because it is still the physical

appearance.  The physical appearance is what the consumer sees

and how the consumer identifies the shoe.  And so that's like

saying, your Honor, well, don't all of your -- doesn't your

shoe have a tongue?  Doesn't your shoe have a midsole, an

outsole?  Doesn't it have laces?

Sure, you can ask about broad generic elements of

shoes, but Skechers themselves demonstrated that you can use

these -- these are just elements of a shoe, but you can make it

look very different.  There is absolutely no reason to make it

look exactly like anyone's existing shoe, unless the entire

shoe is a generic shoe.

But here, Skechers demonstrated that themselves.  They

have images of all kinds of open back, heel style, clog shoes

that they themselves designed, that they themselves made, and

that they themselves sold that don't look anything like the

Traveltime shoe, even though they have, you know, these

kaj2EasA

1   elements.

2           The question is what does it look like?  If you can

3   put the elements on paper without an image, you know, you can't

4   do that for trade dress.  You have to have the visual element,

5   and the visual element here is distinct.

6           And if Skechers didn't think so, then why would they

7   have to send it to their factory to copy it?  Why wouldn't they

8   use one of the 30 prior shoes that they designed as a basis for

9   a new shoe?  I mean, there is also that, which I believe is a

10  jury question as well.  It doesn't make sense, your Honor.  If

11  the shoe were really generic, you know, why would you need to

12  copy it and why were you so specific to tell the factory it's

13  got to have the same -- the exact same dimensions, the exact

14  same dimensions, that the designer who the shoe was sent to the

15  factory and gave that instruction, it's paragraph 10, Exhibit 6

16  to my declaration, and then when it came back, he made strides

17  and efforts to ensure.  He double and triple checked that the

18  dimensions were exactly the same.  Now, why would that be

19  necessary if that shoe were not distinctive in some way?  It is

20  simply -- well, I think it raises a question.

21          THE COURT:  Your briefing spends considerable time

22  arguing about the credibility of Skechers' witnesses, but don't

23  those credibility issues relate specifically to Skechers' bad

24  faith in copying the Traveltime shoe?

25          MR. SAUNDERS:  Right, but there are other -- so that's

kaj2EasA

true, your Honor.  I want to answer your question.  But there
are other material disputes raised by the parties' papers as to
the other likelihood of confusion factors which I was going to
address briefly first.

        For example, Skechers claims that Traveltime, the
registered trademark, is a weak mark, but for the reasons that
we explained, on pages 21 and 22 of our opposition, the
trademark is strong on both grounds inherently.  Inherently
there is nothing about Traveltime that conjures up or suggests
shoes, therefore, it is not a suggestive mark, it is a strong,
distinctive, arbitrary mark.  And it also has substantial
market strength, having been sold for 15 continuous years and
having been a market leader in one year and a leader for the
entire Easy Spirit line of shoes every year.  That certainly
makes the mark, in our view, quite strong.  And therefore,
based on that evidence, that the mark is registered, it's
incontestable, it's arbitrary, distinctive, and has market
strength, a reasonable jury could find that the mark is a
strong mark based on this evidence, and so here we have another
dispute, clearly material and clearly a dispute, your Honor.
They say it's weak, and we provided evidence that it is very
strong.  That's a disputed fact, your Honor.

        And similarly, the similarity of the marks, I mean,
that's absolutely another issue that the jury could find in
favor of Easy Spirit.  Again, Skechers is saying, on pages five

kaj2EasA

1    to six of its reply, "the addition of the word 'time' to the

2    Commute Time mark as a separate word" -- and I'm reading, I'm

3    quoting now -- "rather than in combination, like in Traveltime,

4    does not change the fact that the overall consumer impression

5    of the two marks in context is that they are distinct and

6    unsimilar phrases."

7           We say the evidence shows absolutely the opposite.

8    The fact that there is a space in between "Commute" and "Time"

9    does not distinguish the marks, your Honor.  But that's

10   something that the jury would consider as well.  Does it or

11   doesn't it?

12          And so, again, we have another -- right here, it's

13   clear, it is a disputed material fact, your Honor.  They say

14   one thing, and they say the evidence supports that, and we say

15   absolutely not.  The evidence supports completely the opposite

16   conclusion, that the space in between the two words is

17   meaningless and would not be something that the consumer would

18   pay much attention to.  The fact is, as your Honor said

19   earlier, the addition of the word "time" is what's significant,

20   not the space.

21          THE COURT:  Why shouldn't this Court find that Easy

22   Spirit' average consumers are sophisticated?

23          MR. SAUNDERS:  Right.  So that was another factor that

24   I wanted to address, your Honor.  This one is pretty much a

25   legal issue, though.  But certainly there is evidence that the

kaj2EasA

1    target consumer for these products are, you know, ordinary

2    individuals, slightly -- I don't want to say older, because

3    they may be younger than I am, but it's a certain segment of

4    people who are not fashionistas, so the Second Circuit a number

5    of times and the Southern District in a number of cases has

6    recognized that, when you are dealing with very expensive,

7    high-end, high couture fashion items, when we are talking about

8    the Guccis and the Fendis, and the Chanels, yes, those people

9    are sophisticated, and there is case law that says they know

10   their brands, they know where their shoes come from or their

11   products come from, their handbags, and they are sophisticated

12   because they are spending a tremendous amount of money and they

13   also follow fashion.  But there is absolutely no evidence here

14   of that.  This is a --

15            THE COURT:  But isn't your average consumer has at

16   least some college-level education and they are middle-aged?

17            MR. SAUNDERS:  That may be.

18            THE COURT:  Don't you agree with that?

19            MR. SAUNDERS:  Respectfully, your Honor, that doesn't

20   make them sophisticated in this field.  Maybe they are -- I'm

21   not saying they are not smart.  I'm not saying they are

22   ignorant.  I'm not saying that at all.  I am just saying they

23   don't have -- sophistication refers to the knowledge in the

24   particular field, not just like whether the person is

25   sophisticated and smart.  And so, here, all we are saying is,

kaj2EasA

1  now, they don't have that kind of knowledge.  They don't know

2  what company makes what product and what designer works for

3  what company, like the people who follow fashion do.  In other

4  words, there is no basis here to apply sophistication of the

5  consumer factor.  Here, there is no basis to say these people

6  are knowledgeable about the shoe industry.

7          THE COURT:  Well, aren't shoes a bigger purchase than

8  typical consumer goods like, you know, a pack of gum or a candy

9  bar?

10          MR. SAUNDERS:  Sure, you could say that.

11          THE COURT:  Of course it's true, right?

12          MR. SAUNDERS:  No I'm not saying --

13          THE COURT:  Hold on.  When you buy a pair of shoes,

14  it's not something that you are going to wear once and throw

15  away, okay?  You are going to have them for a period of time.

16  And I think, you know, the argument that somebody has to have a

17  lot of money and buy an expensive Gucci bag does not make them

18  sophisticated.  Sophisticated shoppers are people who are

19  comparison shopping and knowing what they are looking for.

20          MR. SAUNDERS:  That may be true, but all I'm saying is

21  the evidence of record here doesn't go that way.  I mean, you

22  could say, yes, shoes cost more than a pack of gum, and maybe

23  an overcoat costs more than shoes, and a piece of jewelry costs

24  more than an overcoat.  Still, that alone doesn't make the

25  consumer sophisticated.  That is just what the law is.  I'm

kaj2EasA

1    not -- it's not my personal opinion.  That's what the law is.

2    That alone doesn't do it.

3         But there is case law that says where there -- the

4    buyers are professional, let's say, selling medical equipment,

5    like an x-ray scanner, x-ray machine, there is a high burden of

6    proof of likelihood of confusion there because those people are

7    very knowledgeable, because they are buying something that's in

8    their trade.

9         Similarly, where the consumers are spending

10   extraordinary amounts of money on something, there may be more

11   due care in making the purchasing decision.

12        But, again, due care is not quite the same thing as

13   sophistication.

14        THE COURT:  All right.  Your complaint alleges a state

15   law claim for dilution under New York law.  However, in reading

16   your briefs, it suggests to me that the claim rests on a

17   federal statute.  Have you abandoned your state law claim?

18        MR. SAUNDERS:  We haven't abandoned it, your Honor,

19   expressly.  We just ran out of pages, but we haven't expressly

20   abandoned it.  We certainly believe that, under either the

21   federal law or state statute, certainly under the federal

22   statute that, there is dilution.  And, again, significantly,

23   for dilution, you do not need to prove confusion.

24        THE COURT:  But isn't the standard for the federal

25   claim higher in that it needs to be a famous mark?

kaj2EasA

1          MR. SAUNDERS:  It may be absolutely higher and, as I

2     said, we are not abandoning the state claim, but the concept is

3     very similar even if, under the federal statute, there might be

4     a higher burden of proving that the design is very well-known.

5          THE COURT:  All right.  Anything further,

6     Mr. Saunders?

7          MR. SAUNDERS:  Yeah.  Well, I didn't discuss the

8     similarity of the shoes, the similarity of the overall shoes

9     that are at issue here.  But this, too, does also create a

10    material fact in dispute because Skechers is saying on page six

11    of its reply, they argue that the Skechers and Easy Spirit

12    shoes "are dissimilar in the context of open backs, as there

13    are numerous differences between them with respect to the

14    claimed elements and their overall commercial impressions."

15    That's Skechers.

16         But here we clearly have a dispute, another dispute as

17    to a material fact.  Are they dissimilar?  I think it's for the

18    jury to determine, to look at the shoes and to determine

19    whether they are dissimilar or very similar in overall or

20    commercial appearance.  A reasonable jury certainly could find

21    in Easy Spirit' favor on that factual issue, and it's

22    fundamental to the claim.

23         And indeed, your Honor, if the CEO of the company,

24    Mr. Greenberg, refers to his Skechers shoes, to the Commute

25    Time shoes as the "Traveltime-looking product," if he is

kaj2EasA

1    referring to it as the "Traveltime-looking product," then there

2    is certainly quite -- there is a dispute between the evidence

3    of record and Skechers' own argument.  How could these shoes be

4    totally dissimilar and yet the CEO is calling them in documents

5    "the Traveltime-looking product"?  I believe that raises a very

6    significant issue, and a material one, and one that should be

7    decided by the jury.

8          And moving on, finally, to the intent and bad faith,

9    the reason why we spent so much time on it is because we think

10    it is quite important.  There is too much here, your Honor,

11    just to brush it off and say, it's fair competition and we

12    didn't mean to confuse.  There is too much of it and there is

13    too much inconsistency, evasiveness, and finger-pointing.  And,

14    again, this raise as jury question.  I mean, the copying was

15    pervasive.  Skechers suggested in one of its facts that this

16    was -- that the Easy Spirit shoe was sent to the factory to

17    save time.  Well, that's a credibility issue.

18          But there could be no serious doubt that the testimony

19    and evidence, which we summarized in the brief and adduced in

20    discovery, does raise very serious questions as to whether

21    Skechers intended to confuse by coming as close as possible to

22    the mark and to the trade dress and then, on top of it, copying

23    advertising and everything else that it did, and changing the

24    name from one that was synonymous and similar and had the same

25    connation to one that was even more similar, after only months

kaj2EasA

1    of the introduction of the shoe, as your Honor said earlier.

2    And in fact even counsel admitted that adding "time," the word

3    "time," increased the similarity of the marks.  So once again,

4    isn't that a jury issue?  I would say it is.  I would say it is

5    an issue.  Clearly it's material, and I believe it raises

6    another issue that should be decided by the jury.

7              So Skechers is saying, okay, we intended to copy, but

8    of course we didn't intend to confuse.  I think the jury should

9    decide whether that is the case or not based upon all of the

10   evidence.

11             THE COURT:  I think I have your arguments,

12   Mr. Saunders.

13             MR. SAUNDERS:  All right.  And there was -- I just

14   wanted to raise one other point.  It was a case before your

15   Honor, the *Mr. Water Heaters Enterprises*?

16             THE COURT:  Yes.

17             MR. SAUNDERS:  You may recall, 648 F.Supp.2d 576, and

18   I would like to finish there, your Honor, because in that case

19   your Honor found that there was "an inference of bad faith

20   bolstered if the defendant offers no credible explanation for

21   its adoption of a plaintiff's mark."  That case was a summary

22   judgment case, and your Honor stated, "Accordingly, whether

23   defendant acted in bad faith is a jury question," and I think

24   the same logic applies here to the changing of the name from

25   one that is similar to one that is even more similar without

kaj2EasA

1    giving any credible explanation.  And to this day, your Honor,

2    we have no explanation.  We asked.  We fought for

3    Mr. Greenberg's deposition.  We asked Mr. Greenberg.  He had

4    actually no recollection of anything.  He just kept say, "I

5    don't recall," "I don't recall."  And yet, here, you have

6    counsel telling you Mr. Greenberg didn't like the name and that

7    was the reason for the change, and it's really odd that

8    Mr. Greenberg not only couldn't explain why he didn't like the

9    name and made the change, but couldn't even remember,

10   supposedly, any facts whatsoever related to that name change.

11          And so coming back to the *Water Heaters* case, the

12   Court concluded, "While plaintiffs failed to show actual

13   confusion, a question of fact exists as to whether defendant

14   acted in bad faith," and we say the same exact logic in

15   *Mr. Water Heater* applies here and, therefore, respectfully,

16   summary judgment should be denied.

17          THE COURT:  All right.  Thank you, Mr. Saunders.

18          Mr. Lee, anything further?

19          MR. LEE:  Yes, sir.  A couple of minor points and

20   one --

21          THE COURT:  Yes, very, very briefly.  All right?  And

22   first let me ask you this:  In your view, are the trade dress

23   and trademark claims so similar that they rise and fall

24   together, such that if one is dismissed, the other is

25   dismissed?

kaj2EasA

1            MR. LEE:  Necessarily, no, your Honor.  There are

2   certain burdens of proof on the trade dress claims where Easy

3   Spirit has utterly failed to come forward with any evidence,

4   and you wouldn't say that for the same on the trade dress --

5   excuse me, on the trademark claims.  So I would not say they

6   necessarily rise and fall together.  I do believe they both

7   should fall, your Honor, but I wouldn't say they rise and fall

8   together.

9            THE COURT:  All right.  Now you said you had a couple

10  of minor points and a major point?

11           MR. SAUNDERS:  Well --

12           THE COURT:  Did I hear you right?

13           MR. SAUNDERS:  Yes, sir.  I'm not sure minor versus

14  major.  One point I wanted to clarify, because I had one of my

15  colleagues dig this up while Mr. Saunders was talking.

16           You asked about sort of the fuzzy Skechers shoe, the

17  first shoe that was identified in the counterstatement in

18  paragraph 321.  That image in the counterstatement only showed

19  one side of the shoe and the upper.  The actual exhibit that's

20  attached to the papers, that was attached by Easy Spirit,

21  Exhibit 8M, actually shows the converse side, the outside, and

22  that does have the Skechers name prominently on the outside.

23  So you asked about just that one shoe and whether every

24  Skechers shoe says "Skechers."  again, your Honor, we say yes.

25  And that one shoe, the image I believe you saw or your clerk

kaj2EasA

1    saw simply didn't see the other side of it.  But Exhibit 8M

2    shows that clearly.

3            Looking at a couple of high-level issues, your Honor,

4    and you asked about the trade dress and functionality that I

5    wanted to address quickly.

6            Again, it is incumbent upon them to identify their

7    alleged trade dress and we would admit that they did so.  We

8    are not saying that they did not.  What they failed to do is to

9    identify how that trade dress is distinctive either by element

10   or in combination.  They failed to argue how that trade dress

11   is not functional by element or in combination.  We went

12   through that *ad nauseam* in our brief, your Honor, and they

13   failed to address it.  So there is no evidence to suggest

14   otherwise.

15           Same thing with secondary meaning, your Honor.

16   Counsel talked about these various documents and what they show

17   and don't show.  The reality is they produced very little in

18   discovery about advertising or sales.  Only a handful of the

19   articles they produced predate our launch, so only a handful of

20   the articles can even be considered relevant, and they don't

21   show that they promoted the trade dress specifically or

22   separately from selling it -- just having it be an Easy Spirit

23   advertisement.  And, yes, we were prejudiced, your Honor, by

24   their failure to produce that stuff during discovery, but by

25   and large, as counsel admitted, it all postdated our launch.

kaj2EasA

1          We heard Mr. Saunders talk at length about *Footwear*

2   *News* and the iconic shoe, putting aside that that doesn't even

3   necessarily address the trade dress, again, all Mr. Saunders

4   said is not in the record.  There is no evidence behind any of

5   this?  And so we have the article, which wasn't produced in

6   discovery, but all of this other supposition is not evidence,

7   your Honor.

8          And when you are looking at summary judgment, Easy

9   Spirit simply can't cherry-pick every fact that it disagrees

10  with and say, oh, we didn't agree, therefore there is a

11  disputed fact, and so therefore we should get to go to a jury.

12         Their brief in no way, shape, or form discusses the

13  alleged similarity, for example, between the trade dresses.  We

14  went through that at length in our brief, explaining why these

15  trade dresses are dissimilar.  To your point, what they are

16  claiming is such a broad category of trade dress that, you

17  know, whether -- I mean, it's almost like they did claim a

18  tongue and a sole and laces because they allege an outsole, a

19  midsole, an upper that you can slip onto your foot.  Again,

20  these dresses are dissimilar.  We detailed in our brief how so.

21  They did not respond to that.  they can't create an issue of

22  material fact on the issues, for example, just because

23  Mr. Saunders won't agree to it today on the telephone.

24         And last point I would -- again, I would go to sort of

25  the bad faith issue, and this question about Mr. Greenberg and

kaj2EasA

1  Mr. Saunders' comments, there is too much here, too much

2  evasiveness, too much finger-pointing.  I'm not sure honestly

3  what he is referring to about evasiveness.  All of these

4  witnesses answered the questions asked of them.  They all

5  answered who was responsible for what.  Ms. Baruch was asked

6  who is responsible for designing the pattern?  She pointed to

7  Ms. Spears, and they deposed Ms. Spears and she explained that

8  process.  Mr. Greenberg was asked who is responsible for

9  picking and designing and launching the Commute Time shoe?  He

10  said it is Mrs. Baruch and, well, they asked Mrs. Baruch about

11  that extensively.  So there is no evasiveness.  There is no

12  finger pointing.

13         And, yes, certainly while Mr. Greenberg couldn't

14  answer every question put to him, you know, again, you have the

15  fortune -- you have the CEO, chairman of the board of a Fortune

16  500 company, who deals with thousands of pairs of shoes,

17  billions of dollars of sales every year, and he is not going to

18  remember details about a couple of e-mails.  But the e-mails --

19         THE COURT:  Let me ask you this.  Why would he refer

20  to a "Traveltime-looking product"?

21         MR. LEE:  Yes, sir.  At the time, all we can --

22  honestly, he has no recollection of the e-mails.  You can glean

23  from the e-mail that he wants to talk to Mrs. Baruch about

24  offering some competitive shoes, because those e-mails talk

25  about other competitive shoes.  Let's make a different Skechers

kaj2EasA

1    shoe using Skechers designs from the Reggae or some of these

2    other designs, let's make an offer, a competitive offering that

3    looks like the Traveltime.  That's what it says, your Honor, to

4    be fair.  That doesn't mean there is a bad-faith intent to

5    infringe.  And I certainly didn't admit, and I don't believe

6    Skechers has ever admitted they intended to copy.  Competition

7    is competition, your Honor.

8                 And, with that, I'm finished.

9                 THE COURT:  All right.  Counsel, thank you for your

10   arguments.  Decision on the motion is reserved.

11                Have a good afternoon.

12                MR. SAUNDERS:  Thank you, your Honor.  Same to you.

13                MR. LEE:  Thank you, your Honor.

14                              oOo

15

16

17

18

19

20

21

22

23

24

25