UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

EASY SPIRIT, LLC,

                Plaintiff,

     -against-

SKECHERS U.S.A., INC. and
SKECHERS U.S.A., INC. II,

                Defendants.

------------------------------------------------------------

19cv3299

OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

        Plaintiff Easy Spirit, LLC ("Easy Spirit") brings this trademark and trade dress infringement action against Defendants Skechers U.S.A., Inc. and Skechers U.S.A., Inc. II (collectively, "Skechers") under the Lanham Act and New York law.  Easy Spirit claims that Skechers has infringed on its trademark and trade dress rights in the name and design of its "Traveltime" shoe.  As a result, Easy Spirit brings the following claims against Skechers: (1) trademark infringement under 15 U.S.C. § 1114(1)(a); (2) false designation of origin under 15 U.S.C. § 1125(a); (3) New York common law trademark and trade dress infringement; and (4) dilution under N.Y. Gen. Bus. Law ("GBL") § 360-l.  Skechers moves for summary judgment on all of Easy Spirit's claims pursuant to Federal Rule of Civil Procedure 56.  For the following reasons, Skechers' motion is granted in part and denied in part.

<u>BACKGROUND</u>

        Unless otherwise noted, the following facts are undisputed.

I.      Easy Spirit and the Traveltime Shoe

        Easy Spirit designs and sells women's comfort footwear.  (Defs.' Reply to Pl.'s
Counterstatement of Additional Material Facts, ECF No. 87 ("Reply 56.1"), ¶ 291.)  In 2004,
Easy Spirit's predecessors-in-interest introduced the Traveltime shoe—"a light-weight slip-on
mule style [shoe] with an open back" that is "designed for maximum comfort and easy wearing."
(Pl.'s Counterstatement of Material Facts, ECF No. 80 ("Counterstatement"), ¶ 1.)  In 2014, the
Traveltime brand name was registered as a trademark on the Principal Register of the United
States Patent and Trademark Office ("USPTO").  (Counterstatement ¶ 2.)[1]  The registered
Traveltime trademark "consists of standard characters without claim to any particular font style,
size, or color."  (Decl. of Darren W. Saunders, ECF No. 80-2 ("Saunders Decl."), Ex. 41.)

        The Traveltime shoe is—or has been—sold in department stores like Macy's,
Nordstrom Rack, and Bealls, as well as in footwear catalogs, independent shoe stores, and on the
internet.  (Reply 56.1 ¶ 357.)  Easy Spirit claims that the Traveltime shoe has been its best-
selling product each year since the shoe's inception, (Counterstatement ¶ 295), and that over 11
million pairs have been sold to date, (Counterstatement ¶ 259).  Easy Spirit also claims that the
Traveltime shoe has garnered "accolades in the media," (Decl. of Mark DeZao in Supp. of Pl.'s
Opp'n to Defs.' Mot. for Summ. J., ECF No. 80-3 ("DeZao Decl."), ¶ 13), and that the shoe has
been described as "iconic," (Counterstatement ¶ 360).  Skechers disputes the Traveltime shoe's
sales success and media renown, claiming that Easy Spirit cannot substantiate Traveltime sales
before 2017, (see Counterstatement ¶¶ 260–66), and that few media sources have praised—or
even discussed—the shoe's design, (see Counterstatement ¶¶ 267–78).

---

[1]      Easy Spirit, LLC was formed in 2016 to acquire the trademark rights and other assets concerning the Easy
Spirit brand from Nine West Holdings ("Nine West").  (Counterstatement ¶ 14.)

Given the Traveltime shoe's purported popularity, Easy Spirit claims that the shoe's "unique combination of design elements" constitutes a protectable trade dress.  (Compl., ECF No. 1, ¶ 20; Counterstatement ¶ 8.)  Those "elements" are: (i) a slip-on, clog-style upper; (ii) a  "swirl" midsole that runs from the base of the toe cap, gradually widening as it flows to the heel; (iii) an indented curved line along the midsole from the front to the heel and another indented line on the rear of the shoe; (iv) a combined contoured midsole/outsole with an arch that creates an open area between the outsole and heel; (v) a rubber outsole extending up from the bottom of the shoe to the front of the shoe to form a bumper; and (vi) four circular design elements on the midsole at the heel.  (Compl. ¶ 21; DeZao Decl. ¶ 7.)  All six elements are labeled in the following representative photograph of a Traveltime shoe:



(Compl. ¶ 21).

II.    Skechers' Commute and Commute Time Shoes

Skechers is a global shoe brand that designs lifestyle and performance footwear. (Counterstatement ¶ 3.)  In 2017, Skechers designed a new open-back shoe called the

"Commute" for its "Modern Comfort" division and began selling it in February 2018. (Counterstatement ¶¶ 4–5.)

Skechers claims the Commute shoe was the brainchild of Jessica Baruch, the company's Senior Director of Merchandising and Product Development. (Counterstatement ¶¶ 22, 25.) Baruch allegedly wanted to launch a new shoe that drew inspiration from an already-existing line of Skechers shoes called the "D'Lite." (Counterstatement ¶ 25.) To that end, Baruch requested that the Commute shoe feature decorative elements called "chicklets" found on the heel of the D'Lite shoe. (Decl. of Jessica Baruch, ECF No. 54 ("Baruch Decl."), ¶ 7; Decl. of Emily C. Welch, ECF No. 59 ("Welch Decl."), Ex. P, at 48:11–49:9.)

Easy Spirit rejects Baruch's narrative, claiming that Skechers' true inspiration for the Commute shoe was the Traveltime shoe, which Skechers intended to copy "as close[ly] as possible." (Counterstatement ¶ 26.) Easy Spirit also disputes that the decision to create the Commute shoe was made by Baruch and claims that Skechers' CEO, Robert Greenberg, played a role in the decision-making process. (Counterstatement ¶ 25.) Indeed, in March 2017, Baruch received an email with the subject line "Memo from Robert," stating in pertinent part: "A nice idea for the 'Travel Time' [competitive versions] that you're doing is that you do it also in a lace-up version also." (Counterstatement ¶ 335; Saunders Decl., Ex. 3, at 42:4–16.)

Regardless of who came up with the idea, the parties agree that Savva Teteriatnikov served as Skechers' lead designer for the Commute shoe. (Counterstatement ¶¶ 21, 27.) Specifically, Teteriatnikov designed the shoe's outsole (the hard bottom of the shoe) and midsole (the periphery of the bottom), as well as some of the shoe's initial upper patterns (the material on top of the shoe). (Decl. of Savva Teteriatnikov, ECF No. 56 ("Teteriatnikov Decl."), ¶¶ 5–6.) When designing the Commute shoe, Teteriatnikov examined other Skechers

shoes, as well as third-party shoes, for inspiration.  (Teteriatnikov Decl. ¶ 10.)  One of the third-party shoes that Teteriatnikov examined was a Traveltime shoe that was "laying around" his office.  (Reply 56.1 ¶ 303.)  He found certain dimensions of the Traveltime shoe to be appealing and sent the shoe to an affiliate factory in China.  (Reply 56.1 ¶ 303; Teteriatnikov Decl. ¶ 13.)  Teteriatnikov instructed the factory to use the "[s]ame exact outsole width[] and midsole height[]" as the Traveltime shoe in constructing a prototype of the outsole and midsole that he designed for the Commute shoe.  (Reply 56.1 ¶ 303; Saunders Decl., Ex. 6D.)  He believed it would be easier for workers at the factory to take those precise measurements than it would have been for him to do so in his office—a claim that Easy Spirit disputes.  (Counterstatement ¶ 34; Teteriatnikov Decl. ¶ 13.)  Once Teteriatnikov received the Commute midsole/outsole prototype, he compared it against a Traveltime shoe.  (Reply 56.1 ¶ 304.)  At some point during the design process, Teteriatnikov inserted two chicklets into the heel of the Commute shoe.  (Welch Decl., Ex. B ("Teteriatnikov Deposition Tr."), at 165:12–69:22; <u>see</u> Saunders Decl., Ex. 6E.)  Because the chicklets were also present on the heels of the D'Lite and other Skechers shoes, Teteriatnikov considered their addition to the Commute shoe to be "part of the Skecher-izing process."  (Teteriatnikov Deposition Tr., at 165:12–66:18.)

   As the design process continued, a retail buyer for Bealls emailed Baruch about "signage" for "introduc[ing] the [Commute shoe] and [its] features" to Bealls consumers.  (Saunders Decl., Ex. 8A.)  The email included Easy Spirit advertisements depicting Traveltime shoes with different upper patterns.  (Saunders Decl., Ex. 8A.)  The buyer informed Baruch that she wanted "to do something [similar]" for the Commute shoe and also explained which of the depicted patterns sold well at Bealls.  (Saunders Decl., Ex. 8A.)  According to Easy Spirit,

Skechers used the information provided by the Bealls buyer to copy many of the Traveltime shoe's successful upper patterns.  (Reply 56.1 ¶¶ 307–08.)

The name "Commute" was chosen by Melissa Hobbs, a senior product manager for Skechers.  (Counterstatement ¶¶ 45–46.)  Hobbs selected that name after she (or a member of her team) checked the names of prior Skechers shoes, as well as trademark databases for prior relevant registrations.  (Counterstatement ¶ 48.)  However, in September 2018—seven months after bringing the Commute shoe to market—Skechers changed the shoe's name to "Commute Time."  (Counterstatement ¶ 7.)  Easy Spirit claims the name change was directed by Greenberg.  For example, an email dated September 20, 2018 states: "Robert . . . confirmed he wants to proceed with changing the name to 'Commute Time.'"  (Saunders Decl., Ex. 3C.)  Skechers disputes the extent to which Greenberg was involved in the name change.  (Reply 56.1 ¶ 329.)

Like Easy Spirit's Traveltime shoe, Skechers' Commute and Commute Time shoes either have been or are currently sold in footwear catalogs, on the internet, and in department stores, including Macy's, Bealls, and Nordstrom Rack.  (Reply 56.1 ¶ 358.)  Between February 2018 and mid-June 2020, Skechers sold 444,528 pairs of Commute and Commute Time shoes.  (Counterstatement ¶ 6.)  A representative photo of a Commute Time shoe is depicted below.



(Compl. ¶ 23.)

## DISCUSSION

I.   Legal Standard

Summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Baez v. JetBlue Airways Corp., 793 F.3d 269, 274 (2d Cir. 2015) (quotation marks omitted). This Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists." Rodriguez v. City of New York, 72 F.3d 1051, 1060–61 (2d Cir. 1995). If the moving party meets its burden, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (quotation marks omitted); accord Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations omitted). "In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).

II.    Trade Dress Claims

      Easy Spirit brings two claims against Skechers for its alleged infringement of the Traveltime trade dress: (1) a claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and (2) a claim for New York common law trade dress infringement.  (Compl. ¶¶ 46–56, 65–75.)

      A.    Easy Spirit's Lanham Act Claim

      Section 43(a) of the Lanham Act "prohibits a person from using 'any word, term, name, symbol, or device, or any combination thereof' that is 'likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods.'"  Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 114 (2d Cir. 2001) (alteration in original) (quoting 15 U.S.C. § 1125(a)).  The statute "has been held to embrace not just word marks, such as 'Nike,' and symbol marks, such as Nike's 'swoosh' symbol, but also 'trade dress'—a category that originally included only the packaging, or 'dressing,' of a product, but in recent years has been expanded . . . to encompass the design of a product."  Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209 (2000). However, courts in this Circuit "exercise particular caution[] when extending protection to product designs," Yurman Design, Inc., 262 F.3d at 114 (quotation marks omitted), because "product design[s] almost invariably serve[] purposes other than source identification," Wal-Mart, 529 U.S. at 213.

      To prevail under § 43(a), a "plaintiff must prove (1) that the [trade dress] is distinctive as to the source of the good, and (2) that there is a likelihood of confusion between its good and the defendant's."  Yurman Design, Inc., 262 F.3d at 115 (citing Wal-Mart, 529 U.S. at 210); see also Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 377 (2d Cir. 1997).  The "plaintiff [must also] prove that an unregistered trade dress is 'not functional.'" Yurman Design, Inc., 262 F.3d at 116 (quoting 15 U.S.C. § 1125(a)(3)).

i. Distinctiveness

"Where the mark is a word, symbol or even product packaging, the plaintiff may prove distinctiveness by showing . . . that the 'intrinsic nature' of the mark serves to identify a particular source (what is known as 'inherent distinctiveness')." Yurman Design, Inc., 262 F.3d at 115 (quoting Wal-Mart, 529 U.S. at 210–11).  Alternatively, the plaintiff may show that "'in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself' (what is known as 'acquired distinctiveness' or 'secondary meaning')." Yurman Design, Inc., 262 F.3d at 115 (alteration in original) (quoting Wal-Mart, 529 U.S. at 210–11).  A plaintiff alleging infringement of a product design trade dress "must always make the . . . more difficult showing" of secondary meaning.  Yurman Design, Inc., 262 F.3d at 115; see Malaco Leaf, AB v. Promotion In Motion, Inc., 287 F. Supp. 2d 355, 363 (S.D.N.Y. 2003) ("[A] trade dress based on the design of a product can never be inherently distinctive.").

Since Easy Spirit claims a protectable trade dress in the "unique combination" of the "design elements of the Traveltime shoe," (Compl. ¶ 20), it must adduce facts showing that the Traveltime trade dress has acquired secondary meaning.

ii. Secondary Meaning

"The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article because of its source." Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 143 n.4 (2d Cir. 1997).  The Second Circuit has identified six non-exclusive factors relevant to the secondary meaning inquiry: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and

exclusivity of the mark's use." Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 226 (2d Cir. 2012) (quotation marks omitted). "[N]o single factor is determinative and every element need not be proved." Thompson Med. Co. v. Pfizer Inc., 753 F.2d 208, 217 (2d Cir. 1985) (citation and quotation marks omitted). While "the Second Circuit has stated that district courts should be cautious in weighing these factors at the summary judgment stage, it has nonetheless supported summary judgment in cases where the proponent of the alleged [mark] has failed to raise a material issue of fact on the question of secondary meaning." Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc., 478 F. Supp. 2d 340, 344 (E.D.N.Y. 2007).

"[P]roof of secondary meaning entails vigorous evidentiary requirements." Thompson Med. Co., 753 F.2d at 217 (alteration in original) (quotation marks omitted). A "plaintiff bears the burden of proving that his mark acquired secondary meaning by the time the allegedly infringing product came on the market." LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 654 (S.D.N.Y. 2016) (citing Thompson Med. Co., 753 F.2d at 217; see also Greenpoint Fin. Corp. v. Sperry & Hutchinson Co., 116 F. Supp. 2d 405, 409 (S.D.N.Y. 2000) ("The critical question is whether [plaintiff's mark] had gained secondary meaning by the time [defendants] entered the market.").

In its motion, Skechers avers that all of the relevant factors weigh against a finding that the Traveltime trade dress has acquired secondary meaning. Easy Spirit's opposition, however, does not squarely address Skechers' arguments. In fact, the phrase "secondary meaning" is noticeably absent from Easy Spirit's papers. Nevertheless, this Court undertakes a secondary meaning analysis.

a.   Advertising Expenditures

"Advertising expenditures are regarded as indirect evidence of the possible effect that advertising may have on consumers' association of the trade dress with the source of the product." LVL XIII Brands, Inc., 209 F. Supp. 3d at 654–55 (quotation marks omitted). "Targeted albeit low-cost advertising may establish this factor, but only if the plaintiff can show that it was successful in reaching the targeted audience." LVL XIII Brands, Inc., 209 F. Supp. 3d at 655; see also Jewish Sephardic Yellow Pages, Ltd., 478 F. Supp. 2d at 345 ("[P]laintiff has not submitted any concrete evidence showing that these efforts succeeded in reaching the Jewish phonebook users who are plaintiff's target audience."). Additionally, "[t]he Court should consider . . . whether the plaintiff's advertising specifically directed consumers to the mark as an indication of source." LVL XIII Brands, Inc., 209 F. Supp. 3d at 655. Simply "showing that a certain amount was spent on advertising provides little support for secondary meaning absent some demonstration that the advertisements caused consumers to associate the [mark] with [the] [p]laintiff." Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of N.J., 894 F. Supp. 2d 288, 319 (S.D.N.Y. 2012) (quotation marks omitted).

There is a dearth of evidence concerning Easy Spirit's advertising expenditures for the Traveltime shoe. To be sure, Easy Spirit spent approximately $8,132,000 on marketing and advertising for the Easy Spirit brand as a whole between 2017 and 2019. (Reply 56.1 ¶ 374.)[2] Standing alone, however, Easy Spirit's brand-level marketing and advertising expenditures do not evince secondary meaning for the Traveltime trade dress. See MZ Wallace Inc. v. Fuller, 2018 WL 6715489, at *10 (S.D.N.Y. Dec. 20, 2018) (no secondary meaning

---

[2]   Easy Sprit spent approximately $2 million of that total sum in 2017 and $4 million in 2018. (Saunders Decl., Ex. 36.) But Easy Spirit offers no evidence concerning what portion of its 2018 expenditures occurred before Skechers introduced the Commute shoe in February of that year.

despite "millions of dollars of advertising expenditures" because those figures "represent[ed] overall advertising spending" and plaintiff did not demonstrate that its advertisements "promote[d] recognition of the [t]rade [d]ress rather than recognition of [plaintiff's] brand name"); see also Urban Grp. Exercise Consultants, Ltd. v. Dick's Sporting Goods, Inc., 2013 WL 866867, at *4 (S.D.N.Y. Mar. 8, 2013) (annual advertising expenditures of $2.4 million were "not supportive of a finding of secondary meaning[] because there [was] no contention that any of those advertisements or promotions stressed or emphasized the alleged trade dress"); Grout Shield Distrib., LLC v. Elio E. Salvo, Inc., 824 F. Supp. 2d 389, 412 (E.D.N.Y. 2011) (concluding that "[p]laintiff's advertising expenditures [did] not weigh in favor of finding secondary meaning" where "[i]t [was] unclear whether plaintiff's advertising expenditures were made solely to promote the . . . mark" at issue).

Similarly, this Court is unmoved by Easy Spirit's expenditure of $96,798 in online search-related fees for the Traveltime shoe between November 2012 and March 2019. (Counterstatement ¶ 287.) As a threshold matter, that modest sum is inadequate to support secondary meaning. See LVL XIII Brands, Inc., 209 F. Supp. 3d at 655, n.52 (plaintiff's expenditure of $82,000 on marketing and promotion in a single year was "insufficient to support secondary meaning"). In any event, Easy Spirit presents no evidence concerning whether those "efforts succeeded in reaching . . . [its] target audience." Jewish Sephardic Yellow Pages, Ltd., 478 F. Supp. 2d at 345.

In a final attempt to showcase its "substantial [advertising] efforts," (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., ECF No. 78 ("Opp'n"), at 4), Easy Spirit directs this Court toward a smattering of advertisements appended to the Complaint and a declaration from its Senior Vice President of Product Design and Development, Mark DeZao. Neither

source alters this Court's assessment of this factor.  As Skechers observes, several
advertisements appended to the Complaint postdate February 2018 and are therefore irrelevant.
(See, e.g., ECF No. 1-2, at 1–3.; ECF No. 1-4; ECF No. 1-5.)  Other advertisements either do not
call attention to the Traveltime trade dress or fail to display the Traveltime shoe at all.  (See, e.g.,
ECF No. 1-1, at 1; ECF No. 1-3, at 2.)  And even the few timely advertisements that prominently
feature images of the Traveltime trade dress are unaccompanied by key information, including
how often those advertisements ran or whether they were widely distributed.[3]  (See, e.g., ECF
No. 1-1, at 2; ECF No. 1-3, at 3–5.)  Accordingly, this factor militates against a finding of
secondary meaning.

b.  Consumer Surveys

While consumer surveys are "not necessary to establish secondary meaning," MZ
Wallace Inc., 2018 WL 6715489, at *11, they offer "the most direct and persuasive evidence of
secondary meaning," Lopez v. Gap, Inc., 883 F. Supp. 2d 400, 426 (S.D.N.Y. 2012) (quotation
marks omitted); see also Sports Traveler, Inc. v. Advance Magazine Publishers, Inc., 25 F. Supp.
2d 154, 164 (S.D.N.Y. 1998) ("[C]onsumer surveys have become the usual way of
demonstrating secondary meaning.").  Indeed, "[t]he ultimate determination of whether a
particular trademark or trade dress has acquired secondary meaning remains an empirical
question of consumer association."  LVL XIII Brands, Inc., 209 F. Supp. 3d at 639 (quotation
marks omitted).

Skechers offers the expert opinion of Dr. Jeffery A. Stec, Ph.D., whose double-
blind internet survey found that only 1% of respondents associated the Traveltime trade dress

---

[3]      Easy Spirit concedes that it does not possess any information prior to 2017 concerning media plans for the
Traveltime shoe, as well as distribution of print and mailer advertisements for the shoe.  (Counterstatement ¶¶ 280–
83.)

with a single source.  (See Counterstatement ¶¶ 253–57.)  Easy Spirit, however, offers no survey

evidence of its own, opting instead to critique Stec's survey for failing to "replicate real-world

market conditions."  (Counterstatement ¶¶ 238, 253–57.)  Specifically, Easy Spirit observes that

Stec's internet-based survey did not account for shoppers at brick-and-mortar stores, catalog

shoppers, or consumers who engage in televised home shopping.  (Counterstatement ¶ 238.)

Easy Spirit contends that its targeted demographic (women aged 40 to 60) "may not be internet

saavy [sic]" and that Stec's sole reliance on internet shoppers renders his survey results

inaccurate.  (Counterstatement ¶¶ 238, 253–57.)

But Easy Spirit "has the burden of coming forward with probative evidence, and it

has not done so on this factor."  Sports Traveler, Inc., 25 F. Supp. 2d at 164; see also LVL XIII

Brands, Inc., 209 F. Supp. 3d at 658 (acknowledging deficiencies in defendants' expert's

consumer survey but nevertheless concluding that "given [plaintiff's] failure to muster any

contrary survey evidence, even if the factfinder were to afford the [expert's] survey only limited

weight, [the consumer studies] factor would still favor [defendants]" (emphasis in original)).

This factor weighs against a finding of secondary meaning.

c.  Unsolicited Media Coverage

Easy Spirit insists the Traveltime shoe has received "accolades in the media,

including substantial unsolicited media attention."  (Opp'n, at 4.)  However, there is limited

support for that assertion.  Despite extensive discovery, Easy Spirit produced only a handful of

articles discussing the Traveltime shoe that were published before Skechers' Commute shoe

entered the market in February 2018.  (Counterstatement ¶ 268.)  While those articles feature

pictures of the Traveltime shoe, they barely discuss its appearance, let alone the claimed trade

dress.  (See Welch Decl., Exs. CM (highlighting the functionality of the shoe's "rearfoot," which

14

"has a 'lip' that is high enough to keep your heel firmly in place but also allows for you to be able to slip your foot into the shoe without having to bend down"), CN (noting that "Easy Spirit Traveltime mules and Zero Gravity shoes" offer "a more professional look" with "the same level of comfort" as sneakers), CO (stating that the Traveltime shoe has a "1.25-inch heel [that] makes . . . [it] very supportive"), CP (describing the Traveltime shoe as one of "the best shoes for seniors"); see also Counterstatement ¶¶ 268–278.)

Now, however, Easy Spirit seeks to rely on six articles appended to its opposition papers but not timely produced during discovery.  (See Reply 56.1 ¶¶ 296–300; Saunders Decl. Exs. 29–34.)  Setting aside whether this Court can consider those articles, they do not alter the analysis.  Of the six articles, only one was published before February 2018.  That article—a piece from "Footwear News" in August 2017—describes the Traveltime shoe as "iconic" and notes that it is "[o]ne style that continues to resonate with consumers across the board."  (Reply 56.1 ¶ 296; Saunders Decl., Ex. 29.)  A lone article from an industry-specific publication is insufficient to support a finding of secondary meaning.  See LVL XIII Brands, Inc., 209 F. Supp. 3d at 660 n.65 (collecting cases).  This factor favors Skechers.

### d.  Sales Success

"A product's sales success" is relevant to the secondary meaning analysis because it "might be indicative of whether consumers associate a product's trade dress with its origin." GeigTech E. Bay LLC v. Lutron Elecs. Co., 352 F. Supp. 3d 265, 283 (S.D.N.Y. 2018).

Easy Spirit claims to have sold over 11 million pairs of Traveltime shoes since inception.  (Compl. ¶ 12; Counterstatement ¶ 259.)  However, there is no evidence in the record supporting that figure.  Counsel for Easy Spirit conceded as much at oral argument, noting that Easy Spirit arrived at 11 million pairs sold based on: (1) the number of Traveltime shoes ordered

from factories, and (2) its belief that all of those shoes were sold since "the companies did not have excessive inventory of the shoes."  (Tr. of Oct. 3, 2020 Oral Argument ("Argument Tr."), at 27:12–22.)  This Court need not rely on Easy Spirit's back-of-the-envelope estimates because they are not supported by the record.  Instead, this Court focuses on two sets of Traveltime sales records produced during discovery.

The first set shows that Easy Spirit sold 1,046,923 pairs of Traveltime shoes between 2017 and 2019.  (Counterstatement ¶ 260 (citing Welch Decl., Ex. CH).)  Of that total, 396,090 pairs were sold before Skechers introduced the Commute shoe in February 2018.  (See Counterstatement ¶¶ 260–62.)

The second set is a spreadsheet showing that either 3,912,479 or 4,800,226 pairs of Traveltime shoes were sold between October 2011 and December 2017.  (Counterstatement ¶ 264 (citing Welch Decl., Ex. CJ).)[4]  Easy Spirit did not create that spreadsheet—it was created by a predecessor entity called "Premier Brands."[5]  Because Easy Spirit did not create the spreadsheet, Skechers claims that Easy Spirit cannot authenticate the sales figures therein.  (See Counterstatement ¶ 265.)  Accordingly, Skechers urges this Court to disregard the spreadsheet when assessing Easy Spirit's Traveltime sales success.

This Court declines to disregard the spreadsheet at this stage.  But even if it did, it would conclude that the sale of 396,090 pairs of Traveltime shoes from 2017 through January 2018 tips this factor in Easy Spirit's favor.  That sum is not insignificant given the limited time frame covered, and it likely reflects millions-of-dollars in sales revenue.  See R.F.M.A.S., Inc. v.

---

[4]     Easy Spirit presents no evidence concerning Traveltime sales between the shoe's inception through September 2011.  This lack of evidence is puzzling given Easy Spirit's counsel's admission at argument that the shoe's "more significant sales were earlier on in [its] lifetime" and that those early sales "helped build th[e] brand quickly and [made] it . . . popular . . . well known and . . . distinctive."  (Argument Tr., at 27:23–28:7.)

[5]     Premier Brands succeeded Easy Spirit's predecessor-in-interest, Nine West, after the latter filed for bankruptcy.  (Welch Decl., Ex. N., at 444:4–10.)

Mimi So, 619 F. Supp. 2d 39, 81 (S.D.N.Y. 2009) ($4 million dollars in sales indicative of

secondary meaning); Metrokane, Inc. v. The Wine Enthusiast, 160 F. Supp. 2d 633, 640

(S.D.N.Y. 2001) (describing $3 million in sales as "indisputable sales success").

> e.   Attempts to Plagiarize

"Evidence that a mark has been widely copied is persuasive evidence of

secondary meaning because it demonstrates that the mark has become a strong source identifier

in the eyes of the purchasing public."  Lopez, 883 F. Supp. 2d at 428 (quotation marks omitted).

Aside from the Commute Time shoe, Easy Spirit identifies only two Traveltime

"copycats."  (Welch Decl., Ex. K ("DeZao Deposition Tr."), at 146:9–22.)  Easy Spirit

investigated the origins of both shoes with assistance of counsel, but it did not pursue litigation

against those manufacturers or retailers.  (See DeZao Deposition Tr., at 158:15–62:4, 167:17–

69:18; Counterstatement ¶ 225.)  In fact, except for this action against Skechers, Easy Spirit has

never sued a third party for infringing on the Traveltime trade dress.  (Counterstatement ¶ 225.)

And Easy Spirit admits that "numerous styles of Skechers and third-party slip-on clogs . . .

compete fairly in the market" despite incorporating elements of the Traveltime trade dress

because they "do not copy the overall design of the . . . shoe."  (Opp'n, at 25.)  Accordingly, this

factor counsels against a finding of secondary meaning.  See Kelly-Brown v. Winfrey, 95 F.

Supp. 3d 350, 359, n.6 (S.D.N.Y. 2015) (concluding that "[p]laintiffs fail[ed] to identify any

attempts to intentionally copy or plagiarize" the trademark at issue even where "[p]laintiffs

issued cease and desist notices to other businesses that used" the mark); Chum Ltd. v. Lisowski,

198 F. Supp. 2d 530, 536 (S.D.N.Y. 2002) (attempts to plagiarize factor weighed against finding

of secondary meaning where "no more than one competitor ha[d] attempted to use a mark similar

to [plaintiff's]" mark); cf. Cartier v. Samo's Sons, Inc., 2005 WL 2560382, at *5 (S.D.N.Y. Oct.

11, 2005) (weighing attempts to plagiarize factor in plaintiffs' favor where they "present[ed] evidence that 'numerous merchants of knockoff or look-alike merchandise make comparison . . . to Cartier through use of such terms as Cartier-style or even the specific Cartier models'"), aff'd sub nom. Cartier, Inc. v. Sardell Jewelry, Inc., 294 F. App'x 615 (2d Cir. 2008).

   In an effort to alter this Court's calculus, Easy Spirit avers that Skechers intentionally copied the Traveltime trade dress, thereby demonstrating that the trade dress is protectable under the Lanham Act.  (Opp'n, at 24.)  Stated differently, Easy Spirit argues that "Skechers would not have expended so much effort to copy" the Traveltime shoe if it were merely "a generic clog."  (Opp'n, at 24.)  According to Easy Spirit, those "effort[s] to copy" are evinced by: (1) Teteriatnikov's mailing of a Traveltime shoe to an affiliate factory in China; (2) Skechers' alleged "solicit[ation]" of the best-selling Traveltime upper patterns from a retail buyer for Bealls; and (3) a series of Skechers emails referencing the Traveltime shoe.  (See Opp'n, at 24).

   It is undisputed that Teteriatnikov mailed a Traveltime shoe to an affiliate factory in China when designing the Commute shoe.  (Reply 56.1 ¶ 303.)  But it is also undisputed that he did so to obtain two measurements (midsole height and outsole width) for a prototype, (Reply 56.1 ¶ 303; Saunders Decl., Ex. 6D), and neither measurement is an element of the Traveltime trade dress.  Moreover, there is no dispute that Teteriatnikov inserted Skechers chicklets into the midsole that he designed for the Commute shoe, (Teteriatnikov Deposition Tr., 165:12–69:22; see Saunders Decl., Ex. 6E)—a step that he testified was part of the "Skecher-izing process," (Teteriatnikov Deposition Tr., at 165:22–66:18).

   With respect to the Bealls retail buyer, Skechers does not dispute that the buyer emailed Baruch in December 2017 and provided information about upper patterns that had sold

well in Bealls stores.  (Reply 56.1 ¶ 307.)  That retail buyer also included Bealls advertisements

depicting Traveltime shoes with those patterns.  (Reply 56.1 ¶ 307.)  Easy Spirit contends that

Skechers used the information and accompanying advertisements to design its own versions of

those same upper patterns.  (Reply 56.1 ¶ 308.)  It is clear that Skechers eventually offered

similar patterns—for example, anchors, pineapples, and palm trees—for the Commute shoe.

(See, e.g., Reply 56.1 ¶¶ 309, 317, 319.)  But there is no direct evidence that Skechers designed

its patterns based on the information received from the Bealls retail buyer.  Additionally, some of

the allegedly copied patterns are not discussed in Skechers' correspondence with the Bealls retail

buyer or depicted in the advertisements.  (Compare Saunders Decl. Ex. 8A, with Reply 56.1

¶¶ 309–21.)  And Easy Spirit concedes that it holds no rights in those patterns and that they are

not part of the Traveltime trade dress.  (Welch Decl., Ex. DN, at 134:13–138:7; Arg. Tr. at

24:11–25:2.)

       Finally, Easy Spirit cites a string of Skechers emails to Baruch with the subject

line "Memo from Robert" that generally reference the Traveltime shoe.  The first email, dated

March 14, 2017, states: "A nice idea for the 'Travel Time' [competitive versions] that you're

doing is that you do it also in a lace-up version also."  (Saunders Decl., Ex. 3D.)  The second

email is dated May 5, 2017, and states: "The #49359 is a huge hit, why don't you create an open

back version of that.  I'm sure it would give Travel Time a run for its money."  (Saunders Decl.,

Ex 7.)[6]  The final email, dated October 17, 2017, states: "Take me in the Modern Comfort room,

I want to talk to you about some of the travel-time looking product."  (Saunders Decl., Ex. 3E.)

       Even if this Court were to draw an inference of plagiarism from the above

evidence, it is well-established in this Circuit that "imitative intent . . . does not necessarily

---

[6]     The "#49359" is Skechers' "Reggae Fest" shoe—not the Commute or Commute Time shoes.  (Reply 56.1 ¶ 337.)

mandate" a finding of secondary meaning.  Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1042 (2d Cir. 1992) (citations omitted); see Kaufman & Fisher Wish Co. v. F.A.O. Schwarz, 184 F. Supp. 2d 311, 319 (S.D.N.Y. 2001) ("Proof of intentional copying, by itself, does not trigger any presumption of secondary meaning under Second Circuit precedent."). Indeed, the "value of evidence of intentional copying is particularly limited in cases involving product design, since the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product."  Kaufman & Fisher Wish Co., 184 F. Supp. 2d at 319 (quotation marks omitted).

Given the lack of third-party attempts to plagiarize the Traveltime trade dress, this Court is unmoved by the limited evidence of Skechers' purported copying efforts.  This factor weighs against Easy Spirit.  See Nulux, Inc. v. Ramirez, 2008 WL 11411300, at *7 (E.D.N.Y. Oct. 31, 2008) (attempts to plagiarize factor "weigh[ed] against a finding of secondary meaning" even though "[t]he record . . . support[ed] an inference of intentional copying" because there was "no evidence that [defendants] intended to deceive consumers and capture [plaintiff's] goodwill rather than to incorporate desirable, unprotected product features" and there was an "absence of previous instances of plagiarism by third parties").

### f.  Length and Exclusivity

"In connection with the length and exclusivity of the mark's use, no absolute time span can be posited as a yardstick in cases involving secondary meaning."  Jewish Sephardic Yellow Pages, Ltd., 478 F. Supp. 2d at 374 (quotation marks omitted).  With that said, courts in this Circuit have indicated that "continuous exclusive usage of a trade dress . . . over a five-year period" may support—but does not necessitate—a finding of secondary meaning.  Bubble

Genius LLC v. Smith, 239 F. Supp. 3d 586, 600 (E.D.N.Y. 2017); see also Urban Grp. Exercise

Consultants, Ltd., 2013 WL 866867, at *5.

        Easy Spirit brought the Traveltime shoe to market in 2004, and Skechers did not

introduce the Commute shoe until February 2018—a roughly 14-year gap.  However, that

observation does not complete this Court's analysis.  The record is filled with images of

Skechers and third-party shoes that Easy Spirit's witnesses conceded possess most—and in

several cases all—of the Traveltime trade dress elements in combination.  (See, e.g.,

Counterstatement ¶¶ 172–79 (describing and depicting New Balance "801" and "802" shoes).)

Some of those shoes were brought to market before the Traveltime shoe, including Skechers'

"Sport Tattle Tales," "Sport Tattle Tales Myth," "Sport Noogies Heckler," and "Sport Noogies

Bedevil" shoes, all of which were featured in a catalog in 2002.  (See Counterstatement ¶¶ 100–

17.)  In light of these facts, Easy Spirit cannot claim exclusive use of the purported Traveltime

trade dress.  See MZ Wallace Inc., 2018 WL 6715489, at *10  ("The evidence of the ubiquity of

this third-party use in the market significantly undercuts the plaintiff's efforts to show that its

[t]rade [d]ress has achieved secondary meaning."); LVL XIII Brands, Inc., 209 F. Supp. 3d at

663 (length and exclusivity factor weighed against finding of secondary meaning where "the

record [was] replete with examples of toe plates and other metal shoe ornaments used by

[defendants] and other . . . brands"); Meese, Inc. v. Int'l Leisure Prods., Inc., 2003 WL

22902594, at *3 (S.D.N.Y. Dec. 9, 2003) (plaintiff could not show exclusive use of trade dress

where "over the years other competitors who produced poolside basketball products dressed their

products with most of the features found in the [plaintiff's] basketball product"); cf. Jeffrey

Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27, 32 (2d Cir. 1995) ("[T]he fact that a

trade dress is composed exclusively of commonly used . . . elements might suggest that that dress should be regarded as unprotectable.").

g.   Assessment

Five factors weigh against Easy Spirit, with four of them—advertising expenditures, consumer studies, unsolicited media attention, and length and exclusivity— weighing heavily so.  Only one factor—sales success—weighs in Easy Spirit's favor.  On this record, no reasonable juror could find that the Traveltime trade dress has acquired secondary meaning.  See GeigTech E. Bay LLC, 352 F. Supp. 3d at 284 ("[S]ales success alone cannot establish secondary meaning.").  Accordingly, this Court need not address whether the Traveltime trade dress is functional or whether there is a likelihood of confusion between the Traveltime and Commute Time shoe designs.  See Sports Traveler, Inc., 25 F. Supp. 2d at 166. Easy Spirit's claim under § 43(a) of the Lanham Act is dismissed.

B.   New York Common Law Trade Dress Infringement

Easy Spirit also brings a claim against Skechers for New York common law trade dress infringement.  The parties dispute the elements of that claim, namely whether a showing of secondary meaning is required.  Skechers avers that Easy Spirit cannot sustain its common law trade dress claim without having shown that the Traveltime trade dress acquired secondary meaning, (ECF No. 97).  See Sports Traveler, 25 F. Supp. 2d at 166 ("[T]he test[] for . . . secondary meaning appl[ies] to both federal statutory and common law trade dress infringement claims."); see also Uni-World Capital, L.P. v. Preferred Fragrance, Inc., 43 F. Supp. 3d 236, 248 (S.D.N.Y. 2014); Eyal R.D. Corp. v. Jewelex N.Y. Ltd., 784 F. Supp. 2d 441, 448 (S.D.N.Y. 2011); U-Neek, Inc. v. Wal-Mart Stores, Inc., 147 F. Supp. 2d 158, 178 (S.D.N.Y. 2001).  Easy Spirit, on the other hand, argues that evidence of secondary meaning is unnecessary given the

"overwhelming evidence of bad faith by Skechers" in allegedly copying the Traveltime trade

dress, (ECF No. 98).  See Perfect Fit Indus., Inc. v. Acme Quilting Co., 618 F.2d 950, 953 (2d

Cir. 1980) ("[I]n certain circumstances under New York law, an injunction will issue against

confusingly similar trade dress, even though no secondary meaning is shown."); Medisim Ltd. v.

BestMed LLC, 910 F. Supp. 2d 591, 615 (S.D.N.Y. 2012) ("The lack of evidence of secondary

meaning is not fatal to [plaintiff's] common law trade dress claim.").

       Skechers' position is more persuasive.  To begin, Easy Spirit's argument relies

heavily on Perfect Fit, where the plaintiff brought an "action for trade dress infringement . . .

under § 43(a) of the Lanham Act and the New York law of unfair competition."  618 F.2d at 951

(citation omitted).  With respect to the New York claim, the Second Circuit held that the plaintiff

was not required to show secondary meaning because the defendant "deliberately copied" the

plaintiff's trade dress—a cardboard packaging insert called a "J-board" that featured a

photograph of a woman using the plaintiff's product.  Perfect Fit, 618 F.2d at 951–52.  In

reaching that conclusion, the Second Circuit observed that "[s]econdary meaning was originally

a trademark concept designed to limit the extent to which a manufacturer could monopolize

words and symbols that are useful in describing products."  Perfect Fit, 618 F.2d at 952.  The

Second Circuit surmised that "monopolization is not a problem in the realm of trade dress,

because the possible varieties of advertising display and packaging are virtually endless."

Perfect Fit., 618 F.2d at 953 (emphasis added).

       However, the Second Circuit has made clear in subsequent decisions—albeit in

the context of the Lanham Act—that product design trade dress implicates those monopolization

concerns.  See Landscape Forms, Inc., 113 F.3d at 380; ("[G]ranting trade dress protection to an

ordinary product design would create a monopoly in the goods themselves."); Jeffrey Milstein,

Inc., 58 F.3d at 32 ("[O]verextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas."). Critically, Easy Spirit claims a protectable trade dress in a combination of design elements for the Traveltime shoe. Accordingly, Perfect Fit is distinguishable.

Moreover, less than a decade after Perfect Fit, the Second Circuit decided 20th Century Wear, Inc. v. Sanmark-Stardust, Inc., 815 F.2d 8 (2d Cir. 1987). There, the Second Circuit acknowledged that "proof of secondary meaning is not necessary under New York law in order to obtain relief from an infringing trade dress." 20th Century Wear, Inc., 815 F.2d at 11. Yet it simultaneously concluded that there is an "additional requirement [under] New York law that a trade dress be 'distinctive' in order to be protected." 20th Century Wear, Inc., 815 F.2d at 11; see also Grupke v. Linda Lori Sportswear, Inc., 921 F. Supp. 987, 997 (E.D.N.Y. 1996) ("New York law protects only 'distinctive' trade dress.").

This Court fails to comprehend how the Traveltime trade dress could be "distinctive" in view of its earlier conclusion that Easy Spirit has failed to raise a triable issue of fact concerning whether the trade dress acquired secondary meaning. See EFS Marketing, Inc. v. Russ Berrie & Co., 1991 WL 275647, at *6 (S.D.N.Y. Dec. 16, 1991) (interpreting 20th Century Wear, Inc. to "require[] secondary meaning when applying New York law"); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:14 (5th ed.) (noting that the term "distinctive" as used in 20th Century Wear, Inc. is tantamount to "secondary meaning"). Absent distinctiveness, there can be no protectable trade dress. And "[t]here being no trade dress that qualifies for protection and thus no trade dress in which [a] plaintiff has a proprietary right, [a] plaintiff cannot make out a claim for . . . infringement of that trade dress." Elements/Jill Schwartz, Inc. v. Gloriosa Co., 2002 WL 1492197, at *7 (S.D.N.Y. July 15, 2002).

Finally, recent Second Circuit case law supports the conclusion that intentional copying does not relieve Easy Spirit of its obligation to show that the Traveltime trade dress acquired secondary meaning.  In ITC Ltd. v. Punchgini, Inc., plaintiffs brought "various federal and state law claims of trademark infringement and unfair competition in connection with a restaurant trademark . . . [and] related trade dress."  518 F.3d 159, 160 (2d Cir. 2008).  The Second Circuit certified questions to the New York Court of Appeals concerning the scope of New York unfair competition law.  In answering those questions, the New York Court of Appeals stated:

> [T]o prevail against defendants on an unfair competition theory under New York law, [plaintiffs] would have to show first, as an independent pre-requisite, that defendants appropriated (i.e., deliberately copied), [plaintiffs'] mark or dress for their New York restaurants.  If they successfully make this showing, plaintiffs would then have to establish that the relevant consumer market for [the New York] restaurant primarily associates the . . . mark or dress with those . . . restaurants owned and operated by [plaintiffs].

ITC Ltd. v. Punchgini, Inc., 880 N.E.2d 852, 860 (N.Y. 2007) (emphasis added).  Relying on that guidance, the Second Circuit held that, "to pursue an unfair competition claim, [a plaintiff] must adduce proof of both deliberate copying and 'secondary meaning.'"  Punchgini, Inc., 518 F.3d at 161.

Notably, "[t]rade dress infringement is a species of a common law claim for unfair competition."  Sara Designs, Inc. v. A Classic Time Watch Co., 234 F. Supp. 3d 548, 557 (S.D.N.Y. 2017).  Thus, in this Court's view, it would be illogical to excuse a trade dress infringement plaintiff from demonstrating secondary meaning given that secondary meaning is required to sustain a claim for common law unfair competition.  See 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:14 (5th ed.) (opining that, following Punchgini Inc., "New York unfair competition law may now be fully in synch with mainstream

trademark law in requiring proof of a secondary meaning for a non-inherently distinctive . . . trade dress").

For these reasons, this Court concludes that Easy Spirit's inability to adduce facts supporting a finding of secondary meaning dooms its claim for New York common law trade dress infringement, and that claim is dismissed.

III.   Trademark Claims

Easy Spirit also brings claims against Skechers for infringing on the Traveltime trademark under § 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), and New York common law. Both claims are adjudged using the same standard.  See Twentieth Century Fox Film Corp. v. Marvel Enter., Inc., 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002) ("[T]he standards for trademark infringement . . . under New York common law are essentially the same as under the Lanham Act."); see also Pfizer Inc. v. Sachs, 652 F. Supp. 2d 512, 526 (S.D.N.Y. 2009).  Easy Spirit "must demonstrate that (1) 'it has a valid mark that is entitled to protection' and that (2) [Skechers'] 'actions are likely to cause confusion with [that] mark.'"  Tiffany & Co. v. Costco Wholesale Corp., 971 F.3d 74, 84 (2d Cir. 2020) (second alteration in original) (quoting The Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996)).

A.   Validity of the Mark

Skechers disputes neither the validity nor the incontestability of the Traveltime trademark, which was registered with the USPTO in 2014.  (Counterstatement ¶ 2; Reply 56.1 ¶ 379).  Accordingly, this Court "need not tarry with the first prong of the infringement test." Savin Corp. v. Savin Grp., 391 F.3d 439, 456 (2d Cir. 2004); see also Mr. Water Heater Enter., Inc. v. 1-800-Hot Water Heater, LLC, 648 F. Supp. 2d 576, 583 (S.D.N.Y. 2009).

B.  Likelihood of Confusion

In the Second Circuit, courts consider the well-known Polaroid factors as a framework for evaluating whether there is a likelihood of confusion.  See Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961).  Those factors are: (1) the strength of the prior owner's mark; (2) the similarity between the two marks; (3) the competitive proximity of the products; (4) the likelihood that the prior user will bridge the gap; (5) actual confusion; (6) the defendant's good faith; (7) the quality of defendant's product; and (8) the sophistication of the buyers.  Polaroid, 287 F.2d at 495.  No single factor is dispositive, and each factor should be weighed in the context of others to determine if a likelihood of confusion exists.  Nikon Inc. v. Ikon Corp., 987 F.2d 91, 94 (2d Cir. 1993).

i.  Strength of the Mark

"[T]he strength of a mark depends ultimately on its distinctiveness, or its origin-indicating quality, in the eyes of the purchasing public."  Savin Corp., 391 F.3d at 457 (alteration in original) (quotation marks omitted).  "There are two components of a mark's strength: its inherent distinctiveness and the distinctiveness it has acquired in the marketplace."  Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 130–31 (2d Cir. 2004).  "The former . . . examines a mark's theoretical potential to identify plaintiff's goods or services without regard to whether it has actually done so," and the latter examines the "recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services."  Brennan's, 360 F.3d at 131.

"Determination of strength . . . begins with inquiry as to whether the mark has . . . inherent distinctiveness."  Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 384 (2d Cir. 2005).  "Courts assess inherent distinctiveness by classifying a mark in one of four categories arranged in increasing order of inherent distinctiveness."  Brennan's, 360 F.3d at 131.  Those categories

are: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful.  Brennan's, 360 F.3d

at 131.  "A mark is generic if it is a common description of products and refers to the genus of

which the particular product is a species."  Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,

192 F.3d 337, 344 (2d Cir. 1999).  Generic marks "are not at all distinctive and thus are not

protectable under any circumstances."  Star Indus., Inc., 412 F.3d at 385.  A descriptive "mark is

one that tells something about a product, its qualities, ingredients or characteristics."  Gruner +

Jahr USA Publ'g. v. Meredith Corp., 991 F.2d 1072, 1076 (2d Cir. 1993).  Descriptive marks

"are not inherently distinctive, but are protectable provided they have . . . acquired

distinctiveness."  Star Indus., Inc., 412 F.3d at 385 (quotation marks omitted).  "A mark is

suggestive if it merely suggests the features of the product, requiring the purchaser to use

imagination, thought, and perception to reach a conclusion as to the nature of the goods.  Lane

Capital Mgmt., 192 F.3d at 344.  "Arbitrary or fanciful marks are ones that do not communicate

any information about the product either directly or by suggestion."  Star Indus., Inc., 412 F.3d at

385.  "Suggestive marks and arbitrary or fanciful marks are each inherently distinctive."  Star

Indus., Inc., 412 F.3d at 385; accord Lane Capital Mgmt., Inc., 192 F.3d at 344.

          Skechers claims that the Traveltime mark is descriptive because it "connotes

movement."  (Defs.' Mem. of Law in Supp. of Mot. for Summ. J., ECF No. 57 ("Skechers'

Mem. of Law"), at 21.)  Easy Spirit contends that the mark is arbitrary because it does not

"conjure[] up 'footwear.'"  (Opp'n, at 22.)  The phrase "Traveltime" does not necessarily call

footwear to mind, nor do the individual words "travel" and "time."  With that said, "Traveltime"

is not so abstract that it fails to "communicate any information about the product either directly

or by suggestion."  Star Indus., Inc., 412 F.3d at 385.  Rather, the ability to associate the term

"Traveltime" with footwear requires an imaginative jump.  "Traveltime" connotes that it is time

to engage in movement, and movement often requires putting on a pair of shoes.  The Traveltime
trademark is therefore suggestive and inherently distinctive.  See Playtex Prods., Inc. v. Georgia-
Pacific Corp., 390 F.3d 158, 164–65 (2d Cir. 2004) (concluding that district court correctly
found "Wet Ones" to be a suggestive mark for pre-moistened towelettes).

        Moreover, Skechers concedes that the Traveltime mark is incontestable under the
Lanham Act because it has been used for five consecutive years since registration with the
USPTO.  (Reply 56.1 ¶ 379).  As such, the mark "enjoys a conclusive presumption of
distinctiveness."  Savin, 391 F.3d at 457.  The Traveltime mark's incontestable status also
imbues the mark with at least some modicum of strength.  See The Sports Auth., Inc., 89 F.3d at
961 ("[A] trier of fact could reasonably conclude that [a] word mark, having been incontestable
for five years, is strong for the purposes of the Polaroid test."); Mr. Water Heater Enter, Inc., 648
F. Supp. 2d at 585 ("[B]ecause the . . . [m]ark is not limited to words contained in a logo, a trier
of fact could reasonably conclude that Plaintiffs' incontestable word mark is inherently strong.
Thus, with respect to inherent distinctiveness, the . . . [m]ark exhibits some strength." (citation
omitted)); Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 312 (S.D.N.Y. 2000)
("The registration of a trademark is also relevant to the assessment of its strength because" an
incontestable mark "enjoys a conclusive presumption of distinctiveness.").

        Turning to distinctiveness in the marketplace, Skechers' sole argument is that
other movement-related marks in the footwear industry have robbed the Traveltime mark of any
strength.  "The law in this Circuit is clear that extensive third-party use can dilute the strength of
a mark."  Lexington Mgmt. Corp. v. Lexington Capital Partners, 10 F. Supp. 2d 271, 281
(S.D.N.Y. 1998); see also Time, Inc. v. Petersen Publ'g Co., 173 F.3d 113, 118 (2d Cir. 1999)
("The use of part or all of the mark by third parties weakens its overall strength.").  At the same

time, "[t]he significance of [those] third-party trademarks depends wholly upon their usage."

Scarves by Vera, Inc. v. Todo Imports Ltd., 544 F.2d 1167, 1173 (2d Cir. 1976).  "[T]he alleged

infringer must demonstrate that the third-party marks were 'actually used by third-parties, that

they [are] well promoted or that they [are] recognized by consumers.'"  Lexington Mgmt. Corp.,

10 F. Supp. 2d at 281 (alterations in original) (quoting Scarves by Vera, 544 F.2d at 1173).

   Here, Skechers identifies less than a dozen marks—some registered, others not—

in the footwear market that incorporate the word "travel" (e.g., "TravelActiv" and "Travel Feet")

or otherwise connote movement (e.g., "Roam").[7]  (See Counterstatement ¶¶ 226–37.)  And the

majority of those marks are used by a single footwear company called "Propet."  (See

Counterstatement ¶¶ 231–37.)  While the presence of those marks arguably saps some strength

from the registered and incontestable Traveltime mark, this Court cannot say that their use is so

"extensive" to necessarily render the Traveltime mark weak.  Cf. Giggle, Inc. v. netFocal, Inc.,

856 F. Supp. 2d 625, 632 (S.D.N.Y. 2012) ("extensive" third-party use evinced by "over forty

screenshots of advertisements and websites, four trademark registration search reports, and

White Pages listings").  This factor favors Easy Spirit, albeit slightly.

   ii. Similarity of the Marks

   "To apply this factor, courts must analyze the mark's overall impression on a

consumer, considering the context in which the marks are displayed and the totality of factors

that could cause confusion among prospective purchasers."  Malletier v. Burlington Coat Factory

Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005) (quotation marks omitted); see also The

Sports Auth., Inc., 89 F.3d at 962 ("In deciding whether the marks are similar as used, we do not

---

[7] Skechers' motion papers include internet screenshots demonstrating that at least some of those marks are currently in use in the marketplace.  (See, e.g., Welch Decl., Ex. CA (internet screenshot depicting Propet TravelActiv shoe for sale on Amazon.com).)

look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace."). This wholistic analysis applies notwithstanding the fact that the Traveltime mark is registered "without claim to any particular font, style, size, or color," (Saunders Decl., Ex. 41). See GMA Accessories, Inc. v. BOP, LLC, 765 F. Supp. 2d 457, 468 (S.D.N.Y. 2011), aff'd sub nom. GMA Accessories, Inc. v. Elec. Wonderland, Inc., 558 F. App'x 116 (2d Cir. 2014); Medici Classics Prods., LLC v. Medici Grp., LLC, 683 F. Supp. 2d 304, 311 (S.D.N.Y. 2010).

Easy Spirit avers that the parties' marks are confusingly similar because (1) the words "commute" and "travel" convey the same meaning, and (2) both marks contain the word "time." While the words "commute" and "travel" are effectively synonymous, they are also "dissimilar in sound and appearance." Playtex Prods., Inc., 390 F.3d at 164 (concluding that "moist" and "wet" were dissimilar despite being "almost synonymous"). The fact that both marks feature the word "time" does not alter that conclusion, especially given that the Commute Time mark is often displayed next to the Skechers brand name. See Universal City Studios, Inc. v. Nintendo Co. 746 F.2d 112, 117 (2d Cir. 1984) ("[J]uxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar."). Indeed, Easy Spirit does not dispute that many of Skechers' wholesale customers—including Kohls, DSW, QVC, Amazon, Zappos, and Bealls—display the Commute Time mark next to the Skechers brand name when offering the shoes for sale on their websites. (Counterstatement ¶ 61; see also Saunders Decl., Exs. 14, 16, 18 & 20.) Moreover, boxes used for the Commute Time shoe also feature the Skechers brand name. One of those boxes displays the Skechers brand name on its top and side flap, while the Commute Time mark appears only in small print under a UPC code. (Welch Decl., Ex. S.) Another box displays the Commute Time mark more prominently, but in each instance, the mark is situated immediately below the Skechers brand name. (Welch Decl.,

31

Ex. I.)[8]  The consistent presence of Skechers' brand name diminishes any aural or visual

similarities between the Traveltime and Commute Time marks.  This factor favors Skechers.

       iii.   Proximity of the Products

      This factor addresses "whether and to what extent the two products compete with

each other."  Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996).  Skechers

concedes that this factor weighs in Easy Spirit's favor because the Commute Time shoe is sold to

the same class of purchasers as the Traveltime shoe.  (Skechers' Mem. of Law, at 18, 23.)

       iv.   Bridging the Gap

      "'Bridging the gap' refers to the likelihood that the senior user will enter the

junior user's market in the future, or that consumers will perceive the senior user as likely to do

so."  Star Indus., Inc., 412 F.3d at 387.  "When . . . the parties' goods are the same, this Polaroid

factor is irrelevant because there is no gap to bridge."  3M Co. v. Performance Supply, LLC, 458

F. Supp. 3d 181, 195 (S.D.N.Y. 2020); see also Star Indus., Inc., 412 F.3d at 387 ("Because . . .

[the parties'] products are already in competitive proximity, there is really no gap to bridge, and

this factor is irrelevant to the Polaroid analysis in this case.").  It is undisputed that the parties'

goods are the same.  Thus, this factor is irrelevant.

       v.   Actual Confusion

      While "it is black letter law that actual confusion need not be shown to prevail

under the Lanham Act," Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 875

(2d Cir. 1986), "courts have concluded that the absence of such evidence may favor the junior

user," Paco Sport, Ltd., 86 F. Supp. 2d at 319; see also Streetwise Maps, Inc. v. VanDam, Inc,

---

[8]      The Commute Time mark is not present on the shoes themselves.  (Baruch Decl. ¶ 18.)  However, all
Commute Time shoes feature the Skechers brand name in at least one spot—and sometimes in as many as three
spots.  (Baruch Decl. ¶¶ 18–19.)

159 F.3d 739, 745 (2d Cir. 1998) ("[T]he absence of proof of actual confusion, although not dispositive of the question of likelihood of confusion, is a factor favoring defendants." (citation omitted)); Malaco Leaf, 287 F. Supp. 2d at 374 ("[T]he absence of actual confusion evidence, or of survey evidence showing a likelihood of confusion, dictates that this factor be resolved in defendants' favor."). "Evidence of actual confusion may consist of anecdotal or survey evidence." Paco Sport, Ltd., 86 F. Supp. 2d at 319.

Here, Skechers offers another double-blind internet survey conducted by Dr. Stec—this time assessing confusion between potential buyers of Commute Time and Traveltime shoes. Stec found that 0.0% of respondents believed that: (1) Easy Spirit was the source of the Commute Time shoe, (2) Easy Spirit sponsored the Commute Time shoe; and (3) there was a business affiliation between the Commute Time shoe and Easy Spirit. (Counterstatement ¶¶ 246–48.) Easy Spirit, on the other hand, presents no evidence of actual confusion and reiterates its earlier objection that Stec's survey is inaccurate because it is limited to internet shoppers. Easy Spirit's failure to present any evidence of actual confusion tilts this factor in Skechers' favor.

vi.   Bad Faith

"This factor looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 583 (2d Cir. 1991) (quotation marks omitted).

It is undisputed that Skechers was aware of the Traveltime shoe when designing the Commute shoe. But that fact is not dispositive because "[p]rior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith." Arrow Fastener Co. v.

Stanley Works, 59 F.3d 384, 397 (2d Cir. 1995).  At the same time, this Court cannot overlook

the fact that only seven months after bringing the Commute shoe to market, Skechers changed

the shoe's name to Commute Time.  Skechers offers no explanation for why it made that

change,[9] although it insists that the new name was "selected as part of [its] normal [name-

selection] process, including searching trademark databases and in consultation with Skechers'

legal team."  (Skechers' Mem. of Law, at 23.)

       Yet, as Easy Spirit observes, there is conflicting evidence concerning whether

Skechers actually followed that process.  Hobbs—who played a role in vetting the Commute

Time name, (see Skechers' Reply Mem. of Law in Supp. of Mot. for Summ. J., ECF No. 83, at

9)—testified that, except for one instance unrelated to this action, she could not recall consulting

Skechers' legal team when selecting a style name for a shoe.  (Saunders Decl., Ex. 9, at 42.)

However, after her deposition, Hobbs submitted an errata sheet altering that testimony, claiming

that she now recalled submitting the Commute Time name to the Skechers legal team for

approval.  (Welch Decl., Ex. A, at 232.)

       This Court cannot assess the truthfulness of Hobbs' testimony or the clarity of her

memory at this stage.  While there is some evidence in the record supporting Hobbs' altered

testimony, (Welch Decl., Ex. U (email with Hobbs copied, stating that "[l]egal has confirmed we

are able to use the name 'Commute Time'")), the issue of "bad faith . . . is best left in the hands

of the trier of fact."  The Sports Auth., 89 F.3d at 964.

---

[9]      In its opposition papers, Easy Spirit avers that "discovery revealed that changing an existing shoe name at Skechers is a burdensome task that creates extra expense and involves numerous activities and personnel."  (Opp'n, at 2.)  However, Easy Spirit does not cite any evidence in the record to support that assertion.

vii.   Quality of Skechers' Product

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." Arrow Fastener, 59 F.3d at 398.  Easy Spirit concedes there is no quality disparity between the Commute Time and Traveltime shoes.  (Opp'n, at 24.)  "When there is no difference in the quality of the products, the factor should . . . be treated as neutral rather than as weighing in favor of the defendants." Gameologist Grp., LLC v. Sci. Games Int'l, Inc., 838 F. Supp. 2d 141, 164 (S.D.N.Y. 2011), aff'd, 508 F. App'x 31 (2d Cir. 2013); see also Gruner + Jahr USA Publ'g., 991 F.2d at 1079.

viii.   Consumer Sophistication

"The sophistication factor recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." Cadbury Beverages, 73 F.3d at 480 (quotation marks omitted).  "Generally speaking, greater sophistication of consumers reduces the likelihood of confusion." SLY Magazine, LLC v. Weider Publications L.L.C., 529 F. Supp. 2d 425, 442 (S.D.N.Y. 2007) (quotation marks omitted).  "Consumer sophistication may be proved by direct evidence such as expert opinions or surveys.  In addition, in some cases a court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price." Star Indus., Inc., 412 F.3d at 390.

Although the parties dispute whether their targeted consumers are sophisticated, neither party has submitted direct evidence concerning this factor.  Accordingly, this Court is "left to rely solely on . . . indirect indications of sophistication." Star Indus., Inc., 412 F.3d at 390.  Skechers avers that prospective purchasers of the parties' shoes are sophisticated.

Specifically, Skechers notes that Easy Spirit's customers tend to be adult women with—among other qualities—at least some level of college education. (Counterstatement ¶ 243; see Welch Decl., Ex. CF.) Additionally, Skechers contends that "[t]he approximately $60 price of the Skechers Commute Time is not indicative of a purchase vulnerable to confusion." (Skechers' Mem. of Law, at 20.) Easy Spirit, however, argues that the parties' target consumers are looking for "casual footwear" with a focus on "comfort and not high-end labels." (Opp'n, at 24.) Given the parties' dispute and their inability to muster any direct evidence, this Court concludes that resolution of this factor is best suited for a jury. While the parties' shoes are not cheap, one-use purchases like, for example, candy, see Malaco Leaf, 287 F. Supp. 2d at 377, they are not expensive, high-end products either, see LVL XIII Brands, Inc., 209 F. Supp. 3d at 676, n.105 (inferring sophistication based on the fact that the sneakers in question sold for between $495 and $1,200).

ix.  Assessment

Here, four Polaroid factors—strength of the mark, proximity, bad faith, and consumer sophistication—either weigh in Easy Spirit's favor or present factual disputes inappropriate for resolution on summary judgment. Two factors—dissimilarity of the marks and the absence of actual confusion—weigh in Skechers' favor. The parties' shoes are of similar quality, rendering that factor neutral. And there is no gap to bridge. Mindful that the Polaroid factors are not subject to mechanical application, Star Indus., 412 F.3d at 384, this Court concludes that there are sufficient factual disputes to preclude summary judgment with respect to Easy Spirit's trademark claims.

IV.     GBL § 360-l Dilution Claim

Finally, Easy Spirit brings a claim under GBL § 360-l for dilution of the

Traveltime trademark and trade dress.[10]  GBL § 360-l provides that a "[l]ikelihood of injury to

business reputation or of dilution of the distinctive quality of a mark or trade name shall be a

ground for injunctive relief."  "[T]o establish a dilution claim, two elements must be shown: (1)

ownership of a distinctive mark, and (2) a likelihood of dilution."  Hormel Foods Corp. v. Jim

Henson Prods., Inc., 73 F.3d 497, 506 (2d Cir. 1996).[11]  A likelihood of dilution "can be

established by a showing either of blurring or of tarnishment."  Hormel Foods Corp., 73 F.3d at

506.  Easy Spirit proceeds under a theory of dilution by blurring.

Blurring occurs "where the defendant uses or modifies the plaintiff's trademark to

identify the defendant's goods and services, raising the possibility that the mark will lose its

ability to serve as a unique identifier of the plaintiff's product."  Deere & Co. v. MTD Prods.,

Inc., 41 F.3d 39, 43 (2d Cir. 1994) (emphasis removed).  To determine the likelihood of blurring,

the Second Circuit "look[s] to six factors, including: (i) the similarity of the marks; (ii) the

similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of

---

[10]     Despite the fact that the Complaint pleads a claim for dilution under GBL § 360-l, (Compl., at 15), Easy Spirit's opposition papers consistently reference the federal dilution statute, 15 U.S.C. § 1125(c).  To the extent that Easy Spirit seeks to plead a federal dilution claim for the first time in its opposition papers, it is too late.  See Enzo Biochem, Inc. v. Amersham PLC, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013) ("It is well settled that a party may not amend its pleadings in its briefing papers."); Bonnie & Co. Fashions, Inc. v. Bankers Tr. Co., 170 F.R.D. 111, 119 (S.D.N.Y. 1997) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.").  However, even if this Court entertained that claim, it would be dismissed.  Federal "dilution claims are restricted to marks that are truly famous or so well-known that they are essentially household names, such as Coca–Cola, Nike, or Budweiser."  DigitAlb, Sh.a v. Setplex, LLC, 284 F. Supp. 3d 547, 557 (S.D.N.Y. 2018) (quotation marks omitted); Schutte Bagclosures Inc. v. Kwik Lok Corp., 48 F. Supp. 3d 675, 702 (S.D.N.Y. 2014) ("[C]ourts generally have limited famous marks to those that receive multi-million dollar advertising budgets, generate hundreds of millions of dollars in sales annually, and are almost universally recognized by the general public.").  Easy Spirit's evidence of sales success, advertising expenditures, and media coverage for the Traveltime shoe fall short of meeting that bar.  Cf. Savin Corp., 391 F.3d at 450 (genuine dispute of material fact as to fame of senior marks where plaintiff "spent over $20 million on advertising in 2002 and ha[d] achieved annual revenues of $675 million").

[11]     This Court already concluded that the Traveltime trade dress lacks distinctiveness.  Accordingly, Easy Spirit's GBL § 360-l claim for dilution of the Traveltime trade dress is dismissed.

predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark."

N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC, 293 F.3d 550, 558 (2d Cir. 2002).

> Critically, however, "New York law does not permit a dilution claim unless the marks are 'substantially' similar.'" Miss Universe, L.P., LLLP v. Villegas, 672 F. Supp. 2d 575, 595 (S.D.N.Y. 2009) (quoting Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 113–14 (2d Cir. 2009)). And "[t]he substantial similarity test requires more than the familiar test of similarity used in the traditional infringement context." Miss Universe, 672 F. Supp. 2d at 595 (quotation marks omitted). Indeed, the "[m]arks must at least be similar enough that a substantial segment of the target group of customers sees the two marks as essentially the same." Mobileye, Inc. v. Picitup Corp., 928 F. Supp. 2d 759, 782 (S.D.N.Y. 2013); see also Akiro LLC v. House of Cheatham, Inc., 946 F. Supp. 2d 324, 342 (S.D.N.Y. 2013) ("[W]hile the two marks may be similar enough for one to infringe the other, they are not so similar that consumers would view the marks as essentially the same.").

> This Court has concluded that the Traveltime and Commute Time marks are relatively dissimilar, especially given that consumers are often presented with the Skechers brand name when viewing the Commute Time mark. Accordingly, Easy Spirit's dilution claim under GBL § 360-l is dismissed. See Mobileye, Inc., 928 F. Supp. 2d at 782 (where marks in question were "at best weakly similar" under the Polaroid analysis, they were also "far from being so similar that any consumer [would] view them 'as essentially the same'").

<u>CONCLUSION</u>

For the foregoing reasons, Skechers' motion for summary judgment is granted in part and denied in part.  Easy Spirit's federal and New York trademark infringement claims may proceed to trial.  Easy Spirit's remaining claims are dismissed.


Dated: January 26, 2021
       New York, New York


SO ORDERED:


_____
WILLIAM H. PAULEY III
U.S.D.J.