UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
EASY SPIRIT, LLC,                          :
                                           :
                    Plaintiff,             :     19-cv-3299 (JSR)
                                           :
    -v-                                    :     FINDINGS OF FACT,
                                           :     CONCLUSIONS OF LAW,
SKECHERS U.S.A., INC. and                  :     AND ORDER DIRECTING
SKECHERS U.S.A., INC. II,                  :     ENTRY OF FINAL JUDGMENT
                                           :
                    Defendants.            :
                                           :
------------------------------------------x

JED S. RAKOFF, U.S.D.J.

     Plaintiff Easy Spirit, LLC ("Easy Spirit") filed this suit on
April 12, 2019 against Defendants Skechers U.S.A., Inc., and Skechers
U.S.A., Inc. II (collectively, "Skechers") alleging trademark and
trade dress infringement under the Lanham Act and New York state law.
See ECF No. 1. Easy Spirit's claims concerned its trademarked
TRAVELTIME open-back women's shoe and Skechers' newer and allegedly
infringing "Commute Time" open-back women's shoe. Following discovery,
Skechers moved for summary judgment on all claims. See ECF No. 50. On
January 21, 2021, my deeply missed late colleague, the Honorable
William Pauley, granted the motion in part and denied it in part,
dismissing the trade dress claims but allowing Easy Spirit's trademark
infringement claims to proceed to trial. See ECF No. 101.

     The parties then agreed to a remote bench trial, and the case was
reassigned to the undersigned. The Court conducted the trial from
September 9 to September 20, 2021. As a result of Judge Pauley's prior
rulings, the three remaining claims are for (I) trademark infringement

under the Lanham Act, 15 U.S.C. § 1114(a), (II) false designation of origin, 15 U.S.C. § 1125(a), and (III) common law trademark infringement under New York state law. All of the claims require the Court to analyze whether Skechers' use of its allegedly infringing mark is likely to cause consumer confusion. Polaroid Corp. v. Polarad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961); see also Playtex Prods. v. Georgia-Pac., 390 F.3d 158, 167 (2d Cir. 2004); Twentieth Century Fox Film Corp. v. Marvel Enter., Inc., 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002). For the reasons set forth below, the Court finds there is no meaningful likelihood of consumer confusion and thus finds for Skechers on all claims.

## Findings of Fact

The Court makes the following findings of fact, reflecting, inter alia, its assessment of each witness's demeanor and credibility.

### Easy Spirit's TRAVELTIME

The TRAVELTIME trademark is registered with the U.S. Patent and Trademark Office. Plaintiff's Exhibit ("PX") 1. It is therefore incontestable under the Lanham Act, and Skechers does not contest the validity of the registration. See Joint Pretrial Consent Order (ECF No. 164) at 6. Easy Spirit has sold shoes under the TRAVELTIME name continuously since 2004. See Trial Transcript ("Trial Tr.") 36:23-37:20.

After Marc Fisher Footwear acquired the Easy Spirit brand, see Joint Exhibit ("JX") 45 at 2; Trial Tr. 356:3-17, it conducted a

"relaunch" to refresh the brand, including an extensive advertising campaign in the Spring of 2018. See Trial Tr. 123:12-25, 128-6. The campaign targeted women 55 years old and older, that being the consumer group that market research had identified as the primary purchasers of TRAVELTIME shoes. See Trial Tr. 149:18-150:11, 121:6-122:7. The relaunch included, inter alia, advertising over digital media. See, e.g., PX 83 (creative copy used in a fall 2018 email), see Trial Tr. 136:4-15; PX 101 (advertising video used in spring 2019 on Facebook, Easy Spirit website, and in other programmatic videos for digital advertising), see Trial Tr. 137:17-139:11; PX 121 (October 2019 paid advertisement in Oprah Magazine featuring multiple Easy Spirit shoes, including the TRAVELTIME Clogs); PX 133 (creative copy used in a fall 2018 email), see Trial Tr. 141:3-10. The campaign also included other modes of advertising, including on the New York City subway, on Metro North commuter trains, and in the Miami International Airport. See Trial Tr. 180:23-182:25.

Easy Spirit also uses the root "travel-" in the names of its other shoes. See PX 156; PX 35; PX 37; Defendants' Exhibit ("DX") 265; DX 266. Easy Spirit refers to this as its "Traveltime family," which includes various unregistered product names such as Travelflower, Travelport, Travelfur, Travelslip, Travelrite, and Travelclog, among others. See PX 156; PX 35; PX 37; DX 265; DX 266; Trial Tr. 63:5-9, 79:19-82:19.

Easy Spirit has sold shoes under the TRAVELTIME name continuously since 2004. See Trial Tr. 36:23-37:20. In 2006 the TRAVELTIME shoe

became the number one selling shoe in department stores in the United States. See PX 135; PX 207. Between July 2017 and March 2019, sales of the TRAVELTIME shoe totaled over $26.3 million. See PX 111. The TRAVELTIME shoe has been recognized in media coverage, mostly by online industry publications. See PX 119 (July 2019 article in shoe industry online publication Footwear News ranking Easy Spirit TRAVELTIME shoe as number two for comfort and style among women's clogs on the market); PX 211 (July 2020 Health.com article highlighting that TRAVELTIME shoe has 7,000 perfect reviews on Amazon); PX 212 (June 2020 Travel + Leisure online article naming the TRAVELTIME the best backless slip-on sneaker); PX 115 (March 2019 Walk Jog Run online article calling the TRAVELTIME the most comfortable slip on shoe); PX 118 (January 2019 Best Shoe Rated online article calling the TRAVELTIME the best travel shoe for women); PX 123 (November 2019 Shoe Advisor online article calling TRAVELTIME one of the ten best walking shoes for women); PX 124 (November 2019 Trip Savvy online article calling TRAVELTIME the best mule for comfortable women's travel shoes); PX 114 (August 2017 Footwear News online article about the Easy Spirit brand refresh, which refers to "the label's now-iconic Traveltime clog").

## Skechers' Commute Time

In early 2017, Skechers developed the shoe that was later named the "Commute Time." See DX 369; DX 371; PX 9; PX 11; Trial Tr. 471:14-473:9. Early 2017 market research identified an open-back clog/mule shoe trend that was predicted to be popular in the Fall of 2017 and

into the Spring of 2018. See Trial Tr. 455:1-6, 455:14-456:5, 457:2-15; DX 343 at 3, 43.

Skechers Vice President of Design Savva Teteriatnikov designed the shoe that eventually became the Commute Time. See Trial Tr. 606:23-607:1, 607:8-11. Teteriatnikov develops new designs for shoes, including open-back shoes, every year. See Tr. 445:10-15, 446:23-447:3, 447:21-6. The design for the shoe that became the Commute Time started with a specific request from Jessica Baruch, who at the time was Senior Director of Merchandising and Product Development at Skechers.[1] See Trial Tr. 606:23-607:1, 607:8-11. Baruch asked Teteriatnikov to design a new open-back shoe with an outsole that included the "jewels," or "chiclets," from the existing Skechers "D'Lite" style, and that was of medium thickness, in between two existing soles in her product line, the thick "D'Lite" sole and the thin "Biker" sole. See Trial Tr. 507:4-12, 528:5-529:11, 608:17-609:23, 625:18-20, 806:11-23, 813:15-25.

Teteriatnikov designed a new outsole that corresponded to Baruch's request. See Trial Tr. 495:23-496:19, 563:5-8; PX 15. Teteriatnikov used a variety of sources in developing this new design,

---

[1]    Prior to Baruch's request, a different product line manager had requested that Teteriatnikov take the outsole of the existing Skechers "D'Lite" style, and develop a new design for the shoe upper that could be varied with different colors, materials, and prints. See Trial Tr. 471:14-473:9; PX 9. The product line manager sent a picture of TRAVELTIME shoe uppers as an example of the kinds of colors and prints she was talking about. See PX 9; PX 11. Teteriatnikov mocked up a sample of that shoe, but it never advanced to production. See Trial Tr. 481:1-4, 492:1-5, 562:11-563:8; PX 11; DX 369; DX 371.

including his years of experience designing other open-back shoes, as well as references to various companies' open-back shoe designs with which he was familiar. Teteriatnikov named a Tommy Hilfiger shoe, a Skechers "Noogie," and a Skechers "Biker" as playing a particular role in his design of the shoe that became the Commute Time. See Trial Tr. 444:12-13, 444:22-25, 446:23-25, 448:13, 448:25-449:7. Along with this new outsole, Teteriatnikov designed a casual, open-back upper that was consistent with the product line. See Trial Tr. 502:15-25, 503:20-505:10; PX 58.

Teteriatnikov began by mocking up the shoe design in a computer-aided design, referred to as a "CAD." See Trial Tr. 473:6-9. Teteriatnikov then worked with a factory in China used by Skechers, which took Teteriatnikov's CAD and other references he provided and created a technical blueprint. See Trial Tr. 521:16-22. The factory sent the technical blueprint as a computer file back to Skechers, which used a 3D printer to create a physical mockup of the blueprint design. See Trial Tr. 521:21-522:2. Teteriatnikov reviewed this 3D prototype and provided further instructions to the factory to achieve the desired design. See Trial Tr. 522:6-15.

When Teteriatnikov sent the CAD for the shoe that became the Commute Time to the factory in China, Teteriatnikov also sent a physical shoe as a sample for the mid-sized outsole he wanted; this sample was the Easy Spirit TRAVELTIME shoe. See PX 15; Trial Tr. 498:8-24. Skechers did not have a sole that was a good example of what Teteriatnikov wanted, and Teteriatnikov thought "the Traveltime

represented a really good example" of what he was looking for. See Trial Tr. 500:11-501:2, 528:22-11. When the factory sent its first blueprint back to Teteriatnikov to review, Teteriatnikov compared the 3D printed version of the outsole to the TRAVELTIME shoe. See PX 16; Trial Tr. 520:22-521:15. The 3D version looked lower than what Teteriatnikov wanted, so he then instructed the factory to make the midsole higher, so that the shoe had the same midsole height and outsole width as the TRAVELTIME shoe.[2] See id.

However, Teteriatnikov's design for the Commute Time included a number of elements that are not part of the TRAVELTIME shoe design. See Trial Tr. 512:21-514:10, 515:3-518:2, 518:20-519:22; cf. JX 20 with DX 274. Some differences are aesthetic and technical, and some are functional.

So far as aesthetic differences are concerned, one noticeable difference is that the side of the sole of the Skechers Commute Time shoe has distinctive small chiclets that are similar to those on the Skechers D'Lite shoes; the TRAVELTIME does not have chiclets. See Trial Tr. 515:3-6. The stitching on the uppers is different: the TRAVELTIME stitching leaves the upper fabric fairly puffy, while the Skechers Commute Time has a zig-zag stitch that keeps the upper tighter to the foot. See Trial Tr. 516:17-517:1.

Other differences are functional. The TRAVELTIME sole is two separate sections, one at the heel and one at the forefoot; the

---

[2]    An internal Skechers document referred to the mid-height sole as the "Easy Spirit outsole." See PX 43 at 7; Trial Tr. 530:4-10.

Skechers Commute Time outsole is one long plate. <u>See</u> Trial Tr. 512:23-514:19; <u>cf.</u> DX 274A at 6 <u>with</u> JX 19 at 6. The treads and grooves on the outsoles are also different. <u>Id.</u> These outsole differences affect grip and flexibility. <u>Id.</u> The back of the heel on the Commute Time comes up higher on the back of the wearer's foot than the TRAVELTIME. <u>See</u> Trial Tr. 515:7-11; <u>cf.</u> JX 20 at 4 <u>with</u> DX 274 at 4. This affects how easily the foot slides in any out of the shoe while walking or when taking it on and off. <u>See id.</u> The side overlay of the Commute Time goes down into the outsole, which makes the shoe more flexible. Tr. 515:12-516:5; <u>cf.</u> JX 20 at 4 <u>with</u> DX 274 at 4.

When Teteriatnikov finished his design process, colorist KariAnne Spear undertook the next stage of development: selecting fabrics, prints, and other design elements for the shoe's upper. <u>See</u> Trial Tr. 439:2-6, 738:12-17; DX 368; DX 375. Spear started by obtaining patterns from the subscription trend service website WGSN, which she modified, personally drawing parts of the patterns. <u>See</u> Trial Tr. 756:1-760:22, 761:10-22, 768:1-15, 769:1-770:13, 771:17-23, 784:1-17. Spear worked on approximately one hundred different upper designs for the shoe that became the Commute Time, about fifty of which were actually produced and sold. <u>See</u> Tr. 740:22-741:17.

Spear did not reference any TRAVELTIME shoes in the process of designing the uppers for the shoe that became the Commute Time. <u>See</u> Trial Tr. 754:15-24. Spear did reference two Easy Spirit shoes that were not the TRAVELTIME shoe. She used one to show a factory in China how sequins could be attached to a shoe; Skechers did not end up making

or selling such a shoe. Spear used a second to describe a stitching pattern and show what height should not be used in a boot style. See Trial Tr. 748:10-751:17.

Spear did receive input in the design process. In late 2017 through late 2018, a buyer at the Florida-based department store chain Bealls (which sells both Skechers and Easy Spirit shoes, including the TRAVELTIME shoe), told Skechers that shoe designs featuring anchors, pineapples, seashells, and coastal resort prints were selling well.[3] See Trial Tr. 758:11-760:25, 762:5-764:8, 621:11-17; JX 48; JX 50; JX 51. This information was forwarded to Spear, who understood it as a request from Beall's for similar products from Skechers. See Trial Tr. 758:11-760:25, 762:5-764:8, 621:11-17; JX 50; JX 51.

None of the patterns Spear developed for the Skechers Commute uppers that were shown in the Fall of 2017 resemble patterns or colors of any TRAVELTIME shoe designs. Spear also designed uppers for Spring 2018 and for Spring 2019. Of these, five uppers featured, respectively, palm trees, pineapples, a cutout in a stretchy beige fabric, animal print, and a shearling slipper look; Easy Spirit also made TRAVELTIME uppers that featured, respectively, palm trees, pineapples, a cutout in a stretchy beige fabric, animal print, and a shearling slipper look. Compare PX 28 with PX 29; PX 24 with PX 25; PX 30 with PX 31; PX 32 with PX 33; and PX 34 with PX 35.

---

[3]   Retail buyers often share information with companies about what looks are selling well in their stores. See Tr. 824:24-825:15.

The shoe Teteriatnikov designed, for which Spear developed upper patterns, was originally named the "Commute." See Trial Tr. 657:23-658:12, 733:14-734:2. In June 2017, Melissa Hobbs, at the time a senior product manager at Skechers, see Trial Tr. 656:14-16, selected the "Commute" name for the shoe. See Trial Tr. 660:20-661:3, 665:1-9. She chose the name because it was consistent with other shoe names in her product line that were related to movement, like "Bikers" and "Pedestrian," and she thought the "Commute" name matched the purpose of the shoe, which was intended for a woman who wanted a comfortable shoe to wear on her way to work. See id.; see also Trial Tr. 661:11-662:7.

To arrive at the "Commute" name, Hobbs followed Skechers' usual process for selecting new product names. She ran "Commute" through an internal database to confirm that the name had not been used before. See Trial Tr. 706:11-23. She also checked the name against the USPTO's public trademark database. See Trial Tr. 706:11-23. Hobbs did not find any names that conflicted, and did not see any planned advertising or marketing for the shoe; as such, she did not at that point run the name by Skechers' Legal Department. See Trial Tr. 706:11-707:6, 731:17-732:4, 732:5-13, 733:14-734:2.

Skechers showed this shoe to wholesale buyers under the name the "Skechers Commute" in June 2017. See Trial Tr. 707:20-23. Skechers first sold the shoe to consumers under the "Skechers Commute" starting in February 2018. See JX 28; Trial Tr. 610:17-24, 851:21-25.

Skechers President and CEO Robert Greenberg is not usually involved in naming products, though he generally provides feedback. See Trial Tr. 665:21-25. In 2018, however, he decided he wanted to change the "Commute" shoe name. See JX 5; JX 17. Greenberg testified that he did not like the name "Commute" and that it was "not a complete message." See Trial Tr. 995:1-12, 992:2-18, 995:1-12, 1009:2-7. He stated that because Skechers generally makes shoes for specific functions, he wanted the shoe to have a more "functional" name. See Trial Tr. 995:1-12, 992:2-18, 995:1-12, 1009:2-7. Greenberg originally wanted to change the name from "Commute" to "Commuters," or "Commuters by Skechers." See Trial Tr. 991:16-20, 992:14-18, 995:8-12, 1009:2-7, 668:16-20, 677:16-678:14; JX 5; JX 17. The name "Commuters," however, was not approved by the Legal Department. See Trial Tr. 678:8-680:25, 719:14-18, 990:1-17, 992:21-24; JX 5.

Greenberg then suggested the name be changed instead to "Commute Time." See Trial Tr. 991:21-993:18; JX 5. In testimony that the Court finds was true but not the whole story, Greenberg testified that he suggested adding "Time" because it was a common word in Skechers' shoe names and was on hundreds of style names. See Trial Tr. 994:23-25, 995:19-996:7; DX 365. In fact, Skechers already had a shoe named "Time Travel." See DX 365. Greenberg said Skechers chose names that were "pretty," "cute," and have "flavor." See Trial Tr. 994:18-996:7.

However, as he conceded, Greenberg was aware of the TRAVELTIME shoe when he decided to change the "Commute" name, and he was aware that the Skechers Commute Time was a competitive version of the

TRAVELTIME shoe. See Trial Tr. 995:13-18.[4] Greenberg referred to the Commute Time shoe in an internal email as the "Traveltime-looking product." See JX 16. He explained that it was common in the shoe industry to refer to different looks by the name of the classic version, like Converse Chucks or Vans slip-ons. See Trial Tr. 997:22-998:3, 999:2-13.

But even if this suggests that Greenberg chose the "Commute Time" name in part because of its similarity to "TRAVELTIME," the Court accepts his testimony that, in accordance with Skechers' practices, any decision about whether the name "Commute Time" might be potentially confused with the name of the TRAVELTIME shoe was to be made by the Legal Department. See Trial Tr. 996:19-996:4. The Legal Department approved the "Commute Time" name with the suggestion that the name be

---

[4]    At least as of March 14, 2017, Greenberg had been aware that Skechers was developing a shoe to compete with the TRAVELTIME shoe. See JX 15. Greenberg's assistant forwarded a message from Greenberg in an email to Jessica Baruch, suggesting that Baruch create a lace-up version of the "Traveltime CVs," or "competitive versions," being developed in her line. Greenberg noted that Skechers sold a lace-up version of a slip-on shoe called the "Energies," which people loved. See id. The email also stated that "there's your way to jump all over them and get them." See id. Baruch forwarded the email to Teteriatnikov. See Trial Tr. 525:14-526:7. Teteriatnikov understood that making a lace-up would be about competing with the TRAVELTIME, which does not have a lace-up design. See Trial Tr. 525:22-526:15. Skechers did not end up creating a lace-up version of the shoe. See Trial Tr. 526:22-25. Nonetheless, in his deposition testimony (and in contrast to his trial testimony), Greenberg denied having any knowledge of Easy Spirit's TRAVELTIME shoe or Skechers' "Commute" or "Commute Time" shoe, or any memory of the events surrounding the name change of Skechers' "Commute" shoe to the "Commute Time." Greenberg Dep. Tr. 16:4-6, 27:9-12, 30:11-25, 36:14-24, 31:16-32:7. This testimony, the Court finds, was probably less than candid, but was sufficiently corrected by Greenberg's trial testimony.

"Skechers Commute Time," and Greenberg agreed. See JX 5; Trial Tr. 993:19-24. Hobbs confirmed that while the shoe's name internally would be "Commute Time," externally it would be "Skechers Commute Time." See Trial Tr. 993:16-994:3; JX 5.

Skechers began to use the name "Skechers Commute Time" on its website on September 26, 2018. See PX 3; Trial Tr. 611:20-612:1, 690:2-14. To implement the name change to "Skechers Commute Time," Hobbs updated the internal product database, notified various teams within Skechers, including the sales team, and submitted a form to the factory to notify them of the name change. See Trial Tr. 676:14-677:13, 683:1-685:8, 686:12-19, 689:11-14.

It was not a regular occurrence at Skechers to change the name of a shoe when it was already in production; Hobbs, who implemented the name change from "Commute" to "Commute Time," had previously changed the name of shoes when they were already in production about once or twice a year. See Trial Tr. 670:10-22. It was an even less common occurrence to change the name after a shoe was already being sold to customers under another name: it had happened at once in the past fifteen years, when Greenberg requested that the name of a shoe that was already on the market, the "Cleo," be changed to "Cleos." See Trial Tr. 666:1-20.


TRAVELTIME and Commute Time in the Marketplace

The Easy Spirit TRAVELTIME and Skechers Commute Time shoes are both open-back, mule- or clog-style women's comfort shoes. See, e.g.,

13

PX 24; PX 25; PX 28; PX 29. Both shoes are available with uppers of various materials and patterns. See id. Skechers does not place the "Commute Time" mark on the shoes themselves; Easy Spirit does not place the TRAVELTIME mark on the exterior of the shoes, though some shoes have the TRAVELTIME mark on the inner label on the sole heel. See Trial Tr. 73:1-75:17, 241:3-5, 249:10-250:19, 519:10-22, 627:1-9.

Open-back shoes are not new to the women's shoe market. See Trial Tr. 520:4-5. In addition to the TRAVELTIME and Commute Time, respectively, both Easy Spirit and Skechers have had other open-back casual women's shoes on the market for some time. See Trial Tr. 528:1-21; PX 43; PX 156; DX 12; DX 263A; DX 15; DX 339A; DX 12. Other companies have also had a variety of other open-back casual women's shoes on the market for many years. See DX 281A; DX 283A; DX 282A; DX 278A; DX 280A; DX 256; DX 254; DX 287; DX 230A.

A number of other shoe companies have registered marks for shoe names that include either the word "travel" or the word "time." See, e.g., DX 24 (Mephisto TRAVEL'S); DX 29 (Propét TRAVELACTIV); DX 33 (Propét TRAVELTEK); DX 118 (Walmart TIME AND TRU); DX 126 (DC ADVENTURE TIME); DX 353 (Propét TRAVELWALKER). Shoes have been sold to customers under these marks. See Trial Tr. 880:9-11, 882:2-5, 886:8-890:5.

Skechers Commute Time shoes typically retail for about $55-$60. See Trial Tr. 817:24-818:1, 69:17-21. The suggested retail price for Easy Spirit TRAVELTIME shoes is about $70. See Trial Tr. 65:17-66:3, 69:14-16. The TRAVELTIME shoe is predominantly sold through wholesale customers. See PX 111; Trial Tr. 373:12-16. Some wholesale retailers

are entirely online businesses, see Trial Tr. 846:19-22 (wholesale customers include e-commerce sites like Amazon and Zappos); others conduct business both online and in physical stores, with online versus brick-and-mortar sales reflecting varying portions of their sales, cf. Trial Tr. 903:16-04:13 (Peltz conducts about 80% of business online and 20% in physical stores) with id. 847:5-12, 902:5-904:13 (other wholesale customers conduct about 20% of their business online and 80% in stores). As of June 15, 2020, 23% of gross sales in the U.S. for Skechers' Commute Time shoes occurred via Skechers' website. See JX 28. Internet-based sales via Skechers' website or the websites of third-party wholesale retailers represented 44% of all U.S. sales of Skechers' Commute Time shoes as of June 15, 2020. See id.

Both the TRAVELTIME shoes and Skechers' Commute Time shoes are frequently presented in tandem through the same marketing channels: in retail stores like Macy's and Bealls, in catalogues such as Masseys and Maryland Square, and through third-party e-commerce websites such as Amazon and Zappos, or the brands' own websites. See PX 211, JX 28. At times the shoes have been placed directly next to each other, including on the same page of a Masseys catalogue, PX 78 at 78.002, and next to one another on retail store shelves, see Trial Tr. 69:22-25, 398:8-23. In retail stores like Macy's and in Skechers' own retail stores, a customer would see only the shoes themselves, not the boxes. See Trial Tr. 131:4-14, 132:17-24, 397:1-7; JX 35 at 1. In a retail store like DSW or Bealls, a customer might find the boxes on the sales floor, though generally stacked so that only the short end with the

UPC sticker is visible to the customer. Tr. 240:16-22. In those kinds of retail store settings, products are grouped by brand, including signage for the brand. See Trial Tr. 847:15-848:11. E-commerce websites do not show the boxes, only the shoes themselves, and feature the brand names as well as the marks. See Trial Tr. 859:17-860:17, 251:19-252:6; PX 214. For online sales, both the companies' respective websites and third-party websites clearly label the TRAVELTIME shoe with the Easy Spirit brand and the Commute Time shoe with the Skechers brand and housemarks. See DX 285; DX 289; DX 293; DX 295; PX 215A; PX 215B; PX 215C; PX 214; Trial Tr. 338:14-339:9, 859:17-860:17, 251:19-252:6, 861:8-864:17.

The TRAVELTIME shoe box is a minimalist beige box with simple orange lettering and no further adornment or decoration. See PX 188. Prior to spring of 2018 the TRAVELTIME mark did not appear on the shoeboxes themselves, except for on the small UPC label. See Trial Tr. 131:16-19, 241:21-23, 249:17-250:19; DX 270. Following the brand relaunch in spring 2018, the TRAVELTIME mark appeared on the short side of the shoebox itself, as well as on the UPC label. See PX 188. Skechers sold its shoe in two boxes, one when the shoe was called the "Commute" and one after the name was changed to "Commute Time." See PX 65; JX 19. After Skechers changed the name from "Commute" to "Commute Time," the new box had the Skechers brand name and housemarks (such as Air-Cooled Memory Foam and Relaxed Fit) on it, just like the previous box. Cf. JX 19 with PX 65. It also added the "Skechers Commute

Time" logo, which appears on a jewel-toned patterned box with various shapes and accents. See PX 65; JX 19.

Easy Spirit's target customers for its TRAVELTIME shoes are primarily women 55 years old and older, see Trial Tr. 150:3-11, 149:15-17, though it also targets women as young as 50 years old, see Trial Tr. 57:15-58:8, 123:3-6. The target customers for Skechers' Commute Time shoes involve the same demographic, though they also include younger women looking for comfortable shoes. See Trial Tr. 811:2-812:8.

Customers of both Easy Spirit TRAVELTIME and Skechers' Commute Time shoes are brand-conscious and brand loyal. See Trial Tr. 92:6-13, 58:3-4, 816:8-18. These customers are looking for comfort and comfort technologies. See Trial Tr. 57:15-58:8, 817:10-13, 819:9-16, 836:15-25. Customers are knowledgeable about these kinds of shoes because they have purchased these kinds of shoes before. See Trial Tr. 818:25-819:2.


## Easy Spirit's Infringement Suit

In February of 2019, Easy Spirit discovered Skechers' Commute Time shoe. Joint Pretrial Consent Order at 3. On April 12, 2019, Easy Spirit filed suit against Skechers in federal district court alleging federal and state trade dress and trademark infringement claims. See ECF No. 1. Following discovery, Skechers moved for summary judgment on all claims. See ECF No. 50. On January 21, 2021, as previously noted, U.S. District Judge William Pauley granted the motion in part

and denied it in part, dismissing the trade dress claims but allowing Easy Spirit's trademark infringement claims to proceed to trial. See ECF No. 101. Subsequently, the parties agreed to a remote bench trial, and the case was reassigned to the undersigned. The Court conducted a bench trial from September 9 through September 20 on the three remaining claims: (I) trademark infringement under the Lanham Act, 15 U.S.C. § 1114(a), (II) false designation of origin, 15 U.S.C. § 1125(a), and (III) common law trademark infringement under New York state law.

Importantly, in addition to the lay testimony referenced above, Skechers introduced at trial expert testimony from Dr. Jeffrey Stec. Dr. Stec holds a Ph.D. and M.A. in Economics from the Ohio State University and has extensive experience conducting consumer surveys. See Trial Tr. 925:7-926:1. Dr. Stec conducted a consumer survey that showed, inter alia, that none of the participants indicated any confusion about the source of the Skechers' Commute Time name and the TRAVELTIME mark. See Trial Tr. 930:7-17, 974:10-975:14, 1020:17-1021:17, 1023:19-1024:3.

The survey was based on the generally accepted "Squirt" format, see SquirtCo. v. Seven-Up Co., 628 F.2d 1086 (8th Cir. 1980), and included a variety of controls and checks to ensure reliability, including being performed in a double-blind format, using structural checks to identify inattentive or inconsistent participants, and designing questions and randomizing answers to avoid influence based on question format or order. See Trial Tr. 953:17-25, 968:20-971:2,

18

979:13-980:10, 1011:5-15, 1082:16-23. The survey relied on "screener" questions to target people who had purchased women's clogs or open-back shoes in the last year or planned to do so within a year. See Trial Tr. 932:9-933:22, 934:15-935:6, 944:10-22, 945:24-952:1, 1035:8-23, 1036:13-25, 1037:17-1038:4, 1039:25-1040:20, 1048:12-25.

The survey results showed that 0.0% of participants indicated any confusion about the source of the Skechers' Commute Time name and the TRAVELTIME mark, or any confusion about who sponsored or approved either the Commute Time name or TRAVELTIME mark, or any confusion as to the affiliation or connection of the Commute Time name and TRAVELTIME mark. See Trial Tr. 930:7-17, 974:10-975:14, 1020:17-1021:17, 1023:19-1024:3. There were no statistically significant differences in the results when compared among men and women, or by age group. See Trial Tr. 1043:21-1044:22, 1048:5-11, 1049:1-11.[5]

As further discussed below, the Court finds the survey to be entirely reliable and gives great weight to its strong conclusion that there is no consumer confusion between the TRAVELTIME shoe and the Commute Time shoe.

---

[5]    Accounting for a standard 4-5 % confidence interval in the survey, the margin of error did not impact the survey results. See Trial Tr. 930:25-931:6, 1021:21-1023:2. Based on generally accepted survey techniques, a result below a 10% confusion rate indicates a lack of confusion. See Trial Tr. 930:25-931:6, 1021:21-1023:2.

## Conclusions of Law

As noted, Easy Spirit's three claims at trial were for (I) trademark infringement under the Lanham Act, 15 U.S.C. § 1114(a), (II) false designation of origin, 15 U.S.C. § 1125(a), and (III) common law trademark infringement under New York state law. The Court addresses each in turn.

### I.   Trademark Infringement under the Lanham Act, 15 U.S.C. § 1114(a)

To demonstrate trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a), Easy Spirit must demonstrate (1) the validity of its mark and (2) the likelihood of confusion with Easy Spirit's mark as a result of Skechers' use of an allegedly similar mark. Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1075 (2d Cir. 1993).[6] Skechers does not dispute the validity of Easy Spirit's mark. The Court's analysis thus focuses on whether Skechers' use of its allegedly infringing mark is likely to cause consumer confusion. Id. This requires asking "whether numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark." Playtex Prods., 390 F.3d at 161.

In assessing the likelihood of consumer confusion, the Court relies on the familiar eight non-exclusive Polaroid factors: (1) the

---

6    Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

strength of the prior owner's mark; (2) the similarity between the two marks; (3) the competitive proximity of the products; (4) the likelihood that the prior user will bridge the gap; (5) actual confusion; (6) the defendant's good faith; (7) the quality of the defendants' product; and (8) the sophistication of the buyers. Polaroid Corp., 287 F.2d at 495. No single factor is dispositive and each factor should be weighed in the context of the others to determine if a likelihood of confusion exists. See Nikon Inc. v. Ikon Corp., 987 F.2d 91, 94 (2d Cir. 1993).

Here, the parties agree that only five of the Polaroid factors are in dispute. Specifically, the parties agree that two factors – bridging the gap and disparity of goods – are irrelevant, see Sept 3. 2021 Joint Pretrial Consent Order (ECF No. 164) at 6, and Skechers does not dispute that the proximity-of-goods factor favors Easy Spirit. Id. But the parties do vigorously disagree as to assessment to be given each of the remaining five factors: the strength of the plaintiff's mark, the similarity of the marks, actual consumer confusion, the defendant's intent, and customer sophistication.

### 1. Proximity of Goods

The proximity of the goods factor asks whether and to what extent the two products compete with each other. See Lang v. Retirement Living Pub. Co., Inc., 949 F.2d 576, 582 (2d Cir. 1996). A court considers the nature of the products themselves and the structure of the relevant market. See Vitarroz Corp. v. Borden, Inc., 644 F.2d 960, 967 (2d Cir.

1981). The Commute Time shoe is sold to the same class of purchasers as the TRAVELTIME shoe. See Trial Tr. 150:3-11, 149:15-17, 811:2-812:8, 57:15-58:8, 123:3-6. The shoes are also sold through the same marketing channels, including the same retail stores, catalogues, and third party e-commerce websites. PX 211; JX 28. The shoes typically retail for approximately the same price, in the $55-$70 range. See Trial Tr. 817:24-818:1, 69:17-21, 65:17-66:3, 69:14-16. Skechers does not dispute that the proximity-of-goods factor favors finding a likelihood of confusion. See ECF No. 181 at 11; Joint Pretrial Consent Order (ECF No. 164) at 6. The Court agrees, and finds that the proximity-of-goods factor weighs moderately in favor of a likelihood of confusion.

## 2. The Strength of Easy Spirit's TRAVELTIME Mark

"The strength of a mark refers to its ability to identify the source of the goods being sold under its aegis," whether as a function of the mark's inherent distinctiveness or the distinctiveness it has acquired in the marketplace. Brennan's, Inc. v. Brennan's Restaurant, L.L.C., 360 F.3d 125, 130-31 (2d Cir. 2004). As set out below, the Court finds that Easy Spirit's TRAVELTIME mark is to some degree inherently distinctive, but has not acquired much additional distinctiveness in the marketplace, so that the strength of the mark factor weighs only moderately in favor of a likelihood of confusion.

A. *Inherent Distinctiveness*

In assessing inherent distinctiveness, courts classify a mark in one of four categories, listed in increasing order of inherent distinctiveness: generic, descriptive, suggestive, or arbitrary or fanciful. Id. at 131. A generic mark -- one that is "a common description" of a product and "refers to the genus of which the particular product is a species" -- is not at all distinctive and thus not protected. See Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999); Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 384 (2d Cir. 2005). A descriptive mark -- one that "tells something about a product, its qualities, ingredients or characteristics" -- is "not inherently distinctive" but is protectable if it has "acquired distinctiveness." See Gruner + Jahr, 991 F.2d at 1076; Star Indus., 412 F.3d at 385. A suggestive mark -- one that "merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods" -- is inherently distinctive to a modest degree. Lane Capital Mgmt., 192 F.3d at 344. An arbitrary or fanciful mark -- one that "do[es] not communicate any information about the product either directly or by suggestion" -- is not only inherently distinctive but also merits strong protection. Star Indus., 412 F.3d at 385, 344.

In terms of this hierarchy, the TRAVELTIME mark is plainly suggestive: it requires some imagination, thought, and perception for a purchaser to go from "travel time" to the idea of movement, then to

what one might need when moving, and finally to the product, an open-back comfort shoe. Lane Capital Mgmt., 192 F.3d at 344. However, even though a purchaser must make an imaginative leap from TRAVELTIME to open-back shoes, this does not render the "TRAVELTIME" mark so abstract as to be either arbitrary or fanciful; the mark still communicates information about the product. It communicates, even if only by suggestion, that the product is to be used while traveling or that the product enables traveling -- hardly arbitrary when paired with comfort shoes. Accordingly the Court concludes that the TRAVELTIME mark is suggestive and thus inherently distinctive. See, e.g., Playtex Prods., 390 F.3d at 164-65 (affirming the district court's conclusion that "Wet Ones" was a suggestive, not descriptive, mark for pre-moistened toilettes where "Wet Ones" could plausibly describe a wide variety of products).

B. *Acquired Distinctiveness*

Acquired distinctiveness, as opposed to inherent distinctiveness, refers to the "recognition plaintiff's mark has earned in the marketplace as a designator of plaintiff's goods or services." Brennan's, Inc., 360 F.3d at 131. When there is widespread recognition of a mark among consumers, there is an increased likelihood of consumer confusion because consumers are more likely to assume the mark identifies the previously familiar mark and product. See Playtex Prod., 390 F.3d at 163. Sometimes called "secondary meaning," acquired distinctiveness is determined by analyzing six factors: advertising

expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use. See Car-Freshner Corp. v. American Covers, LLC, 980 F.3d 314 (2d Cir. 2020). No single factor is dispositive and not all are required to establish secondary meaning. See Thompson Med. Co., Inc. v. Pfizer Inc., 753 F.2d 208, 2017 (2d Cir. 1985).

> i.  *Advertising Expenditures*

At trial, Easy Spirit provided evidence detailing the nature of the advertising it undertook as part of the brand relaunch in spring of 2018. This included sample advertising creative copy, including videos and marketing emails using the TRAVELTIME mark. See, e.g., PX 83 (creative copy used in a fall 2018 email), Trial Tr. 136:4-15; PX 101 (advertising video used in spring 2019 on Facebook, Easy Spirit website, and in other programmatic videos for digital advertising) Tr. 137:17-139:11; PX 121 (October 2019 paid advertisement in Oprah Magazine featuring multiple Easy Spirit shoes, including the TRAVELTIME Clogs); PX 133 (creative copy used in a fall 2018 email), Trial Tr. 141:3-10.[7] This also included testimony from the Marc Fisher Footwear Vice President of Marketing and Advertising and PR, Shanya Perera, about the advertising campaign. See, e.g., Tr. 104:23-105:1,

---

[7]   Easy Spirit also introduced evidence of creative copy that did not feature the TRAVELTIME mark, see, e.g., PX 154. However, where the copy does not feature the TRAVELTIME mark, it does not support any finding as to whether the TRAVELTIME mark acquired secondary meaning.

180:23-182:25 (describing advertising campaigns on the New York City subway, on Metro North commuter trains, and in the Miami International Airport).

However, Easy Spirit did not provide evidence of its advertising expenditures. Nor did Easy Spirit provide evidence about how many customers or consumers the TRAVELTIME-specific advertising reached. See Lopez v. Gap, Inc., 883 F. Supp. 2d 400, 425 (S.D.N.Y. 2012) ("However, to support a finding of secondary meaning, such advertising must have reached the targeted audience."). Perera testified that the campaign targeted women 55 years old and older, which was the audience that market research had identified as the primary purchasers of TRAVELTIME shoes. Tr. 149:18-150:11, 121:6-122:7. But the evidence about the results of the advertising campaign did not show the reach of the TRAVELTIME mark advertising as opposed to the Easy Spirit brand more generally. See PX 99 at 99.005.

Nor does Easy Spirit's advertising evidence support finding that the TRAVELTIME mark acquired secondary meaning prior to 2018, when Skechers began selling the shoe under the Commute Time name. See Lopez, 883 F. Supp. 2d at 425 ("A party seeking to establish secondary meaning . . . must show that the mark acquired secondary meaning by the time the allegedly infringing mark came onto the market."). The only evidence of pre-2018 advertising presented by Easy Spirit was a March 2017 New York Times print advertisement. See PX 207. Because Easy Spirit did not present sufficient evidence of its pre-2018 expenditures on advertising

specific to the TRAVELTIME shoe that reached its target audience, the Court finds this factor does not support finding that the TRAVELTIME mark acquired secondary meaning.

### ii. *Unsolicited Media Coverage*

Easy Spirit presented evidence of unsolicited media coverage of the TRAVELTIME shoe, including coverage that ranked the TRAVELTIME shoe highly among women's comfort shoes and clogs and even referred to the shoe as "iconic." Skechers responds that only the evidence of unsolicited media coverage that predates Skechers' use of the Commute Time name is relevant, arguing that Easy Spirit must demonstrate that the TRAVELTIME mark acquired secondary meaning prior to when Skechers began to use the Commute Time name in 2018. See Lopez, 883 F. Supp. 2d at 425.

Most of Easy Spirit's evidence of unsolicited media coverage is from 2019 or later. See PX 119 (July 2019 article in shoe industry online publication Footwear News ranking Easy Spirit TRAVELTIME shoe as number two for comfort and style among women's clogs on the market); PX 211 (July 2020 Health.com article highlighting that TRAVELTIME shoe has 7,000 perfect reviews on Amazon); PX 212 (June 2020 Travel + Leisure online article naming the TRAVELTIME the best backless slip-on sneaker); PX 115 (March 2019 Walk Jog Run online article calling the TRAVELTIME the most comfortable slip on shoe); PX 118 (January 2019 Best Shoe Rated online article calling the TRAVELTIME the best travel shoe for women); PX 123 (November 2019 Shoe Advisor online article calling TRAVELTIME one of the ten best walking shoes for

women); PX 124 (November 2019 Trip Savvy online article calling TRAVELTIME the best mule for comfortable women's travel shoes). Easy Spirit presented only one piece of evidence of pre-2018 unsolicited media coverage, and this was focused mainly on the Easy Spirit brand, referring to the TRAVELTIME mark only once. See PX 114. Where most of the evidence of unsolicited media coverage, including the only pre-2018 evidence, is from industry-specific online publications that post-date the commencement of the instant litigation, it is not clear that this evidence provides any strong indication of whether the TRAVELTIME mark acquired secondary meaning in the eyes of consumers before Skechers started using its Commute Time mark.

   *iii. Sales Success*

   In 2006 the TRAVELTIME shoe became the number one selling shoe in department stores in the United States. See PX 135; PX 207. Between July 2017 and March 2019, sales of the TRAVELTIME shoe totaled over $26.3 million. See PX 111.[8] Skechers argues that pre-2018 sales of the TRAVELTIME shoe are not ultimately probative of the strength of the TRAVELTIME mark because the mark does not appear on the shoes themselves (the only words on the shoes themselves are "Easy Spirit"

---

[8]   Indeed, Easy Spirit presented substantial though somewhat conclusory evidence that the TRAVELTIME shoe has been Easy Spirit's most successful shoe every year since 2006, see Trial Tr. 36:23-38:6, 34:12-35:8. Easy Spirit also presented evidence of successful collaboration with other brands. See Trial Tr. 189:8-11 (noting that the Martha Stewart TRAVELTIME shoe was the best-selling shoe in the collection), 51:7-11 (noting that the Swarovski TRAVELTIME shoe has sold out each year since it was introduced).

on the insole heel of some models) and did not even appear on the shoe boxes until the spring of 2018. See Tr. 131:16-19, 241:21-23, 249:17-250:19; DX 270. In other words, what was successful with consumers was an Easy Spirit comfort shoe not especially identified as TRAVELTIME. Nonetheless, the Court finds the overall sales success is so strong that, even if TRAVELTIME was only mentioned in passing, the success still provides some support for concluding that the TRAVELTIME mark acquired secondary meaning in the eyes of consumers.

   iv.   *Length & Exclusivity of Mark's Use*

Easy Spirit has sold shoes under the TRAVELTIME name continuously since 2004. See Tr. 36:23-37:20. Skechers contends that two facts cut against Easy Spirit as to the exclusivity of the TRAVELTIME mark's use: the fact that other shoe companies routinely use trademarks comprised of the word "travel" or "time," and the fact that Easy Spirit uses similar product names with the root "TRAVEL-." See ECF No. 181 at 6-8; see also Car-Freshner Corp., 980 F.3d at 330 ("When the word that makes a mark somewhat suggestive is widely used in competitive, nearly competitive, and other products, its suggestive quality substantially loses what that quality would otherwise contribute to the strength of a trademark.").

Skechers presented evidence that a number of other shoe companies have registered marks for shoe names that include either the word "travel" or the word "time." See, e.g., DX 24 (Mephisto TRAVEL'S); DX 29 (Propét TRAVELACTIV); DX 33 (Propét TRAVELTEK); DX 118 (Walmart TIME AND TRU); DX 126 (DC ADVENTURE TIME); DX 353 (Propét

TRAVELWALKER).[9] Easy Spirit counters that none of these third-party registrations uses both the word "travel" and "time." To be sure, the Court's overall trademark analysis is of TRAVELTIME as a unitary mark. See, e.g., Universal City Studios, Inc. v. Nintendo Co., 746 F.2d 112, 117 (2d Cir. 1984) ("In order to determine if confusion is likely, each trademark must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar."). However, third party use of either component term is an appropriate and relevant consideration in assessing the strength of the mark. See, e.g., Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 744 (2d Cir. 1998) (considering third party use of either of the senior mark's component words and noting that "third party use of the words 'street' and 'wise' weakens the strength of Streetwise's mark").

Skechers also presented evidence that Easy Spirit uses the root "travel-" in the names of many of its other shoes. See PX 156; PX 35; PX 37; DX 265; DX 266; see also Trial Tr. 63:5-9, 79:19-82:19 (referring to Easy Spirit's use of unregistered product names including Travelflower, Travelport, Travelfur, Travelslip, Travelrite, and

---

[9]     Easy Spirit also contends that evidence of mark registrations is not probative of secondary meaning without evidence of the extent of the marks' use in the marketplace. However, Skechers did adduce some evidence in the form of testimony that these third-party marks were used in the marketplace. See Trial Tr. 880:9-11, 882:2-5; 886:8-890:5. And evidence of mark registrations was enough for the Second Circuit in Car-Freshner to find that third-party registrations for competitive products weakened the strength of the senior mark, even without additional evidence of the extent of the use of those marks. 980 F.3d at 328-30.

Travelclog, among others). Easy Spirit counters that it uses the root "travel-" in its TRAVELTIME family of shoes to take advantage of the goodwill generated by the TRAVELTIME name. See ECF No. 184 at 3.

A comparison to the Second Circuit's analysis in Car-Freshner is instructive. In Car-Freshner, the court found that the suggestiveness of the mark "Bayside Breeze" for automotive air freshener products was diminished where the suggestive word "breeze" was used by the plaintiff in its other air freshener scent names and where "breeze" also appeared in the names of third-party registrations for competitive products. 980 F.3d at 328-30. The court contrasted this with the plaintiff's "Black Ice" mark (also for automotive air freshener products), which remained nearly arbitrary "as a phrase despite the appearance of its component words in other products." Id. Here, TRAVELTIME is more like "Bayside Breeze" – a suggestive mark where the suggestive words appear in other products of the plaintiff as well as in other third-party registrations.

As for the occasional reference to the TRAVELTIME shoe as "iconic," in an online news article and elsewhere, it is not clear that this referred to the mark as opposed to the shoe design. See Tr. 151:22-152:6, 999:2-13; PX 114. And Easy Spirit did not, for example, introduce evidence to indicate that when customers think of an open-back comfort shoe they think first of the TRAVELTIME specifically. See Playtex Prod., 390 F.3d at 165 (referring to the studies and surveys that supported plaintiff's claim that the mark at issue was well-established).

Where advertising expenditures and unsolicited media coverage do not demonstrate that TRAVELTIME acquired secondary meaning before Skechers started using the Commute Time mark in 2018, and where sales success and the length and exclusivity of the mark's use weigh, at best, only moderately in favor of finding secondary meaning, the Court finds that Easy Spirit has not established strong evidence that the TRAVELTIME mark acquired secondary meaning prior to when Skechers began using the Commute Time mark. While Easy Spirit is not required to establish secondary meaning because the Court finds the mark suggestive and thus inherently distinctive, see Gruner + Jahr, 991 F.2d at 1076, the lack of strong evidence of acquired distinctiveness contributes to the Court's finding that the strength of the mark factor weighs only moderately in favor of a likelihood of confusion. See Car-Freshner, 980 F.3d at 328-30 (considering secondary meaning factors in analyzing acquired distinctiveness even for suggestive and inherently distinctive mark to weigh mark strength in likelihood of confusion analysis).

### 3. The Similarity of the Marks

"Marks are similar when they are the same in appearance, sound and meaning." Horn's, Inc. v. Sanofi Beaute, Inc., 963 F. Supp. 318, 322 (S.D.N.Y. 1997). In assessing the similarity of the marks at issue, a court "must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective

purchasers." <u>Malletier v. Burlington Coat Factory Warehouse Corp.</u>, 426 F.3d 532, 537 (2d Cir. 2005). The size, logos, typefaces, and package designs may be relevant to analyzing the similarity of the marks. <u>See</u> <u>W.W.W. Pharm. v. Gillette Co.</u>, 984 F.2d 567, 573 (2d Cir. 1993).[10] Easy Spirit argues simply that the meaning and connotation of Commute Time is similar to TRAVELTIME because at least one dictionary defines "commute" as to "*travel* as a commuter." <u>See</u> Trial Tr. 664:3-18 (emphasis added).[11] Skechers contends that the marks do not look, sound, or mean the same, and that the marks are thus dissimilar. The Court agrees with Skechers.

First, the marks do not look the same, especially when compared in the context of how they appear to the consumer, as is appropriate in analyzing their similarity. TRAVELTIME is one word; Commute Time is two. TRAVELTIME generally appears in all capital letters; Commute Time does not. TRAVELTIME is written on one line; Commute Time

---

[10]   The similarity of the products themselves, however, is more appropriately analyzed under the proximity-of-goods factor. <u>See, e.g.</u>, <u>Arrow Fastener Co., Inc., v. Stanley Works</u>, 59 F.3d 384, 394-97 (2d Cir. 1995) (addressing the products and the functional difference between the staplers at issue in analyzing the proximity of the goods, not in the similarity of the marks); <u>Clinique Lab'ys, Inc. v. Dep Corp.</u>, 945 F. Supp. 547, 552-55 (S.D.N.Y. 1996) (noting under the proximity-of-goods factor that "[t]he products at issue are nearly identical soaps, moisturizers, eye creams, and toners," while focusing on the marks themselves in analyzing the similarity of the marks").

[11]   Easy Spirit also argues that the decision of the Skechers President and CEO to add "time" to the shoe name, making it "Commute Time," is relevant to an analysis of the similarity of the marks. <u>See</u> ECF No. 182 at 6. This is more appropriately addressed in the context of the factor examining the defendant's intent to deceive or confuse customers.

generally appears on separate lines. TRAVELTIME generally appears in a sans serif typeface; Commute Time generally appears in a script or cursive typeface. A comparison of the respective shoe boxes demonstrates that the colors, shapes, and logos accompanying the respective word marks are not similar. TRAVELTIME appears on a minimalist beige box with simple orange lettering and no further adornment or decoration. See PX 188. Commute Time appears on a jewel-toned patterned box with various shapes, accents, and Skechers housemarks. See PX 65; JX 19. Such differences, including coupling the marks with the company names, cuts against finding the marks similar. See Car-Freshner, 980 F.3d at 332 (noting that significant differences in packing, "particularly the prominent display of the parties' brand names . . . largely dispel the slight similarity arising from the common use of the word "breeze" and the image of a sailboat").

It should be noted that in many retail settings, a customer would not see the marks at all, since neither TRAVELTIME nor Commute Time is usually visible on the shoes themselves. In particular, Easy Spirit does not place the TRAVELTIME mark on the exterior of the shoes, and while some shoes have the TRAVELTIME mark on the inner label of the sole heel, this is of limited visibility. See Trial Tr. 73:1-75:17, 241:3-5, 249:10-250:19, 519:10-22, 627:1-9. By contrast, for online sales, both the companies' respective websites and third-party websites clearly label the TRAVELTIME shoe with the Easy Spirit brand

and the Commute Time shoe with the Skechers brand and housemarks.[12]
See DX 285; DX 289; DX 293; DX 295; PX 214; PX 215A; PX 215B; PX 215C;
Trial Tr. 338:14-339:9, 859:17-860:17, 251:19-252:6, 861:8-864:17.

Neither do the words sound the same. While both are comprised of
two syllables, the accent is on the first syllable of "travel," as
opposed to the second syllable of "commute." The words otherwise sound
nothing alike when pronounced aloud. Furthermore, "travel" and
"commute," while related,[13] are not synonymous. Both can operate as

---

[12]   Easy Spirit argues that the fact that Skechers attaches its brand
name in front of the Commute Time name does not render the mark
dissimilar. ECF No. 184 at 12-13. In some cases, the Second Circuit
has considered that where the brand name accompanies the allegedly
infringing mark, it weighs against finding the marks similar in
analyzing the general impression created by the marks. See, e.g.,
W.W.W. Pharm., 984 F.2d at 573. In other cases, the Second Circuit has
noted that simply placing the brand name in front of the allegedly
similar mark is not itself sufficient to prevent a likelihood of
confusion. See, e.g., W. E. Bassett Co. v. Revlon, Inc., 435 F.2d 656,
662 (2d Cir. 1970) (noting that such an argument, if accepted "would
allow any company that is well enough known, to infringe a competing
company's mark, especially if the competitor is small, merely by
coupling its own name with the competitor's mark"). Here, we have
substantially more dissimilarities between the impression of the marks
on customers than simply Skechers tagging its brand name before the
allegedly infringing mark because the marks do not otherwise look,
sound, or mean the same. As such, we find that the fact that "Commute
Time" is always accompanied by the Skechers company name and housemarks
slightly favors finding the marks dissimilar.

[13]   As the Court observed at trial, see Trial Tr. 664:5-17, dictionary
definitions demonstrate the two words are related. See, e.g., commute,
Merriam-Webster Collegiate Dictionary (11th ed. 2003) (defining
"commute" as "to travel regularly to and from a place and especially
between where you live and where you work"); travel, Merriam-Webster
Collegiate Dictionary (11th ed. 2003) (defining "travel" as "to go
on a trip or journey" or "to go to a place and especially one that is
far away"). This demonstrates that the words are related, insofar as
both words can be defined at a high level of generality as meaning "to
go from one place to another." This does not, however, make the two
words synonymous.

verbs or as nouns that describe movement. The similarity, however, ends there. For example, when someone puts on their dating profile that they love to "travel," rarely, if ever, do they mean that they enjoy commuting to and from their place of work.

In sum, where the marks do not look the same, sound the same, or mean the same thing, and where, as presented to consumers, they do not create any similar impression, the Court finds the marks dissimilar and thus concludes that this factor weighs moderately against any likelihood of confusion.

### 4. Actual Consumer Confusion

Showing actual confusion is not required to prevail in a claim for trademark infringement under the Lanham Act. See Lois Sportswear, U.S.A., Inc., v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986). Where such evidence is absent, however, this factor favors the defendant, though it is not dispositive of the question of likelihood of confusion. See Streetwise Maps, 159 F.3d at 745; Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 319 (S.D.N.Y. 2000). Surveys can be used to show the presence or absence of actual consumer confusion. Paco Sport, Ltd., 86 F. Supp. 2d at 319.

Here, Easy Spirit presented no evidence that consumers were, in fact, confused about the source or association of Skechers' Commute Time shoe as a result of Skechers' use of an allegedly similar mark.[14]

---

[14]   Though Easy Spirit witnesses hypothesized about the potential for confusion, see Trial Tr. 270:11-13, 398:8-399:10, 402:24-403:16, such

While Easy Spirit is not required to present a survey or to show actual confusion at all to prevail on its claim, "the absence of surveys is evidence that actual confusion cannot be shown." The Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 964 (2d Cir. 1996); Star Indus. v. Bacardi & Co., 412 F.3d at 388.

But we do, in fact, have a survey here, showing a zero percent likelihood of actual consumer confusion. Although the survey results are not a legal conclusion as to the ultimate inquiry of the likelihood of confusion, this is probative evidence that informs the Court's assessment of the actual confusion factor. Skechers' expert witness, Dr. Jeffrey Stec, testified about the results and methodology of the survey he conducted showing that 0.0% of participants indicated any confusion about the source of the Skechers' Commute Time name and the TRAVELTIME mark, or confusion about who sponsored or approved either the Commute Time name or TRAVELTIME mark, or confusion as to the affiliation or connection of the Commute Time name and TRAVELTIME mark. See Trial Tr. 930:7-17, 974:10-975:14, 1020:17-1021:17, 1023:19-1024:3. A confusion rate less than 10% indicates a lack of confusion based on generally accepted survey techniques and recognized by courts. See e.g., MZ Wallace Inc. v. Fuller, No. 18-cv-2265 (DLC) 2018 WL6715489 at *12 (S.D.N.Y. Dec. 20, 2018). There were no statistically significant differences in the results when compared among men and

_____

opinions, without any factual basis, are irrelevant to a consideration of the actual confusion factor. See, e.g., W.W.W. Pharm., 984 F.2d at 574-75 (affirming district court's dismissal of plaintiff employee's wholly speculative testimony as not indicative of actual confusion).

women, or by age group. See Trial Tr. 1043:21-1044:22, 1048:5-11, 1049:1-11. The survey results here thus strongly indicate a lack of actual confusion, and the Court finds this factor accordingly weighs strongly again a likelihood of confusion.

Easy Spirit attempts to undermine the reliability of Dr. Stec's survey by attacking his methodology on three fronts. First, Easy Spirit argues that the survey did not confine its participants to the target population for Easy Spirit's TRAVELTIME and Skechers' Commute Time shoes – women 55 years old and older. The Court finds this argument unpersuasive. To begin with, while Easy Spirit advertising may target women 55 years old and older, and while many purchasers of Easy Spirit's TRAVELTIME and Skechers' Commute Time shoes may be women 55 years old and older, a consumer survey need not be limited to this demographic. In fact, as Dr. Stec testified, proper survey practices require including customers and prospective customers, not artificially restricting the population from which the survey sampled, as Easy Spirit argues should have been done. See Trial Tr. 932:12-933:1, 933:1-12. Dr. Stec testified that the survey polled people who had purchased in the last year, or were planning to purchase in the next year, women's clogs or open-back shoes. Any further restrictions based on gender or age would be empirically inappropriate. See, e.g., Conopco, Inc. v. Cosmair, Inc., 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999) (finding a survey purporting to show actual confusion flawed and lacking probative value because it excluded men and limited respondents by age). Furthermore, and dispositive of this argument, even if the

survey had been limited to Easy Spirit's proposed demographic, Dr. Stec testified that there were no statistically significant differences in the results when compared among men and women, or by age group. See Trial Tr. 1043:21-1044:22, 1048:5-11, 1049:1-11.

Second, Easy Spirit argues that the survey is unreliable because it chose to show the shoes to the participants by reference to the parties' respective websites, rather than via a third-party retailer, whether e-commerce or brick-and-mortar stores. Easy Spirit indicated that the TRAVELTIME shoe is predominantly sold through wholesale retailers, and further noted that only 3% of purchasers of the Skechers Commute Time shoe in the United States bought the shoe on Skechers' website. ECF No. 182 at 8-9. Easy Spirit argues that conducting the survey by referencing the parties' website advertising for their respective shoes therefore was artificial in a way that rendered the survey methodologically unsound.

Easy Spirit's argument rests on flawed assumptions and inaccurate calculations. For one, Easy Spirit made no specific assertion about whether the sale of TRAVELTIME shoes by wholesale retailers actually occurred in brick-and-mortar stores as opposed to via those retailers' websites, asserting only that "many" of the third-party wholesale retailers do have brick-and-mortar stores. ECF No. 182 at 8; see Trial Tr. 365:14-17; PX 111; PX 106. Some wholesale retailers are wholly online businesses, see Trial Tr. 846:19-22 (noting that wholesale customers include e-commerce sites like Amazon and Zappos); others conduct business both online and in physical stores, with online as

opposed to brick-and-mortar sales reflecting varying portions of total sales, cf. Trial Tr. 903:16-04:13 (noting that Peltz conducts about 80% of business online and 20% in physical stores) with Trial Tr. 847:5-12, 902:5-904:13 (noting that other wholesale customers conduct about 20% of their business online and 80% in stores).

Next, an accurate calculation reflects that 23%, not 3%, of gross sales in the U.S. for Skechers' Commute Time shoes occurred via Skechers' website. See JX 28. Internet-based sales via Skechers' website or the websites of third-party wholesale retailers represented 44% of all U.S. sales of Skechers Commute Time shoes. See JX 28. While Dr. Stec's survey did not replicate the exact purchasing experience of every consumer confronting Skechers' shoes in the marketplace, given the multiple modalities of consumption, there was no single marketplace to replicate. Dr. Stec's survey made reasonable choices based on his experience and training and on accepted survey techniques – that the source companies' respective websites would provide the best representation of their shoes, including shoe descriptions and reviews, see Trial Tr. 1057:12-1058:14, and that using a third-party website would inappropriately introduce another brand to the question of confusion, having survey respondents instead associate the shoes with, say, Amazon, potentially confounding the survey results, see Trial Tr. 1058:15-1059:19, 1016:15-1017:7.

Third, Easy Spirit asserts that the survey is flawed because respondents received modest incentives to take the survey, which, it argues, affected the survey's integrity. As Dr. Stec testified,

incentives are generally accepted in survey administration of this sort, and the relevant scientific and academic literature has shown that incentives improve response rates and do not affect data reliability. See Trial Tr. 936:19-937:12, 944:23-945:22, 1067:25-1069:16; see also Erica Ryu, Mick P. Couper, and Robert W. Marans, Survey Incentives: Cash vs. In-Kind, etc., 18 Int'l J. Pub. Op. Res. 89, 90 (2005).

In sum, Easy Spirit's asserted flaws provide little, if any, reason to question the reliability of Dr. Stec's survey methodology and results. Easy Spirit failed to offer any evidence of actual confusion, and failed to rebut or discredit Skechers' reliable survey evidence, which showed that 0.0% of survey participants indicated any confusion about the source of the Skechers' Commute Time name and the TRAVELTIME mark, or confusion about who sponsored or approved either the Commute Time name or TRAVELTIME mark, or confusion as to the affiliation or connection of the Commute Time name and TRAVELTIME mark. See Trial Tr. 930:7-17, 974:10-975:14, 1020:17-1021:17, 1023:19-1024:3. And there were no statistically significant differences in the results when compared between men and women, or by age group. See Trial Tr. 1043:21-1044:22, 1048:5-11, 1049:1-11.

Dr. Stec's survey was conducted in March 2020, see DX 34.010, and Skechers had been using the Commute Time mark as early as fall of 2018 -- an adequate period of time for any supposed confusion to develop. See Nabisco, Inc., v. PF Brands, 191 F.3d 208, 228 (2d Cir. 1999). The total absence of actual confusion, as shown by his survey,

is a "powerful indication" that Skechers' Commute Time trademark does not cause a meaningful likelihood of confusion. Id. The Court thus finds this factor weighs strongly in favor of there being no likelihood of confusion.

### 5. Skechers' Intent to Deceive or Confuse Consumers

This factor looks at whether the junior user acted in bad faith or with an intent to deceive consumers such that it increases the likelihood of consumer confusion. See Car-Freshner, 980 F.3d at 333. "Prior knowledge of a senior user's mark does not, without more, create an inference of bad faith." See Playtex Prod., 390 F.3d at 166. The relevant intent here is not the intent to compete, but the intent to deceive consumers about the source or affiliation of the product to capitalize on the good will of the senior user's mark. See Streetwise Maps, 159 F.3d at 745 ("The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product."); see also George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1541 (2d Cir.1992) ("Absent confusion, imitation of certain successful features in another's product is not unlawful and to that extent a free ride is permitted.").

As it made clear from its counsel's opening statement, see Trial Tr. 2:9-7:10, Easy Spirit largely hangs its case on this factor, arguing that Skechers purposely copied the TRAVELTIME shoe and slapped on a confusingly similar name. Even if this were so, it must be

remembered that the ultimate analysis concerns the likelihood of consumer confusion, and, as noted above, there was none. Furthermore, the evidence at trial, while not unequivocal in respect to the issue of intent, showed more an intent to compete than an intent to deceive.[15]

The impetus for the design of the shoe that became the "Commute," and was then renamed the "Commute Time," came from a recognition that open-back shoes were becoming trendy and commercially successful. This led to a request from Baruch to Teteriatnikov to make an open-back shoe on a mid-sized sole that used the "jewel" or "chiclet" elements from the existing Skechers D'Lite sole. See Trial Tr. 507:4-12, 528:5-529:11, 608:17-609:23, 625:18-20, 806:11-23, 813:15-25. Teteriatnikov designed a new outsole that corresponded to Baruch's request. See Trial Tr. 495:23-496:19, 563:5-8; PX 15. In designing the new outsole, Teteriatnikov used a variety of sources, particularly a Tommy Hilfiger shoe, a Skechers "Noogie," and a Skechers "Biker." See Trial Tr. 444:12-13, 444:22-25, 446:23-25, 448:13, 448:25-449:7.

It is true that Teteriatnikov later instructed the Chinese factory that the measurements of the midsole height and outsole width of this new outsole should be the same as the Easy Spirit TRAVELTIME shoe. See PX 16. This design process was not unusual given the practice and custom in the shoe industry to incorporate elements of other companies' shoes to create competitive versions based on fashion trends and what

---

[15]   Easy Spirit's trade dress claims were dismissed on summary judgment. See ECF No. 101. The Court nonetheless addresses the parties' arguments about whether the development of the Commute Time trade dress sheds any light on Skechers' intent.

customers wanted. And the overall design and development process indicates a proper evolution of the shoe design, incorporating elements in a permissible attempt to compete in the open-back comfort shoe market. See PX 43; PX 156; DX 12; DX 263A; DX 15; DX 339A; DX 12; DX 281A; DX 283A; DX 282A; DX 278A; DX 280A; DX 256; DX 254; DX 287; DX 230A.

Moreover, Teteriatnikov's design for the shoe that became the Commute Time employed a number of features that were not present on the TRAVELTIME shoe, further indicating an attempt to compete rather than to copy wholesale with an intent to confuse consumers. See Trial Tr. 512:21-514:10, 515:3-518:2, 518:20-519:22; cf. JX 20 with DX 274. Some were aesthetic differences, such as the chiclets on the side of the Skechers Commute Time, similar to the Skechers D'Lite shoes, where the TRAVELTIME does not have chiclets, Trial Tr. 515:3-6; cf. JX 20 at 4 with DX 274 at 4, or the differences in stitching on the upper such that the Skechers Commute Time upper stays tighter to the foot than the TRAVELTIME shoe. Other differences were functional. The outsole differences (a two-section TRAVELTIME outsole versus a one-plate outsole on the Commute Time, with additional differences in treads and grooves) affect grip and flexibility. Trial Tr. 512:23-514:19; cf. DX 274A at 6 with JX 19 at 6. The heel of the Commute Time comes up higher on the foot than the TRAVELTIME, with attendant differences in how easily the foot slides in any out of the shoe while walking or when taking it on and off. Trial Tr. 515:7-11; cf. JX 20 at 4 with DX 274 at 4. The side overlay of the Commute Time goes down

into the outsole, which makes the shoe more flexible. See Trial Tr. 515:12-516:5; cf. JX 20 at 4 with DX 274 at 4.

As for the upper patterns, neither party introduced evidence about which company first developed the allegedly similar upper designs. Spear created the Commute Time upper designs independently, by pulling patterns from WGSN and then hand-drawing many aspects of the ultimate design. See Trial Tr. 756:1-760:22, 761:10-22, 768:1-15, 769:1-770:13, 771:17-23, 784:1-17. In any case, the companies' designs, while they can be described as similar at a high level of generality, are markedly different when viewed closely. Compare PX 28 with PX 29; PX 24 with PX 25; PX 30 with PX 31; PX 32 with PX 33; and PX 34 with PX 35.

In sum, while Skechers' assertion at trial that there are twenty-two differences between the Commute Time and TRAVELTIME may be overblown, the Court finds that there were meaningful differences in the design of the shoes such that an inference of direct copying in the design process is not warranted. Put differently, the development of the Commute Time shoe does not indicate any impermissible intent to confuse on the part of Skechers. Though the evidence at trial indicated that Skechers sought to develop a competitive open-back comfort shoe, it did not indicate that Skechers impermissibly copied Easy Spirit's TRAVELTIME shoe with an intent to confuse or deceive consumers, or capitalize on any goodwill Easy Spirit's TRAVELTIME shoe enjoyed.

Skechers' selection of the Commute Time name does, however, raise some eyebrows. It is suspicious that in September 2018, following the Spring 2018 relaunch of the TRAVELTIME shoe, which was accompanied by a whirl of advertising, and seven months after Skechers started marketing its shoe to consumers as the "Commute," Skechers CEO and President Robert Greenberg, with knowledge of the TRAVELTIME shoe, see JX 16; Trial Tr. 995:13-18; JX 15, eventually ordered that the "Commute" shoe be renamed the "Skechers Commute Time" shoe. See Trial Tr. 991:16-20, 992:14-18, 995:8-12, 1009:2-7, 668:16-20, 677:16-678:14, 678:8-680:25, 719:14-18, 990:1-17, 992:21-24; JX 5; JX 17.[16]

The force of this evidence is reduced, however, by the evidence that Greenberg first tried to rename the Skechers shoe "Commuters" and only changed to "Commute Time" after his legal department rejected "Commuters" as legally problematic, while thereafter approving "Commute Time." See JX 5; Trial Tr. 993:19-24.

Other evidence, moreover, further indicates that Greenberg intended to compete, not to confuse consumers. A March 14, 2017 email from Greenberg via his assistant to Baruch suggested that Baruch create a lace-up version of the open-back mule and stated that "there's your way to jump all over them and get them." The two plausible readings

---

[16]   While Easy Spirit also argues that Greenberg's repeated lack of recollection in his deposition, on its own or when coupled with his better refreshed testimony at trial, is further proof of his bad faith. But the Court finds it more likely that Greenberg simply prepared better for his trial testimony than for his deposition. This is not to gainsay, however, that, as already indicated, the Court does not find Greenberg to be a wholly credible witness.

of this email show an intent to compete rather than confuse. First, creating a lace-up version of the shoe is a way "jump all over" Easy Spirit and "get" Easy Spirit by competing with them, offering a style of shoe that they do not. Second and alternatively, "them" could be referring to the "people" in the preceding sentence of the email, i.e., identifying how to attract consumers and get them interested by offering a style that Easy Spirit does not. On either reading, the email shows an intent to compete, not confuse.

Once more, however, there is putatively conflicting evidence. An October 17, 2017 email from Greenberg through his assistant to Baruch refers to the "travel-time looking product." See JX 16. However, the Court finds credible Greenberg's explanation that it was common practice in the shoe industry to refer to a style of shoe by the best-known version of that shoe on the market -- like Converse Chucks or Vans slip-ons. See JX 16; Trial Tr. 997:22-998:3, 999:2-13. Each of these internal emails therefore indicates an intent to compete in the shoe industry and does not demonstrate an intent to confuse consumers.

In any case, the Court does do not focus solely on Greenberg in analyzing the company's intent, but also considers the conduct of other employees, including those who independently designed the shoe that became the Commute Time, well before Greenberg initiated the name change. See, e.g., Malaco Leaf, AB v. Promotion in Motion, Inc., 287 F. Supp.2d 355, 276-77 (S.D.N.Y. 2003) (analyzing company president's knowledge of allegedly infringed product along with evidence of intent of other company employees). And, as discussed

above, other Skechers employees independently designed and developed the shoe, including selecting the initial name, to which Greenberg added when he suggested the name change.

In summary, while the renaming of a previously and independently designed competitive shoe is not above suspicion, this is not enough to show that Skechers intended to capitalize on the reputation and goodwill that Easy Spirit's TRAVELTIME mark enjoyed, and as such, even the suspicious renaming and its timing weighs little in the ultimate analysis of the likelihood of confusion. See Car-Freshner Corp., 980 F.3d at 333 ("Bad faith and intent to deceive are relevant to the extent that they add to the likelihood that the accused infringer will achieve its objective of consumer confusion, but they do not alone determine likelihood of confusion nor provide an occasion for imposing punishment."). More generally, where, as here, the Court finds that the marks are not similar, even the arguable bad faith on the part of Greenberg in renaming the shoe does not remotely outweigh such facts as the actual absence of confusion.

## 6. Customer Sophistication

The customer sophistication factor "recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 480 (2d Cir. 1996). This factor's reference to sophistication refers not to the intelligence or education of customers, but instead to whether the customers possess particular

knowledge and discernment with respect to the kind of products at issue such that they are likely to distinguish between marks with respect to the products. See, e.g., Arrow Fastener, 59 F.3d at 399–400. As a general matter, the more sophisticated the consumers, the lower the likelihood of confusion. See SLY Magazine, LLC v. Weider Publications, L.L.C., 529 F. Supp. 2d 425, 442 (S.D.N.Y. 2007). In analyzing consumer sophistication, we consider "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." Sports Auth., 89 F.3d at 965. Where neither party presents direct evidence of consumer sophistication vel non, as is the case here, a court may rely solely on indirect indications of sophistication, such as the nature of the product or its price. See Star Indus., 412 F.3d at 390.

Easy Spirit argues that simply and solely because the customers of TRAVELTIME and Commute Time shoes are older women, they are not sophisticated consumers of comfort shoes. This argument, which Easy Spirit makes in wholly conclusory terms, borders on the offensive and, in any case, is at war with common experience and common sense: Why would older women, simply by virtue of their age and gender, not qualify as discerning consumers of comfort shoes?

Furthermore, there is inferential evidence to the contrary of Easy Spirit's assertion. For example, the evidence at trial indicated that customers of both Easy Spirit TRAVELTIME and Skechers Commute Time shoes are brand-conscious and brand loyal. See Trial Tr. 92:6–

13, 58:3-4, 816:8-18. These customers know what they are looking for: comfort and comfort technologies. See Trial Tr. 57:15-58:8, 817:10-13, 819:9-16, 836:15-25. Customers are knowledgeable about these kinds of shoes because they have purchased these kinds of shoes before. See Trial Tr. 818:25-819:2. The familiarity of customers with the brands and with the comfort technologies at issue indicates they are sophisticated consumers when it comes to these kinds of comfort shoes.

Furthermore, the price points of the shoes are sufficiently high to indicate that these are thoughtful purchases, even though they are by no means high-end luxury investments. Cf. Malaco Leaf, 287 F. Supp. 2d at 374 (finding consumers not sophisticated where cheap, one-time candy purchases were at issue), with LVL XIII Brands v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 676 n.105 (S.D.N.Y. 2016) (finding that fact that sneakers at issue retailed for $495 to $1,200 supported inference of consumer sophistication). Skechers Commute Time shoes typically retail for about $55-$60. See Trial Tr. 817:24-818:1, 69:17-21. The suggested retail price for Easy Spirit TRAVELTIME shoes is about $70. See Trial Tr. 65:17-66:3, 69:14-16. The Court therefore finds, based on the price point of the shoes, the brand awareness and loyalty of customers, and customers' familiarity with comfort technologies, that the customers here relevant are sophisticated in their purchases so as to reduce the likelihood that they would confuse Skecher's Commute Time shoes with Easy Spirit's TRAVELTIME shoes. This factor thus weighs against finding that meaningful confusion is likely.

Polaroid Balancing

While "[n]o formula is available" in balancing the Polaroid factors, Car-Freshner Corp., 980 F.3d at 334, the ultimate analysis remains the likelihood of consumer confusion. The proximity of the goods and strength of the mark factors weigh moderately in favor of finding a likelihood of consumer confusion. The marks at issue accompany goods that compete with each other. We have a suggestive, and thus inherently distinctive TRAVELTIME mark, though it weighs only moderately in favor of a likelihood of confusion where there is little evidence of its acquired distinctiveness in the marketplace prior to when Skechers began to use its Commute Time mark. The marks are fairly dissimilar, which weighs moderately, though not strongly against the likelihood of confusion. The evidence of Skechers' intent to compete, which, while it does not cast Skechers' CEO Greenberg in the most positive of lights, does not demonstrate an intent to deceive consumers. This factor thus does not weigh strongly one way or another, particularly when paired with the lack of actual confusion. The consumers of the shoes at issue are relatively sophisticated, meaning the factor weighs modestly against the likelihood of confusion. Where the other factors do not substantially favor finding a likelihood of confusion, decisively tipping the scales here is the absence of any direct evidence that consumers were actually confused, coupled with compelling survey evidence showing an absence of actual confusion between the marks.

On balance, therefore, the Court finds no likelihood of consumer confusion between Easy Spirit's TRAVELTIME mark and Skechers' Commute Time mark. The Court therefore finds that Easy Spirit's claim for trademark infringement under the Lanham Act has not been proved and must be dismissed.

## II.  False Designation of Origin Under 15 U.S.C. § 1125(a)

Easy Spirit's claim for false designation of origin under 15 U.S.C. § 1125(a) is coextensive with its claim for trademark infringement under 15 U.S.C. § 1114(1)(a). See, e.g., Starbucks v. Wolfe's Borough Coffee, 588 F.3d 97, 114 (2d Cir. 2009) (holding that § 1125(a) claim requires same showing under Polaroid factors); Playtex, 390 F.3d at 167 (holding the same). As discussed above, the Court finds no likelihood of consumer confusion as to Easy Spirit's TRAVELTIME mark and Skechers' Commute Time mark, and accordingly finds for Skechers on Easy Spirit's claim under § 1125(a) as well.

## III. Common Law Trademark Infringement Under New York State Law

Trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a) and under New York common law are adjudged using the same standard. See Twentieth Century Fox Film Corp., 220 F.Supp.2d at 297. Again, since the Court finds no likelihood of consumer confusion as to the marks at issue here, the Court thus finds for Skechers on Easy Spirit's common law trademark infringement claim, too.

## Conclusion

For the foregoing reasons, the Clerk is hereby directed to enter final judgment in favor of Defendants on all claims and to close the case.

SO ORDERED.

Dated:    New York, NY

November 16, 2021

_____
JED S. RAKOFF, U.S.D.J.